**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| Plaintiff | ) | CIVIL ACTION NO.:  3:16cv-30184 |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAMS COLLEGE, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT**
**AND PERMANENT INJUNCTIVE RELIEF**

NOW COMES the Plaintiff, John Doe[1], by and through counsel, Stacey Elin Rossi, and

for his Complaint at Law for declaratory judgment, monetary damages, and injunctive relief,

states and alleges as follows:

**NATURE OF THE ACTION**

This is an action for injunctive relief, declaratory judgment, and damages arising from

Defendant Williams College's ("Defendant," "Williams," and "College") wrongful, improper,

and negligent disciplinary actions of Plaintiff resulting from the application of "disciplinary

procedures" that were in violation of the College's rules and policies, hence its contractual

obligations as written and implemented; the requirements of Title IX of the Education

Amendments of 1972 (20 U.S.C. §§ 1681-1688 [commonly known as "Title IX"]) and its

---

[1] Plaintiff refers to himself as "John Doe" and to his accuser as "Susan Smith" throughout the Complaint.

implementation of regulation at 34 C.F.R. 106; Massachusetts Civil Rights Act (M.G.L. C. 12, §§ 11H, 11I); Massachusetts Unfair and Deceptive Practices Act (M.G.L. C. 93A and M.G.L. C. 93 §102); principles of good faith, fair dealing, due process and fundamental fairness; negligence, assault, and defamation. Defendant also violated Plaintiff's right to privacy under the Family Educational Rights and Privacy Act ("FERPA") (20 U.S.C. § 1232g; 34 CFR Part 99) and Massachusetts Privacy Act (M.G.L. C. 214, § 1B).

## PARTIES

1.  Plaintiff John Doe[2] ("John" and "Plaintiff") is and at all times relevant to this Complaint has been a resident of the State of New York. He is not identified to protect his academic and career plans.

2.  Defendant Williams College is a private, non-profit college located in Williamstown, Massachusetts and is among the most elite of national colleges in the United States. U.S. News & World Report has consistently ranked Williams as the Number 1 best liberal arts college in the nation every year since at least 2010. (http://www.usnews.com/info/blogs/press-room/2015/09/09/us-news-announces-the-2016-best-colleges; http://www.usnews.com/info/blogs/press-room/2014/09/09/us-news-announces-the-2015-best-colleges; https://www.washingtonpost.com/apps/g/page/local/us-news-college-ranking-trends-2014/1292/)

3.  At all times material hereto, Williams College acted by and through its agents, servants, employees, and representatives who were acting in the course and scope

---

[2] All personally identifying information has been redacted to protect the privacy of the party herein referred to as John Doe, the complainant.

of their respective agency or employment and/or in the promotion of Williams' business, mission, and/or affairs.

4.    Williams College is a recipient of federal funding and is not allowed to discriminate on the basis of sex or gender under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

5.    At times relevant to this case, Plaintiff was a full time student at Williams.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over Plaintiff's federal claims under Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, et seq.; 28 U.S.C. § 1331, and 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000, exclusive of costs and interest.

7.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

8.    This Court has personal jurisdiction over Defendant because its principal place of business is within the Commonwealth.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendant resides in Berkshire County, Massachusetts and because the events and omissions giving rise to Plaintiff's claims occurred within Massachusetts.

10.   This Court is authorized to issue the Injunctive Relief requested by Plaintiff under Rule 65 of the Federal Rules of Civil Procedure.

11.   This Court is authorized to grant Plaintiff's prayer for relief regarding costs, including reasonable attorney fees, under 42 U.S.C. § 1988.

## FACTUAL ALLEGATIONS

### I. Background and Relationship of the Parties

12.    Established in 1793, Williams is a private, non-profit school granting undergraduate degrees.

13.    John is a first generation Ecuadorian-American admitted to Williams in reliance on full financial aid including Federal Pell Grants, substantial grants from Williams, loans, and work-study employment.

14.    Four years of tuition, costs, and fees at Williams totals approximately $256,000.00.

15.    John was a full-time student at Williams from September 2011 until his scheduled date of graduation in spring 2016.

16.    SARAH BOLTON ("Bolton") was at all times material to this complaint the "Dean of the College" at Williams College and acted both within and outside the course and scope of her authority as Dean of the College.

17.    MARLENE SANDSTROM ("Sandstrom") was at all times material to this complaint the "Dean of the College" at Williams College and acted within the course and scope of her authority as Dean of the College.

18.    SUSAN SMITH ("Smith and "employee Smith") was a student of Williams College until spring 2015 and was an employee of Williams College from the time of her graduation until June 30, 2016. Employee Smith is referred to as such because all claims in this Complaint refer to her actions during her time as an employee of the College and afterwards.

19. From October 2013 to winter 2015, Susan Smith and John were in an exclusive romantic relationship.

20. Susan Smith graduated from Williams in spring 2015. She was employed by the College from summer 2015 until June 30, 2016.

21. In 2010, Bolton was appointed Dean of the College at Williams, a position she held continuously from then until June 30, 2016.

22. On July 1, 2016, Sandstrom was appointed Dean of the College at Williams, replacing Bolton.

23. On information and belief, prior to and including 2016, Sandstrom had no training or experience conducting sexual misconduct investigations or adjudications.

24. The actions taken by Defendant resulted in a deeply flawed investigatory and disciplinary process during which John was denied the most rudimentary elements of fairness due him under contractual equivalents of due process in the private college setting; in violation of Title IX; and in violation of written procedures promised to him by Williams in its Student Handbook.

25. Twenty-two years old at the time of retaliation by employee Smith in May 2016, John was less than one month away from graduation scheduled for June 5, 2016.

26. John completed all the coursework, credits, and requirements for earning a bachelor degree and attended graduation on June 5, 2016. His final cumulative GPA was 3.12.

27. Defendant inflicted unfair, biased, and harmful actions and omissions upon John. Defendant chose a course of action that foreseeably led to the withholding of his degree at graduation; threatened permanent denial of his degree; and consequent catastrophic harm to his academic and career prospects, earning potential, and reputation. John is threatened with substantial, imminent, and irreparable harm from Defendant's actions.

28. By this action, John seeks to right these grievous wrongs, salvage his reputation, and restore his emotional and psychological well-being.

## II.   Relevant Legislative History

29. The United States Department of Education promulgated 34 C.F.R. 106.31 under the authority of Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682 [45 FR 30955, May 9, 1980, as amended at 47 FR 32527, July 28, 1982; 65 FR 68056, Nov. 13, 2000]

30. 34 C.F.R. 106.31, Discrimination on the Basis of Sex in Education Programs or Activities Prohibited, states,

(a) *General.* Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance…

(b) *Specific prohibitions.* Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such aid, benefit, or service;

(4) Subject any person to separate or different rules of behavior, sanctions, or other treatment;

(5) Apply any rule concerning the domicile or residence of a student or applicant, including eligibility for in-state fees and tuition;

(6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

31.   In January 2001, the United States Department of Education, Office for Civil Rights ("OCR"), published a set of compliance standards for Title IX educational institutions to apply in sexual harassment matters, including standards for "Prompt and Equitable Grievance Procedures" and "Due Process Rights of the Accused." Notice of publication at 66 Fed. Reg. 5512, January 19, 2001. ("OCR Standards") Exhibit P-1.

32.   The OCR Standards require schools not only to "ensure the Title IX rights of the complainant," but also to "accord due process to both parties involved."  The OCR Standards require schools to adopt "prompt and equitable" procedures that "accord due process to both parties involved" including, at a minimum:

a.   Notice . . . of the procedure, including where complaints may be filed;

b.  Application of the procedure to complaints alleging [sexual] harassment carried out by employees, other students, or third parties;

c.  **Adequate, reliable, and impartial investigation of complaints,** including the opportunity to present witnesses and other evidence; (emphasis added)

d.  Designated and reasonably prompt timeframes for the major stages of the complaint process;

e.  Notice to the parties of the outcome of the complaint; and

f.   An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate. *Id.* at 20.

33.  The OCR Standards require Title IX schools to ensure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 21.

34.  On April 11, 2011, OCR issued a letter to all educational institutions receiving federal funds (commonly known as the "Dear Colleague Letter") stating that under Title IX, "A school's investigation and hearing processes cannot be equitable unless they are impartial." Exhibit P-2 at 12. The Dear Colleague Letter also emphasizes that the procedures must be fair and prompt, citing the OCR Standards. *Id.* at 9.

35.  The Dear Colleague Letter instructs schools to judge allegations of sexual harassment by a "preponderance of the evidence" standard instead of a higher standard, such as "clear and convincing evidence." *Id.* at 11.

### III. Bias in Application of the College's Policies and Procedures; Grossly Improper Procedure, and Description of Events

36.  John and Susan Smith had a romantic, sexually intimate, and exclusive relationship from the fall 2013 to the winter 2015.

37. Susan Smith graduated from Williams in spring 2015. She was employed by the College from summer 2015 until June 30, 2016.

38. On the night of December 5, 2015, John attended a party on the Williams campus. While dancing with another woman, employee Smith confronted him for dancing with someone other than herself as she wanted to dance with him.  When John walked away, Smith followed John. The time was sometime between 11:30 pm of December 5, 2015 to midnight of December 6, 2015. Smith followed John all the way to his dormitory. John pointed out Smith's wrongdoing, that she had violated the terms of her employment by attending a student party, as Smith held the position of Alumni Coordinator at Williams. Smith slapped John. She also grabbed and took away his phone. John retreated to his room. Smith escalated the situation even further afterwards by telephoning John's sister, Lady Doe.[3]

39. At 12:14 a.m. December 6, 2015, Smith telephoned Lady Doe, admitting that she had smacked John. During the phone call, Smith kept repeating "he's gonna report me for assault and I'm gonna lose my job!! They're gonna fire me!!" Smith kept repeating to Lady Doe, "my life is over" and that she wants to kill herself. Exhibit P-3.

40. At 2:27 a.m. December 6, 2105, one hour after the phone call with Lady Doe ended, Smith emailed Bolton claiming that she (Smith) had written essays for John in violation of the College's Honor Code. Exhibit P-4.

41. At the time of the December 6, 2015 email until the spring 2016, Williams' policy for reporting Honor Code violations stated, "For Faculty and TA's -- If you have any reason to suspect one of your students has violated the honor code on any

---

[3] Surname has been redacted to "Doe" to protect the identity of John Doe.

assignment, you must contact the Faculty Chair of the Honor Committee." The procedures further stated, "Chairs decide that there is sufficient evidence to proceed."

42. As an employee of Williams, Smith fell closest to the category of "faculty and TAs" as opposed to "students" who are to report to the Student Chair of the Honor Committee.

43. As the Dean of the College was not the appropriate official to field reports of Honor Code violations, Bolton should have directed Smith to provide the information to the Faculty Chair or Student Chair of the Honor Committee as it is their purview to take complaints and to decide whether there is sufficient evidence to proceed. Instead, Bolton allowed her impartiality to be compromised, demonstrating an unfair bias against John.

44. Furthermore, Smith was, in effect, reporting an improper relationship she was having with a student in violation of the Williams College Employee Handbook which states, in relevant part, "All faculty and many staff are potentially in a position of power with regard to students; hence, sexual relationships between employees and students are in almost all cases inappropriate." Bolton ignored this fact as evidenced by the absence of action to discipline Smith.

45. In February 2016, John took the LSAT in anticipation of applying to law school.

46. On February 10, 2016, Bolton texted private educational information regarding John to Smith and, by doing so, violated John's right to privacy under FERPA and under state law.

47. FERPA is a Federal law administered by the Family Policy Compliance Office in the U.S. Department of Education. FERPA applies to all educational agencies and institutions (e.g., schools) that receive funding under any program administered by the Department.

48. Under FERPA, a school may not disclose personally identifiable information from an eligible student's education records to a third party unless the eligible student has provided written consent. One of the exceptions to the prior written consent requirement in FERPA allows "school officials," including teachers, within a school to obtain access to personally identifiable information contained in education records provided the school has determined that they have "legitimate educational interest" in the information.

49. As Alumni Coordinator, Smith was not a school official with a legitimate educational interest in an Honor Code disciplinary proceeding against John. Even as an "accuser," she had no interest in the outcome. Only complainants in sexual misconduct cases have a right to such information as provided in the College procedures and as required by Title IX.

50. On February 23, 2016, the College's Honor Committee held a hearing at which John was charged with violating the Honor Code based on Smith's claims. Smith alleged that she wrote various sections of three papers of John's for three classes.

51. John was found not responsible for the allegations pertinent to Spanish 308 and 403, taught by Professor Michael Martinez-Raguso and Professor Jennifer French, but was found responsible [temporarily as the finding was to be reversed upon appeal] for the allegation regarding Spanish 201.

52. On the basis of information presented by Bolton behind closed doors and without affording John the opportunity to respond, the Committee said that it had no choice but to recommend expulsion as John's sanction. It is a reasonable inference that the students and faculty on the Committee were unlikely to contradict the Dean of the College because she holds a position of power over them. Without Bolton's influence on the committee, the outcome would have been very different.

53. John was cleared of the accusation that he had plagiarized two of the three papers questioned at the 2016 hearing and the third one (Spanish 201) was not even presented for examination. Furthermore, the professor for the Spanish 201 class, Soledad Fox, was also not present and the Committee based its finding solely on the allegation of a spurned ex-girlfriend employed by the College.

54. The Honor Hearing Procedures state, "All notes and documentary evidence must be left in the room and will be shredded after the hearing, save original copies of evidence to be retained by the Dean's office." Exhibit P-5. No record of the hearing is mentioned in the procedures. However, Bolton retained a detailed recorded of the hearing for Defendant's sole use.

55. The fact that students are not afforded the same opportunity is fundamentally unfair as this asymmetry greatly favors the College if the student decides to pursue legal action in a court of law.

56. The procedures also state that the hearing is held in strictest confidence: nothing that transpires may be described or discussed outside the hearing. *Id.*

57. On February 23, 2016, Bolton telephoned Smith, telling her that John would be expelled and that the expulsion was absolutely guaranteed. Bolton instructed Smith

not to tell John about this conversation. John was in the same room while this phone

conversation took place and Smith revealed to John what Bolton said.

58.    On or around March 3, 2016, on information and belief, Bolton again

communicated private educational information regarding John to Smith, informing

her that there was virtually no chance that John would prevail if he was to appeal

the disciplinary decision. Such statements further evidence Bolton's bias against

John.

59.    The said communications violate both FERPA and Williams' [Committee's] Honor

Hearing Procedures that state, in relevant part, "the hearing is held in strictest

confidence: nothing that transpires may be described or discussed outside the

hearing." *Id.*

60.    On or around March 4, 2016, Smith relayed what Bolton had said about John to

John. John communicated to Smith that he did not wish to hear from Smith. That

was his final communication to Smith.

61.    The aforementioned actions and statements demonstrate Bolton's continuous bias

against John and predetermination of the case's outcome.

62.    Also on March 4, 2016, Bolton provided John a letter dated March 2, 2016,

informing him that the committee had found him responsible for violating the

Honor Code regarding the paper for the Spanish 201 class.

63.    On March 8, 2016, Dean Johnson admitted to John and John's sister, Lady Doe,

that the disciplinary process is "unfair to students" and that the procedures are

deliberately written in a way that allows Williams to maneuver itself in its favor.

Johnson also stated that Smith should not have been aware of the outcome of the hearing or the likelihood of an appeal.

64. In fact, the College's "Student Handbook" consists of the williams.edu website as Williams ceased publishing hard copy handbooks in 2013. The code of conduct, honor hearing procedures, violation reporting procedures, appeal procedures, etc. are ever-changing and continually edited with no notice to the students. The students have no way of knowing what the policies and procedures were at a past time unless they had downloaded the information themselves. A relevant example exists at http://sites.williams.edu/honor-system/suspected-violations/. Sometime at the end of March 2016, Plaintiff's attorney cited the procedure when preparing this Complaint copying the standard for staff-reported infractions (see above). Since transcribing that information, changed sometime in April or May 2016, the procedure now states, "It is up to the Faculty Chair, in cooperation with the Student Chair and the Dean of the College, to determine whether to proceed with a hearing." Before, it was solely up to the Faculty Chair and Student Chair to determine whether to proceed with a hearing.

65. Also on March 8, 2016, Bolton told John and Lady Doe that John was "not allowed to appeal the sanction," and that he can only appeal the fact finding portion of the hearing. The Honor Committee Appeals Procedures contain no provision barring students from appealing the sanction. Bolton's statement makes little sense in that the very purpose of an appeal would logically be to overturn a sanction. Students reasonably expect to appeal the sanction; otherwise there would be no point to an appeal.

66.   On information and belief, Bolton again communicated private educational information to Smith on March 8, 2016. Presumably, Bolton telephoned or texted employee Smith and spoke to her about the meeting she had with John.

67.   Between March 8, 2016 and March 12, 2016, employee Smith telephoned John forty-eight (48) times, left two voicemails, and texted nine times.

68.   On March 13, 2016, John's attorney emailed employee Smith a cease and desist letter, bcc'ing it to Bolton. By this action, John, through his attorney, reported a complaint for assault and harassment against employee Smith with Williams authorities as the letter referenced the assault of December 6, 2015 and subsequent harassment. Exhibit P-6.

69.   On March 14, 2016, John and his attorney met with Bolton and College Counsel. John, through his attorney, expressed deep concern that Williams was protecting an employee who had assaulted and harassed him, a student. Further, John put the College on notice of employee Smith's abuse of and abuse of power against one of its students who had spurned her advances.

70.   Title IX requires that in cases involving potential criminal conduct, school personnel must determine, consistent with State and local law, whether appropriate law enforcement or other authorities should be notified. (Dear Colleague Letter)

71.   Bolton appeared completely unconcerned about the harassment of and the assault upon John, a student, by one of the College staff. No report to legal authorities was made and no action was taken by Human Resources. Bolton, on information and belief, did not even consider reporting the assault to police.

72. On March 16, 2016, John requested an appeal hearing based on new evidence and improper procedures.

73. On April 7, 2016, the Student Chair of the Honor Committee granted the appeal hearing.

74. Also on April 7, 2016, in an in-person meeting between Bolton and John, Bolton informed John that the College was putting a mutual no-contact order in place between employee Smith and John at Smith's request. John had not contacted Smith in any way since March 4, 2016, as described above, nor was he ever the harassing or assaultive party in the relationship with Smith. The no-contact order was Smith's response to John's attorney's cease and desist letter.

75. On information and belief, Bolton had informed employee Smith that John's appeal hearing had been granted and it was on this basis and upon Bolton's recommendation that employee Smith request that the College put in place a no-contact order.

76. John received no equivalent advice. In fact, it was employee Smith who had always been the assaultive harasser in the relationship, as it would later become known.

77. Bolton's decision-making, disciplinary decisions, and disparate treatment towards John were replete with bias.

78. As a consequence of the no-contact order, Bolton requested that John not participate in a College dance team performance scheduled for that upcoming weekend so as to accommodate Smith who was coordinating the event. Despite the fact that Smith was the sole aggressor, it was John who faced [even further] punishment and again was denied educational opportunity based on his gender.

79. On April 13, 2016, John's attorney made a formal Title IX complaint on John's behalf to Williams' Title IX Coordinator, Toya Camacho, against Defendant, Bolton, and employee Smith for the dating violence, i.e. assault and harassment, Smith committed against Plaintiff plus the deliberate indifference towards this as demonstrated by Defendant and Bolton. Exhibit P-7.

80. As described above, on March 13 and March 14, 2016, Bolton had earlier been given notice of the dating violence and harassment of John by employee Smith as Bolton had been bcc'ed the letter from John's attorney to Smith. Between then and April 13, 2016, the only institutional response was to discriminate against John in the no-contact order implementation, i.e. the incidents were not investigated as required under Title IX.

81. Title IX requires schools to minimize the burden on the complainant, John, when taking steps to separate the complainant and the perpetrator. In penalizing John with the no-contact order, i.e. denying him participation in the dance contest, Defendant failed to follow this mandate. Exhibit P-1, *supra* at 15.

82. On April 21, 2016, Bolton sent John the following email:

I'm writing as we have become aware of your concern regarding the actions of Susan Smith. *[referring to the April 13, 2016 Title IX complaint from Plaintiff's attorney to Ms. Camacho. notation added.]* You have stated that she has both assaulted you and committed actions that may meet the College's definition of stalking, which is forbidden under our sexual misconduct policy.  I would like to talk with you to go over the College's processes for investigation and adjudication of such matters and to explain what your options are in terms of participating in this process.

You can see the details of the process here.  Because this matter involves a student and a staff member, it would be over seen by our Title IX coordinator, Toya Camacho, in collaboration with me (the Title IX deputy for students) and Martha Tetrault (director of Human Resources and Title IX deputy for staff.)

Please let me know if you wish to meet about this matter. You could also meet with Ms. Camacho, if you prefer. You are not required to participate in this process, however the college may need to proceed with an investigation based on its responsibilities under Title IX, so we would like to meet with you to explain the process and your options so that you have a chance to understand what is happening and to participate if you wish to do so.

83. Bolton's email confirms that she, as a "responsible party" charged with the authority to address the misconduct and harassment of employee Smith under College policy and Title IX requirements, had not investigated or even considered the notice of assault and harassment given to her on March 13 and 14, 2016 as worthy of an investigation under Title IX.

84. Furthermore, Bolton's email ignores the complaint in the April 13, 2016 letter that the College has discriminated against John by depriving him of an educational opportunity when taking steps to separate the complainant [John] and the perpetrator [employee Smith]. Bolton's email begs the question why Williams persists in allowing such a partial school official, expressly named in the Title IX complaint to the Title IX Coordinator as failing to adequately address John's concerns about the dating violence and harassment, to take the lead with John's Title IX complaint.

85. On April 26, 2016, the Honor Committee appeal hearing for Spanish 201 was held without Bolton present as the Student and Faculty Chairs honored John's request for her recusal. John presented a statement that Smith had fabricated her story and presented evidence corroborating his allegation. He also described the events of the night of December 5, 2015, in part and not in strict order:

Smith was, in his opinion, was very inebriated. Upon seeing John, Smith approached him and asked that he dance with her. He was hesitant to do so, since he knew she was not allowed to be at the event, given that she is an

employee of the College. This caused Smith to become extremely angry; she initiated an extensive argument. In an attempt to diffuse the situation, John left the event and headed to his dormitory. Smith followed him, demanding that he confront her. Noting that he was not giving in to her demands, she physically hit him with her hand and took away his phone. Smith left him alone only after he mentioned he would go to Campus Safety and Security to explain her outrageous behavior.

John also asked Professor Fox questions eliciting answers that would support a "not responsible" finding. He challenged the weakness of the entire case.

86. Lady Doe, Plaintiff's sister, also presented a statement at the said hearing, presenting additional evidence as to employee Smith's behavior and state of mind on the night of December 5/6, 2016 when Smith made the allegation against John. Exhibit 3, *supra*.

87. On April 27, 2016, the Honor Committee reconvened to deliberate the case. The Committee found John "not responsible" of violating the Honor Code. Therefore, the grounds for Bolton's original sanction of expulsion were nullified by the Committee's finding. Rachel Bukanc, Dean's Office/Acting Recording Secretary for the appeal hearing, informed John that she would email him the outcome "in a few days."

88. Also on April 27, 2016, Bolton, who had recused herself from the appeal hearing process, wrote an email to employee Smith that not only informed Smith that Plaintiff had again been cleared of the plagiarism violation but consoled Smith about the outcome of the hearing. Furthermore, Bolton wrote, "For now, the most important things are to continue to get support, and to ensure that you are safe" as if it wasn't employee Smith who had assaulted and harassed John.

19

89.   Also on April 27, 2016, John sent an email to Bolton in response to her April 21, 2016 email. He stated, "Since the complaint includes allegations against you and because you are not an impartial party as Dean of the College, I feel it is inappropriate for you to be part of this investigation. I thereby request that the complaint be handled by Ms. Camacho, as it was her to whom the complaint was directed."

90.   In response, Bolton emailed John, "My email was actually in reference to the actions of Susan Smith referred to in the 'cease and desist' letter which your attorney copied me on earlier when she sent it to Susan, not to any complaint that you may have filed with Ms. Camacho.  Because this cease and desist letter made the college aware of alleged actions by Susan which may be violations of the code of conduct, the college may need to investigate her actions. This is separate matter from any complaint against me or against the college you may have filed. However, I am happy to have Ms. Camacho handle this matter as well and to recuse myself…"

91.   To the extent that Bolton again claims that these are separate proceedings for separate offenses, she seeks cover under her own shortcomings in the first place. Williams does not title its investigations and adjudications of sexual misconduct as a "Title IX" process. Separate proceedings are not called for in the College's policies and procedures.

92.   On May 3, 2016, Ms. Camacho met with John to discuss the Title IX complaint that had already been officially filed on his behalf by his attorney April 13, 2016 with notice already having been given one month earlier. Ms. Camacho's first question

was whether John wanted to file the Title IX complaint officially. She then asked why John wanted to file it at this particular moment. John told her that it isn't that he wanted to file it just now, but he had reported the complaint about a month ago and that the college disregarded the compliant until recently.

93. On information and belief, at a time between April 27, 2016 and May 4, 2016, employee Smith decided that she would be finally able to accomplish an expulsion of John, with the encouragement of Bolton, by lodging a counter complaint against John. Personally named in John's attorney's April 13, 2016 Title IX complaint letter as discriminating against John, Bolton was motivated by malice and anti-male bias.

94. On May 10, 2016, less than one month from graduation and just at the beginning of John's final final exams, Ms. Camacho met with John to explain to him that in response to John's Title IX complaint against her, a complaint that could result in termination of her employment, employee Smith had filed a counter complaint against him claiming that he had "displayed abusive behavior towards her during the past two years." When John asked how this act cannot be seen as an act of retaliation, Ms. Camacho could not provide an answer. Exhibit P-8.

95. Attached to Ms. Camacho's letter were the procedures and written timeframes for the investigation and adjudication. The timeline provides for an eleven (11) week process from start to finish, with "finish" being the hearing. If Defendant had commenced the investigation of employee Smith when John first reported the assault and harassment, March 14, 2016, and not allowed employee Smith to counter complain, John would not have been subjected to this investigation and

adjudication. He would have earned his degree at graduation on June 5, 2016.

Exhibit P-9.

96.   Defendant did not commence the investigation until May 10, 2016. Therefore, the

hearing should have been held no later than July 26, 2016. At the time of the filing

of this complaint, approximately thirty (30) weeks, has passed [much greater than

twice the time] since the investigation began.

97.   Defendant has not adhered to the written timeframes nor has it followed the written

procedures. Defendant also has violated Title IX's requirement for a prompt

process.

98.   In fact, John has been ongoing disciplinary action since February 2016 when

Defendant faced the plagiarism charges. As a result, his status with the College has

been precarious and his degree in limbo for nearly ten months at the time of the

filing of this complaint.

99.   It is important to note that Smith was highly aware of the academic disciplinary

case's outcome and knew fully well that there could be no better way to take

revenge on John and achieve her goal of having him expelled than by accusing him

of abuse as loosely and vaguely as it is defined in the College's Code of Conduct.

Smith had not been in a relationship with John since winter 2015, had engaged in

numerous conversations with Bolton about John over the past year, but only just

then lodged such a complaint. That she did so within moments of learning that the

College was finally going to investigate her not only does not pass the smell test,

but it reeks of retaliation.

100. Employee Smith's baseless complaint, in clear response to John's complaint constitutes blatant retaliation. Incredibly, Defendant facilitated the retaliation.

101. Just as Defendant did not properly investigate or take seriously John's report on March 13, 2016, only to have the Title IX Coordinator ask John nearly two months later if he wished to "formally file" a complaint, disregarding the retaliatory nature of Smith's counter complaint, Defendant again violated the terms of the College's contract by failing to follow this rule prohibiting retaliation.

102. The actions and omissions by Defendant were rife with improper procedures, bad faith, bias, and unfairness to John partially based on his gender.

103. Furthermore, under Title IX and the College's Code of Conduct, employees are not entitled to lodge complaints against students. Employees' rights fall under employment discrimination in the context of employee complaints against employees. Therefore, employee Smith was not and entitled to and should not have been allowed to lodge a complaint against John.

104. Defendant subjected John to a charade of an investigatory process when the role of abuser was actually the College employee.

105. On May 20, 2016, the interviews for the investigation of John and employee Smith commenced. The College hired attorney Allyson Kurker to conduct the investigation and to provide an investigative report. John was not allowed any input into the selection of the investigator. College policy provides for the Dean to direct the investigator as to what evidence to include.

106. Such a policy blatantly violates Title IX requirements for fair and impartial procedures.

107.    Also on May 20, 2016, John wrote to Ms. Camacho an email regarding questions he

asked the college's external investigator at his first interview on May 20, 2016. The

email stated:

> At today's interview with Allyson Kurker, I asked the following questions:
>
> 1. Is this is a Title IX investigation? (to which Ms. Kurker answered, "Yes.")
>
> 2. Are you aware that Title IX does not protect employees? (to which Ms.
> Kurker said that Title IX applies to all schools that accepts federal funding, an
> answer that did not make sense)
>
> 3. Why are you investigating Susan 's Title IX complaint against me? (to which
> Ms. Kurker said that I would have to direct these questions to you)
>
> I am sending this email to ask the above questions. Thank you in advance.
>
> Exhibit P-10.

108.    On May 23, 2016, Ms. Camacho responded to John's May 20 email by stating,

"Title IX protects employees as well as students. Ms. Kurker is investigating both

your complaint against Susan and Susan 's complaint against you. The college's

policies prohibit harassment by students and by employees." *Id.*

109.    On May 24, 2016, John emailed Ms. Camacho, in relevant part, "When we met a

couple of weeks ago, I asked why the college did not see Susan's complaint as an

act of retaliation. I remember your answer not being at all clear. Could you please

explain to me why what seems a blatant retaliatory act is being facilitated by the

college?" *Id.*

110.    On May 26, 2016, Ms. Camacho replied, in relevant part, "Susan [employee Smith]

is allowed to file a complaint and the investigation/adjudication process will

determine whether it is a legitimate complaint." *Id.*

111. Title IX does not protect employees against students. Ms. Camacho's response that "Title IX protects employees as well as students" constitutes incorrect information. *Id.* Never in the history of Title IX has the Department of Education (DOE) or any court of law ever considered school employees to be protected by Title IX. Only students are referred to as protected by the statute in all the DOE and OCR regulatory guidance. In fact, in every DOE and OCR documentation on Title IX, "Title IX is intended to protect students from sex discrimination" appears. Exhibit P-1, *supra* at 22.

112. Guidance documents also state, "school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities **filed by students** against school employees, other students, or third parties." (emphasis added) *Id*. at 19.

113. Furthermore, without "a policy or procedure specifically addressing sexual harassment, students are unaware of what kind of conduct constitutes sexual harassment or that such conduct is prohibited sex discrimination, a school's general policy and procedures relating to sex discrimination complaints will not be considered effective." *Id*. at 19-20.

114. OCR regulations, therefore, disallow the removal of a sexual misconduct case by school administrators from the governing sexual misconduct policy and procedures; otherwise, as stated above, students would be rendered unaware of what kind of conduct constitutes sexual harassment or that such conduct is prohibited.

115. The only context in which a Title IX complaint by an employee may be contemplated is when there is a complaint of employment discrimination filed

against recipients of federal financial assistance, i.e. the educational institution.
Therefore, employee Smith could complain against Williams College, but not
against John.

116. The DOE's OCR Standards guidance document (Titled *Revised Sexual Harassment
Guidance: Harassment of Students by School Employees, Other Students, or Third
Parties*) states that sexual harassment of employees may be prohibited by Title IX.
20 U.S.C. 1681 et seq.; 34 CFR part 106, subpart E. However, if employees file
Title IX sexual harassment complaints with OCR, the complaints are processed
pursuant to the Procedures for Complaints of Employment Discrimination Filed
Against Recipients of Federal Financial Assistance (28 CFR 42.604). *Id*. at 24. The
purpose of the regulation is to implement procedures for processing and resolving
complaints of employment discrimination filed against recipients of Federal
financial assistance. 28 CFR 42.601.

117. Defendant not only seeks to re-write the law regarding Title IX, but to turn it on its
head.

118. Defendant persisted in this retaliatory action, harassing, browbeating, and bullying
John, abusing the imbalance of power and authority and causing him grave harm.
The actions of Defendant and employee Smith have caused and continue to cause
John incredible distress and emotional harm.

119. On June 5, 2016, John attended graduation and "walked with his class" but was not
handed his degree. John had completed all the coursework and credit requirements
for earning a bachelor degree

120. On June 8, 2016, John asked Ms. Camacho if he could receive transcripts of all the interviews from the investigation.

121. On June 10, 2016, Ms. Camacho responded that, "Yes, you can request the transcripts of student records under FERPA. The request should be made to Dean Bolton. We do have to alert everyone whose records would be released if we do release the records."

122. On June 14, 2016, per Ms. Camacho's instruction, John requested Bolton provide transcripts of all the interviews from the investigation.

123. On June 15, 2016, Bolton promised John that she would request these from Ms. Kurker.

124. On August, 22, 2016, John emailed Ms. Camacho asking about the transcripts as he had not received any yet.

125. On August 24, 2016, Sandstrom emailed John a transcript of two of three of his interviews and no other.

126. On September 1, 2016, Sandstrom denied John's request, now claiming that the parties in sexual misconduct cases are not entitled to transcripts or tapes of the investigator's interviews with others.

127. John's attorney responded by forwarding College Counsel the earlier emails from Bolton and Ms. Camacho promising him all the transcripts and describing them as "student records" to which he was entitled under FERPA.

128. College Counsel replied, "As John has been informed, the college procedures do not provide for giving interview transcripts to the parties to a sexual misconduct disciplinary proceeding.  The interview transcripts are not routinely provided to the

college, and therefore they are nor provided to the adjudication panel and are not part of the record on which the panel makes its decision…And, as you know, under FERPA John has a right to inspect, but not to receive copies of, his educational records.   If John wishes to make a formal FERPA request to review his educational records the college will of course respond appropriately, but in the meantime the adjudication process will proceed in accordance with the college's usual procedures."

129. On September 13, 2016, John received the investigative report. Exhibit P-11.

130. References to the substantive issues in the report are those that do not contain hearsay. *Id.*

131. The report explained that John was investigated for allegations that he violated the 2015-2016 Relationship Abuse policy, 2013-2014 Student Code of Conduct provision regarding non-consensual sex, and 2014-2015 Dating and Domestic Violence policy. The investigative report laid out the purportedly applicable policies proposed by the College, except for the 2013-2014 Student Code of Conduct which was entirely missing from the report.

132. During the investigation and report production, Defendant had the opportunity to confer with the investigator throughout the investigation and had the opportunity to clarify applicable policies.

133. The September 13, 2016 report contained an exhibit that demonstrates Defendant's disparate treatment towards females, Smith in particular, compared to males, John in particular. Exhibit P-12.

134. In said exhibit, Bolton responded to an email from Smith describing trivial difficulty she was having in her relationship with John. Bolton categorized what Smith had written as "scary and upsetting" and said that "People who love you shouldn't treat you in ways like that." Bolton and Dean Reyes' overreacted to Smith, allowing her to take a week off from school. *Id*.

135. A comparison of the Deans' responses to Smith's email to Defendant's lack of response to John's complaint of assault shows a stark contrast between how females, e.g. Smith, and males, e.g. John, are systematically treated.

136. On September 24, 2016, John submitted his response to the September 13, 2016 report. Exhibit P-13.

137. John's September 24, 2016 response attacked the report for being biased against John as incorrect policies were applied, critical policies were not included as was John's Title IX complaint letter, statements from a partial Dean were included, and the term "testify" was used to describe Smith's statements. *Id.*

138. Also on September 24, 2016, employee Smith submitted her response to the report.

139. The written report serves as notice to the student of the applicable policy violations. The written response serves as the student's opportunity to respond to the allegations. The student's opportunity to be heard occurs when the Hearing Panel convenes to deliberate the written report and written response. The student is not present at the hearing.

140. John's September 24, 2016 response attacked all the allegations made by the employee Smith as insufficiently meeting the criteria of the corresponding College

policies as presented in the report. The response also clarified the inapplicability of the Relationship Abuse policy during the times that fell before the College adopted said policy. *Id*.

141. Further, John's September 24, 2016 response provided more than sufficient counter arguments regarding how, even if the stated policies did apply, nothing described by employee Smith amounted to policy violation.

142. Employee Smith openly admitted to assaulting John at approximately midnight on December 5 or December 6, 2015. This fact is not in dispute although the time at which the incident occurred is uncertain.

143. Employee Smith also invaded John's right to privacy by logging in to his Facebook and Snapchat accounts. John presented evidence supporting these claims in his responses.

144. That the proceedings were meant to remain confidential was conveyed to John and, on information and belief, to Smith but employee Smith has persisted in speaking to other students and former students about the case.

145. Upon reviewing John's comprehensive response, on information and belief, Sandstrom feared that there was a likelihood that the Hearing Panel would determine that there was insufficient evidence to find John "responsible" for policy violations based on the report as written.

146. On September 28, 2016, four days after the response to the investigator's report period had expired, September 24, 2016, and with John's response already submitted, Sandstrom wrote the following to John:

> I also want to clarify how our code of conduct and sexual misconduct policy apply to this case, which includes allegations that span over several years.

(1) The investigative report carefully lays out the relevant college policies that were in effect in 2013-2014, 2014-2015, and currently (see pages 4-8). While there were some shifts in specific language over time, there was always a code of conduct which prohibited sexual misconduct of any kind.

(2) Some of the complaints at issue here involve relationship abuse. Specific wording about relationship abuse was added to the college code of conduct in October of 2015. It is important to note, however, that the fact that the code of conduct did not include an explicit "relationship abuse" provision prior to 2015 does not mean that the existing code of conduct could not be applied to the types of misbehavior that have been alleged. Our code of conduct has always contained general guidelines that are intended to permit the college to address problematic behavior even if it isn't explicitly identified in the code. Students are told that "they must respect the rights of others in the community," that sexual harassment is not permitted, that they will be held responsible "if they fail to maintain good conduct on the campus or elsewhere." In addition, the code states that "the College does not attempt to describe every act that constitutes a violation of the code of conduct, but rather the College reserves the right to make determinations on a case by case basis...."

147. The report did not include the policy that was in effect in 2013-2014 at all. Therefore, Sandstrom's statement was not an accurate representation. The "shifts in specific language" of which Sandstrom wrote actually were monumental changes to the College policies, as described in detail in John's response and annotated investigative report.

148. The "relevant" policies Dean Sandstrom referenced in the paragraph identified as number 1 in her September 28, 2016 email are those policies that John allegedly violated and for which John was given notice in the report dated September 13, 2016. It was those policies for which John was given an opportunity to respond.

149. Sandstrom wants to have it both ways. In the former paragraph, she states that the policies identified for those time frames during which particular events occurred are those that apply and are those outlined in the report. However, she now asserts in

the latter paragraph that John is being adjudicated for behavior that violates "general guidelines" that aren't "explicitly identified in the code." She further cites that "students are told that 'they must respect the rights of others in the community,' that sexual harassment is not permitted, that they will be held responsible 'if they fail to maintain good conduct on the campus or elsewhere.'"

150. Sandstrom's references to vague general guidelines without reference to particular correlated alleged violations (the specific incidents laid out and investigated) by John do not adhere to the College's written process that affords the student notice and opportunity to respond nor to the requirements of Title IX for fair and impartial hearings, state contract law principles of good faith and fair dealing, or fundamental fairness "due process" in private college disciplinary action.

151. The College's written procedures for both sexual misconduct and issues other than sexual conduct call for notice of the alleged policy violation and the opportunity to respond:

> A student charged with such a breach will be informed by a dean of the alleged violation. Any student who is charged with an offense shall have a reasonable opportunity to make his or her defense in a respectful manner...Student Handbook, and

> Sexual Misconduct policy governing investigative report and response. Exhibit P-9, *supra*.

152. In the latter paragraph by Sandstrom, John was notified that he was now being adjudicated for the offense of violating general guidelines such as "'they must respect the rights of others in the community,' that sexual harassment is not permitted, that they will be held responsible 'if they fail to maintain good conduct on the campus or elsewhere'" after the opportunity to respond had passed.

153.  Sandstrom's insertion of new charges, after the response period had closed, left John without an opportunity to defend himself against these overbroad and vague "catch alls." Furthermore, Sandstrom employed the "the College reserves the right to make determinations on a case by case basis" escape provision as if the Code of Conduct is a trifling document without the weight of a contract.

154.  Also on September 28, 2016, Sandstrom explained to John, because he and employee Smith had included new information in their responses that were not included in the original report, they would each be given the opportunity to review each other's responses and to provide a second written response to those materials within 10 days.

155.  This second response was limited to 1) only new material presented in the response and 2) no new information that was not already part of the materials.

156.  On October 3, 2016, John discovered from Ms. Kurker that Sandstrom was planning on having her, the investigator, produce a "revised report."

157.  The College disciplinary process does not call for any report except for the original report.

158.  The College never provided John a copy of the revised report.

159.  The process must adhere to the College's own policies which call for prompt, fair, and impartial procedures, e.g. not directed by the Dean to achieve her desired outcome, policy violations not changed midway and after the opportunity to respond, and meet the reasonable expectations of the student.

160.  On October 7, 2016, John submitted his response to employee Smith's response, his "second response."

161.  Employee Smith had been provided an opportunity to submit a second response. Sandstrom did not provide John a copy of Smith's second response; therefore, John was not given notice of the allegations and statements made in that document.

162.  On October 21, 2016, the Hearing Panel convened. The Panel consisted of Ninah Pretto from the Dean's Office; Steve Klass, Vice President for Campus Life; and Aaron Gordon, Administrative Director of Divisional Affairs and Vice President for Campus Life.

163.  The Hearing Panel was provided the revised investigative report, John's original and second responses, and employee Smith's original and second responses.

164.  On November 22, 2016, John received a determination letter from the Hearing Panel finding him responsible for violating the Code of Conduct by engaging in non-consensual sex.

165.  The Hearing Panel completely ignored the fact that the Code of Conduct at the time of September 2014 stated that "both parties have the obligation to communicate consent or the lack of consent." Exhibit P-13 at 5, 10, 11, 29, 30. The Hearing Panel also ignored the fact that the Code of Conduct did not have a policy of "affirmative consent" at the time but used it in its decision making.

166.  The Hearing Panel's letter stated, in relevant part, "Susan [Smith] also indicated that you engaged in non-consensual sexual intercourse with her in September of 2014. Based on the preponderance of the evidence we find it more likely than not that you did *not* have affirmative consent to have sexual intercourse with Susan during the incident in question. Susan indicated that the unusual sexual position and roughness were indicators that you did not have consent. In additional [sic.], several

witnesses recalled that Susan had described this incident of nonconsensual sex to them. Taken together, the Hearing Panel found this evidence to be credible, and therefore find you responsible for violation of the code of conduct in regard to sexual misconduct."

167. However, Smith never made any statement to anyone that the sex was rough at all. The Hearing Panel simply made that up.

168. Essentially, the Hearing Panel based their determination solely on an unusual position. To equate an unusual position with non-consensual sex, i.e. rape, confounds the mind.

169. As aforementioned, the Hearing Panel wrote that an unusual position taken together with several "witnesses" recalling that Susan described this incident was evidence "found to be credible, and therefore [found John] responsible for violation of the code of conduct in regard to sexual misconduct." The College's procedural standard for determining responsibility is preponderance of the evidence, not mere credibility.

170. The only so-called "evidence" that exists is the allegation by Smith that she started to believe she was raped, as that is what non-consensual sex is, many months after engaged in sex with John in an unusual position. Smith recalled this version of events to friends, with increasingly degrees of severity and embellishment, during a period at which the relationship had begun to deteriorate.

171. The Hearing Panel did not address the fact that Smith and John had been in a sexually active relationship for a year before the alleged incident and continued that relationship for over one year following said incident.

172. The Hearing Panel did not address the fact that Andrea Estrada, the first person Smith allegedly told of the incident approximately one month later, informed Ms. Kurker that she did not recall Smith confiding in her about any episode of sexual contact with John that Smith described as either non-consensual or upsetting.

173. The Hearing Panel did not address the fact that other so-called "witnesses" were friends of Smith to whom Smith spoke in the late spring to summer 2016 after the Title IX complaints were lodged and counter lodged. In fact, there were no actual witnesses and no extrinsic evidence whatsoever. There were only the several friends who repeated what they recalled Smith had told them much later.

174. Most importantly, the Hearing Panel ignored the fact that Smith told Ms. Kurker that she did not express to John that she did not want to be having sex. Exhibit P-11, *supra* at 12.

175. The College's procedures limit appeals to i) significant procedural lapses or ii) the appearance of substantive new evidence not available at the time of the original decision. As such, the accused's right of appeal remains highly circumscribed.

176. While significant procedural lapses have plagued the process, particularly the misapplication of policies, these had already been brought to the attention to the Dean and Hearing Panel in John's response. Exhibit P-13, *supra*.

177. Therefore, without substantive new evidence or new significant procedural lapses, John could not appeal. Moreover, John could not appeal on the grounds that there was insufficient evidence to sustain the findings.

178. There was woefully insufficient evidence to sustain the Hearing Panel's findings. The Hearing Panel itself indicated that it was merely "credible" that there had been

an unusual sexual position and it was on this basis alone that it determined that the
sex was non-consensual.

179. Because the Hearing Panel's letter informed John that a sanction would be imposed;
the College invariably imposes a separation from the College as a minimum
sanction in non-consensual sex cases; John has finished his degree requirements;
and the only sanction available to the College is to permanently withhold his
degree, the inevitable outcome for John is the permanent denial of his degree.

180. It seems John was presumed guilty from the start as the investigation was rife with
bias and grossly improper procedure that doubtlessly would influence the outcome.

181. A fair determination of the facts requires a fair process, not tilted to favor a
particular outcome, and a fair and neutral fact-finder, not predisposed to reach a
particular conclusion.

182. On information and belief, Defendant's flawed procedures and mishandling of
John's case were symptomatic of a broader culture of inherent, systematic and
intentional gender bias against male students accused of sexual misconduct, through
which male students are unable to receive a fair and impartial student disciplinary
process when a complaint of sexual misconduct is made against them by a female,
even when the female is employed by the College.

183. On information and belief, the sexual misconduct policy has only been enforced
against male students at Williams.

184. Defendant's violations were knowing and foreseeable, as the Defendant had notice
of the flaws in its disciplinary process, as written and implemented, and of their
unfair, biased, and discriminatory action from multiple sources, including:

a. OCR Standards that have been in place since 2001 and OCR's 2011 Dear Colleague Letter require fairness and impartiality in sexual misconduct investigation and adjudication. OCR delivers notice of these regulations to all schools that receive federal funds;

b. The March 13, 2016 notice to Bolton of employee Smith's harassment of and assault upon Plaintiff;

c. On March 14, 2016, John voiced concern to Bolton and College Counsel that Defendant was protecting the harassing and assaultive employee;

d. John's April 13, 2016 Title IX complaint against Defendant and employee Smith to Williams' Title IX Coordinator, Toya Camacho;

e. John's numerous inquiries regarding how could and why was Defendant facilitating retaliation in direct violation of College policy and Title IX;

f. John's complaint to College Counsel on September 29, 2016 regarding Sandstrom's September 28, 2016 email, which stated,

> It would be appreciated if you would educate Dean Sandstrom as to the principles of contract law governing college codes of conduct and the high level of due process afforded to students as to non-academic disciplinary matters (contractual equivalents of "due process" in the private school setting). Her email to my client…demonstrates serious deficiencies including, but not limited to, a disregard for the unenforceability of vague, overbroad, and amorphous provisions that she recites, reasonable expectations of the parties, and statutory and case law regarding good faith and fair dealing.

185. Defendant's failure to investigate impartially and promptly directly violates Title IX. Furthermore, the College's own policies provide for investigations of all dating violence and harassment. Defendant failed to follow Title IX regulations and the College's policies.

186. It is important to ask what purpose this adjudication serves. John has completed all the requirements for his degree and reaching back into the past, akin to degree revocation, appears to only serve a vindictive, spiteful, and retaliatory aim of employee Smith.

187. There have been only a few documented non-academic collegiate cases that resulted in degree revocation. One was for the charge was of murder and another was for embezzlement.

188. In an attempt to continue his academic pursuits and in anticipation of the threatened expulsion in February, John made inquiries to numerous graduate schools and law schools about their admission policies. The vast majority of these institutions informed John that, if his record indicates a finding of expulsion or sexual misconduct, he will not be admitted, regardless of his grades, test scores, community activities, or the circumstances surrounding his case.

189. Without earning his undergraduate degree, John cannot apply to graduate school and law school. As a result, John faces catastrophic present and future economic loss.

190. The same restrictions apply to John's transfer opportunities. The same colleges and universities cited above have policies that explicitly forbid acceptance of transfer students who have been denied a degree from a college or university. Therefore, if Defendant is allowed to deny John his degree, John may not even be able to enroll at another institution, let alone one of comparable quality, in order to repeat years of requirements and complete his college degree. Without obtaining his undergraduate degree, John cannot apply to graduate school, nor does he have any reasonable prospects of employment commensurate with his education. The harm that a permanent denial of his degree would cause John will be astronomical.

## COUNT I
## VIOLATION OF 20 U.S.C. §§ 1681-1688 (TITLE IX)

191. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth
herein.

192. Title IX states in pertinent part: "no person in the United States shall, on the
basis of sex, be excluded from participation in, be denied the benefits of, or be
subjected to discrimination under any education program or activity
receiving Federal financial assistance..." 20 U.S.C. § 1681(a).

193. Title IX bars the imposition of university discipline where gender is partly a
motivating factor in the decision to discipline.

194. Williams receives federal funding under Title IX, 20 U.S.C. §§ 1681-1688
(2011).

195. As a Title IX recipient, Williams is required to comply with the requirements of
Title IX as well as those of the regulations promulgated thereunder by the
Department of Education.

196. The regulations require each school receiving Title IX funds to "adopt and
publish grievance procedures providing for the prompt and **equitable**
resolution of student...complaints alleging any action which would be
prohibited by Title IX or its regulations."  34 C.F.R. 106.8 (2010). (emphasis
added). Exhibit P-14 at 10.

197. OCR's 2011 Dear Colleague Letter did not create new rights and duties for
schools, but rather, clarified existing rights and responsibilities in order to ensure
universities protect students and avoid liability. The regulations require that
sexual misconduct disciplinary procedures are equitable, reliable, fair, and

impartial. Exhibit P-2, *supra.* College policy provides for same. Exhibit P-9, *supra* at 9.

198. The regulations further require that "a school's procedures must accord **due process to both parties involved** ..." (emphasis added). Exhibit P-1, *supra* at 22.

199. Williams' sexual misconduct and disciplinary policies, as implemented in Plaintiff's case, are not equitable and do not accord due process to the accused.

200. Defendant failed to conduct an adequate investigation and adjudication in violation of both Title IX and its own written procedures.

201. Defendant placed excessive focus on the concerns and interests of the female counter complainant [employee Susan Smith] to the exclusion of the rights and interests of the male Plaintiff.

202. To repeat from above, Bolton had not responded to the March 13, 2016 cease and desist letter and March 14, 2016 verbally delivered concerns about the dating violence of employee Smith until April 21, 2016, i.e. until after receiving notice from the Title IX Coordinator that Plaintiff's attorney emailed her what attorney called a "formal Title IX complaint." The purpose of the complaint was to put on record that the March 13th-14th complaints constituted Title IX sexual harassment under the terms of the College's policies and that Bolton's response, or lack thereof, was not prompt, not unbiased, and not impartial but was instead selective enforcement and deliberate indifference.

203. According to the OCR, when a responsible employee knows or reasonably should know of possible sexual [or dating] violence, OCR deems a school to have notice of

the sexual [or dating] violence. The school must take immediate and appropriate steps to investigate or otherwise determine what occurred, and, if the school determines that sexual [or dating] violence created a hostile environment, the school must then take appropriate steps to address the situation. The school has this obligation regardless of whether the student, student's parent, or a third party files a formal complaint. John's attorney had already filed complaints on March 13 and 14, 2016, a month earlier. Williams persisted in violating Title IX by its obstinate refusal to take the assault and harassment of John and discrimination against him seriously. Exhibit P-14 at 15.

204.   Title IX makes it unlawful for schools and respondents to retaliate against individuals when they file a complaint alleging a violation of Title IX. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate and appropriate steps to investigate or otherwise determine what occurred. If an individual brings concerns about Title IX problems to a school's attention, it is unlawful for the school to retaliate against that individual for doing so. *Id.* at 42-43.

205.   Defendant denied Plaintiff an educational opportunity by barring him from the dance team competition. Defendant further disparately treated Plaintiff and employee Smith by allowing her to attend said competition.

206.   The improper procedure, selective enforcement, deliberate indifference, and retaliation in the investigation can be attributed to gender bias against males in cases involving allegations of sexual misconduct.

207. If Defendant applied the College's policies and procedures in a gender neutral manner, Plaintiff should not have faced investigation and adjudication and should have been allowed to participate in the dance competition. Moreover, he should have been allowed to receive his degree at the June 5, 2016 graduation.

208. Defendant placed excessive focus on punishing Plaintiff when he was mistreated by a female employee of Williams, demonstrating continuous indifference towards Plaintiff's concerns, rights, and interests.

209. The assault, harassment, and stalking that employee Smith made upon Plaintiff constituted dating violence and/or relationship abuse under the terms of the college's sexual misconduct policies; yet the assault was not reported to police per Williams' current policy of reporting all dating violence to law enforcement nor was it promptly investigated by Defendant. Furthermore, Defendant sanctioned the retaliatory counter complaint against Plaintiff for his making a complaint against employee Smith and Bolton.

210. On information and belief, the fundamental unfairness that imbued Plaintiff's disciplinary process is part of a pattern of decision-making that discriminates against male students accused of sexual misconduct and demonstrates the influence of entrenched gender discrimination.

211. Defendant's discipline of Plaintiff evidences gender-bias in part because Defendant demonstrated indifference and selective enforcement regarding Plaintiff compared to employee Smith; in sum, Defendant's actions constituted differential treatment.

212. Smith, an employee of the College, retaliated against John in violation of Title IX's and the College policy's express prohibitions against retaliation.

213. A school violates a student's rights under Title IX when the following conditions are met: (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program; and (2) the school, upon notice, fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. *Id.*

214. By failing to promptly investigate, evaluate, and adequately address the conduct of Bolton and employee Smith; failing to remedy the discriminatory effect that was consequent of the dating violence upon and the erroneous adjudication of Plaintiff; and facilitating unlawful retaliation, Defendant violated Title IX.

215. Fundamental unfairness imbued the disciplinary processes against Plaintiff.

216. Bolton was deliberately indifferent to the complaint against the female employee, to the complaint that employees are not protected by Title IX, and to the complaint that employee Smith was retaliating against John. The unfairness is part of a pattern of decision-making that discriminates against male students accused of sexual misconduct and favors female members of the Williams community.

217. Defendant violated Plaintiff's rights and Title IX protections in part because Defendant knew or should have known its actions would have an adverse impact on male students alleged to have engaged in sexual misconduct with a female student and was deliberately indifferent to this impact.

218. Plaintiff's Title IX complaints are sufficient on the totality of the circumstances described herein.

219. The allegations in the Complaint are sufficient to plausibly infer that Williams'
     treatment of Plaintiff was motivated in part by his gender.

220. Plaintiff alleges that sufficiently specific anti-male bias has been exhibited by the
     differential treatment he and employee Smith received during the process, and by
     the one-sided manner that the investigation and decision-making were conducted.

221. Because female students and employees at Williams rarely (if ever) face charges of
     sexual misconduct, they are not disadvantaged by Williams' sexual misconduct
     policies that place onerous burdens on the accused students and deny them
     rudimentary due process safeguards. As the accused (male) is disproportionately
     affected by the sexual misconduct proceedings, the policies disproportionately
     adversely affect male students.

222. Males invariably lose when charged with sexual harassment at Williams provides a
     verifiable causal connection between flawed proceedings and allegations of gender
     bias.

223. As a result of Defendant's enforcement of this biased policy and failure to comply
     with the other requirements under Title IX with respect to disciplinary procedures,
     Plaintiff has been denied the benefits of Williams' educational program in violation
     of Title IX.

## COUNT II
## BREACH OF CONTRACT

224. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set
     forth herein.

225. Plaintiff and Defendant had a commercial contractual relationship, either express
     or implied. Such contract was formed on the one hand by Plaintiff's payment (or

payment made on his behalf) of tuition and fees to Williams and on the other, by the terms contained in the Student Handbook, the College Catalogue, and other College materials.

226. Plaintiff had a reasonable expectation that Defendant would adhere to the terms of such contract, as contained in the Disciplinary Procedures and other College materials.

227. By attending a college that accepts federal funding, Plaintiff further had a reasonable expectation that Defendant's stated and implemented procedures would comply with the requirement under the Title IX regulations to provide a fair, reliable, impartial, and equitable process for adjudicating claims of sexual misconduct and to ensure due process to both the accuser and the accused.

228. Defendant breached the terms of its contract with Plaintiff and engaged in bad faith and unfair dealing by violating disciplinary procedures as set forth above, and, in particular, by:

    a.   conducting disciplinary cases in a manner biased towards females;

    b.   proceeding with decision-making without adequate evidence and proceeding with an investigation and adjudication initiated by an employee against a student in violation of the College's own written policies;

    c.   treating Plaintiff and employee Smith in a highly disparate manner;

    d.   acting with deliberate indifference towards Plaintiff's report that he had been harassed and assaulted;

    e.   misinforming Plaintiff that he could not appeal the plagiarism sanction (in February 2016) in contradiction with Williams' own policies and procedures;

    f.   capriciously applying so-called standards that are not provided in the College's Hearing Procedures including a one-sided non-verbatim record of the hearings solely from the Dean's perspective;

g.  arbitrarily and capriciously applying policies, e.g. in the September 13, 2016 report and in Sandstrom's September 28, 2016 email, and barring Plaintiff from an opportunity to respond to the latter which would violate the most basic principles of fundamental fairness and due process;

h.  arbitrarily and capriciously applying "general guidelines" so vague and overbroad as to not provide reasonable grounds to know that what conduct is prohibited, offers virtually no useful guidance as to what conduct is prohibited, and allows the College to punish any conduct it wishes;

i.  arbitrarily and capriciously applying vague "general guidelines" in an attempt to take the adjudication out of the realm of Title IX and to achieve the desired outcome of Defendant, i.e. a finding against Plaintiff;

j.  discriminatorily denying Plaintiff an educational opportunity, i.e. dance team, the weekend following April 7, 2016;

k.  failing to follow through on the promise to provide transcripts of interviews;

l.  failing to adhere to the College's policy of confidentiality in disciplinary matters, failing to protect confidential information as a matter of reasonable expectation of students, and violating Plaintiff's right to privacy under state law;

m.  failing to promptly respond to and to impartially investigate Plaintiff's Title IX complaints made on March 13, 2016 and on April 13, 2016 regarding the dating violence and harassment and the April 2016 discrimination based on gender in violation of the College's "procedures that seek to ensure a prompt, fair, and impartial investigation and resolution;"

n.  similarly failing to adhere to the College's written timeline for the investigation and adjudication process and to adhere to Title IX requirements for a timely, i.e. "prompt" process;

o.  hiring, without allowing Plaintiff input, an external investigator who produced a biased report as said report i) did not include and apply the correct policies, ii) did not include the Title IX Complaint, iii) included a Dean as a "witness", and iv) improperly employed the term "testify" to describe employee Smith's statements;

p.  i) failing to adhere to the College's written procedures for one report and failing to provide Plaintiff with the second, i.e. "revised" report and ii) denying Plaintiff the opportunity to receive and respond to employee Smith's "second response";

q.  i) failing to adhere to the College's written procedure for using the preponderance of the evidence standard for determining whether a student is responsible for violation of the code of conduct with regards to sexual

misconduct, ii) failing to apply the applicable written policy of 2014, iii) finding Plaintiff responsible for non-consensual sex with insufficient evidence to sustain the findings; iv) finding Plaintiff responsible on the basis of mere credibility, and v) determining that what was credible was an unusual sexual position and that an unusual sexual position is tantamount to non-consensual sex;

r.   limiting the right to appeal to i) significant procedural lapses or ii) the appearance of substantive new evidence not available at the time of the original decision; and

s.   retaliating and facilitating retaliation against Plaintiff in his Title IX complaint in violation of the College's express prohibition against retaliation.

229.   Defendant's procedural violations, acts and omissions as described herein rendered the proceedings unfair, contravening the specific provision entitling students to a process which is "within the confines of good order and fairness."

230.   The implemented procedures effectuate a failure of due process for the student population, especially the male student population, because they 1) encourage and facilitate the reporting of potentially false reports of sexual misconduct without any recourse for those who may be falsely accused, 2) allow employees to complain against students, and 3) sanction and facilitate unlawful retaliation.

231.   Defendant has created an environment in which an accused male is effectively denied fundamental principles of fairness and justice by being prosecuted through the disciplinary process under the cloud of presumption of guilt. Such a one-sided process deprived Plaintiff, as a male student, of educational opportunities at Williams on the basis of his sex.

232.   Because Defendant employed a sham process that denied him basic due process rights and failed to comply with Williams' own policies and procedures, Defendant breached the contract with Plaintiff.

233. Such failures combined to cause Plaintiff significant prejudice in that he was denied an even-handed assessment of the facts and even-handed application of policy and procedures, ultimately resulting in his threatened degree denial and the need to hire an attorney to appeal the claims made against him.

## COUNT III
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

234. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein.

235. Massachusetts law recognizes an implied covenant of good faith and fair dealing in all contracts, either express or implied.

236. By the conduct alleged herein, Defendant has breached the implied covenant of good faith and fair dealing, causing multiple forms of damage to Plaintiff.

## COUNT IV
## ESTOPPEL AND RELIANCE

237. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein.

238. Defendant's various standards, policies and procedures constitute representations and promises that Defendant expected or should have reasonably expected would induce action or forbearance by Plaintiff.

239. Defendant expected or should have expected Plaintiff to accept the College's offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises, including that Defendant would provide Plaintiff with a fundamentally fair process, should he be accused of a violation of the Student Handbook.

240. Plaintiff relied to his detriment on Defendant's express and implied promises and representations.

241. As a direct, proximate, and foreseeable consequence of the above-identified conduct, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages including but not limited to emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

### COUNT V
### MASSACHUSETTS UNFAIR AND DECEPTIVE PRACTICES ACT
### (M.G.L. C. 93A AND M.G.L. C. 93 §102)

242. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein.

243. At all times material hereto, Defendant offered educational services for sale to the public.

244. At all times material hereto, Plaintiff was an individual consumer of Defendant's educational services.

245. In connection with the sale of its educational services and collection of tuition, fees, and costs related thereto, Defendant committed various unfair and deceptive acts and practices in violation of the M.G.L. Chapter 93, specifically M.G.L. C. 93A and M.G.L. C. 93 §102, including, but not limited to:

   a. representing that students would receive a fair and impartial process in connection with allegations of misconduct, but did not due to Defendant's errors, acts, and omissions;

b.   representing that students would receive timely notices of all charges, including the nature of all charges, but did not due to Defendant's errors, acts, and omissions;

c.   representing that students would have the charges treated properly through the disciplinary process, but did not due to Defendant's errors, acts, and omissions;

d.   misrepresenting Williams' compliance with Title IX; and

e.   implementing procedures that disproportionately favors females at the expense of the rights and interests of Plaintiff and students in similar situations.

246.   Plaintiff relied upon the various warranties and [mis]representations of Defendant in entering his agreement with Williams and in continuing to make payments to Williams.

247.   The purpose of M.G.L. Chapter 93A is to provide a "proper disclosure of information and a more equitable balance in the relationship of consumers to persons conducting business activities" in Massachusetts. *Commonwealth v. DeCotis*, 366 Mass. 234, 238, 316 N.E.2d 748, 752 (1974).

248.   Defendant's unfair and deceptive conduct constituted untrue representations of the characteristics and benefits of Williams' educational services; constituted untrue representations that Williams' educational services were of a particular standard or quality; constituted a failure to comply with the terms of a written guarantee or warranty; and constituted deceptive conduct which created a likelihood of confusion and misunderstanding – all within the meaning of M.G.L. Chapter 93A.

249.   The purpose of M.G.L. Chapter 93 §102 is to ensure that all persons within the commonwealth, regardless of sex, race, color, creed or national origin, have, "except as is otherwise provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce contracts, to inherit, purchase, to lease,

sell, hold and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

250. Defendant's gender-based bias against Plaintiff constituted discrimination in violation of M.G.L. Chapter 93 §102.

## COUNT VI
## NEGLIGENCE

251. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein.

252. Defendant owed duties of care to Plaintiff. Such duties include, without limitation, a duty of reasonable care in investigating and adjudicating the charges against him.

253. Further, Defendant owed duties of care to Plaintiff to protect him from defamation, harassment, assault and battery by Williams' own employees.  The fact that employee Smith assaulted Plaintiff is undisputed. Smith slapped Plaintiff December 6, 2015. Employee Smith violated Plaintiff's right to privacy by the unauthorized use of his Facebook and Snapchat accounts.

254. Employers are responsible for the tortious acts of their employees.

255. At all times material hereto, Defendant had a duty to hire competent personnel, adequately train its personnel, adequately supervise its personnel, and terminate and/or sanction personnel for substandard performance.

256. Defendant owed a duty of care to Plaintiff to ensure that its policies and procedures, without limitation, written and implemented, were fair and reasonable.

257.  Defendant breached these duties of care owed to Plaintiff and, independent of its

breach of contract set forth above in Count II, was negligent in the following

respects:

  a.  failing to hire well-trained agents and employees;

  b.  failing to train its employees, agents or representatives in the proper method to
      thoroughly investigate and adjudicate, without bias, complaints of sexual
      misconduct;

  c.  failing to properly train its employees, agents, or representatives regarding the
      requirements of Title IX;

  d.  failing to properly train its employees, agents, or representatives in basic due
      process as it pertains to the investigation, adjudication, and appeal from
      adjudication of complaints of sexual misconduct;

  e.  failing to supervise its employees, agents, or representatives to ensure complains
      of sexual misconduct are adequately investigated and fairly adjudicated; and

  f.  failing to maintain proper policies and procedures designed to fairly, reasonably,
      and adequately adjudicate claims of sexual misconduct without bias or favor.

258.  Defendant breached its duties to care owed to Plaintiff.

259.  As a direct, proximate, and foreseeable consequence of Defendant's aforementioned

conduct, Plaintiff's academic and career prospects, earning potential, and reputation

have been severely harmed. He has sustained enormous damages including but not

limited to emotional and psychological damages, damages to reputation, past and

future economic losses, loss of educational and professional opportunities, loss of

future career prospects, and other direct and consequential damages.

**COUNT VII**
**VIOLATION OF FUNDAMENTAL FAIRNESS**

260.  Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth

herein.

261. Defendant owed a duty to Plaintiff to provide him with a process that was
fundamentally fair to him as a Williams student.

262. Defendant failed to provide a fair process by:

   a. conducting disciplinary cases in a manner biased towards females;

   b. proceeding with decision-making without adequate evidence and proceeding with
      an investigation and adjudication initiated by an employee against a student in
      violation of the College's own written policies;

   c. treating Plaintiff and employee Smith in a highly disparate manner;

   d. acting with deliberate indifference towards Plaintiff's report that he had been
      harassed and assaulted;

   e. misinforming Plaintiff that he could not appeal the plagiarism sanction (in
      February 2016) in contradiction with Williams' own policies and procedures;

   f. capriciously applying so-called standards that are not provided in the College's
      Hearing Procedures including a one-sided non-verbatim record of the hearings
      solely from the Dean's perspective;

   g. arbitrarily and capriciously applying policies, e.g. in the September 13, 2016
      report and in Sandstrom's September 28, 2016 email, and barring Plaintiff from
      an opportunity to respond to the latter which would violate the most basic
      principles of fundamental fairness and due process and College policy;

   h. arbitrarily and capriciously applying "general guidelines" so vague and overbroad
      as to not provide reasonable grounds to know that what conduct is prohibited,
      offers virtually no useful guidance as to what conduct is prohibited, and allows
      the College to punish any conduct it wishes;

   i. arbitrarily and capriciously applying vague "general guidelines" in an attempt to
      take the adjudication out of the realm of Title IX and to achieve the desired
      outcome of Defendant, i.e. a finding against Plaintiff;

   j. discriminatorily denying Plaintiff an educational opportunity, i.e. dance team, the
      weekend following April 7, 2016;

   k. failing to follow through on the promise to provide transcripts of interviews;

   l. failing to adhere to the College's policy of confidentiality in disciplinary matters,
      failing to protect confidential information as a matter of reasonable expectation
      of students, and violating Plaintiff's right to privacy under state law;

m. failing to promptly respond to and to impartially investigate Plaintiff's Title IX complaints made on March 13, 2016 and on April 13, 2016 regarding the dating violence and harassment and the April 2016 discrimination based on gender in violation of the College's "procedures that seek to ensure a prompt, fair, and impartial investigation and resolution;"

n. similarly failing to adhere to the College's written timeline for the investigation and adjudication process and to adhere to Title IX requirements for a timely, i.e. "prompt" process;

o. hiring, without allowing Plaintiff input, an external investigator who produced a biased report as said report i) did not include and apply the correct policies, ii) did not include the Title IX Complaint, iii) included a Dean as a "witness", and iv) improperly employed the term "testify" to describe employee Smith's statements;

p. i) failing to adhere to the College's written procedures for one report and failing to provide Plaintiff with the second, i.e. "revised" report and ii) denying Plaintiff the opportunity to receive and respond to employee Smith's "second response";

q. i) failing to adhere to the College's written procedure for using the preponderance of the evidence standard for determining whether a student is responsible for violation of the code of conduct with regards to sexual misconduct, ii) failing to apply the applicable written policy of 2014, iii) finding Plaintiff responsible for non-consensual sex with insufficient evidence to sustain the findings; iv) finding Plaintiff responsible on the basis of mere credibility, and v) determining that what was credible was an unusual sexual position and that an unusual sexual position is tantamount to non-consensual sex;

r. limiting the right to appeal to i) significant procedural lapses or ii) the appearance of substantive new evidence not available at the time of the original decision; and

s. retaliating and facilitating retaliation against Plaintiff in his Title IX complaint in violation of the College's express prohibition against retaliation.

263. Even when Plaintiff provided the opportunity for Defendant to take action to correct the injury, Defendant's refusal to do so perpetuated the injury.

264. Bolton and Sandstrom failed to exercise reasonable care in the disciplinary action against Plaintiff by advancing their own agendas and imposing personal bias in

deferring to the female employee and perpetuating that bias in the subsequent proceedings.

265. It was foreseeable that the Defendant's failure to exercise reasonable care would result in substantial injury to Plaintiff.

266. As a direct, proximate, and foreseeable consequence of Defendant's aforementioned conduct, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained enormous damages including but not limited to emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

## COUNT VIII
## MASSACHUSETTS CIVIL RIGHTS ACT (M.G.L. C. 12, §§ 11H, 11I)

267. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein.

268. Plaintiff has a right to be educated by Williams in a manner consistent with its promises and statements, both as written in the Student Handbook and as required by federal and state law, including being subject to a disciplinary process that is free from discrimination and fair in its intent and application.

269. Defendant conducted an inadequate, unfair, discriminatory and partial process. Defendant chose to interfere with Plaintiff's rights, which caused significant damages as discussed above.

270. This conduct is a violation of the Massachusetts Civil Rights Act, M.G.L. c. 12 §a. 11H, a violation that has caused plaintiff to suffer significant damages.

## COUNT IX

### ASSAULT, DEFAMATION, AND VIOLATION OF PRIVACY

271. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein.

272. The fact that employee Smith assaulted Plaintiff is undisputed. Smith slapped Plaintiff December 6, 2015.

273. Employee Smith violated Plaintiff's right to privacy by the unauthorized use of his Facebook and Snapchat accounts.

274. Defamation is the publication, either orally or in writing, of a statement concerning the plaintiff which is false and causes damage to the plaintiff. *McAvoy v. Shufrin,* 401 Mass. 593, 597, 518 N.E.2d 513 (1988). To establish a claim of defamation, a plaintiff must satisfy the following elements when the speech is a matter of private concern:

    a. First, the defamatory statement must "hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair his standing in the community, at least to his discredit in the minds of a considerable and respectable class in the community." *Tartaglia v. Townsend,* 19 Mass.App.Ct. 693, 696, 477 N.E.2d 178 (1985). Employee Smith alleged that Plaintiff raped her on or around September 1, 2014. Accusing Plaintiff of being a rapist holds Plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair his standing in the community, at least to his discredit in the minds of a considerable and respectable class in the community.

    b. The statement must have been to at least one other individual other than the one defamed. *Brauer v. Globe Newspaper Company,* 351 Mass. 53, 56, 217

N.E.2d 736 (1966). Employee Smith made the statements to Defendant, the investigator, other students and/or former students, and others. By encouraging employee Smith's counter-complaint, Defendant encouraged her defamation of Plaintiff.

    c.   Finally, the plaintiff must show that he suffered special damages and must set forth these damages specifically. *Lynch v. Lyons,* 303 Mass. 116, 119, 20 N.E.2d 953 (1939). Based on employee Smith's accusations, Plaintiff faced investigation, was denied his degree on graduation day, and was compelled to hire an attorney to defend himself against the College's charges.

275.  Under Massachusetts tort law, employers are responsible for the tortious actions of their employees. Therefore, Plaintiff is thus likely to succeed on his claim that Defendant is liable for the tortious actions of employee Smith.

### COUNT X
### INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

276.  Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein.

277.  Defendant committed numerous violations of Plaintiff's contract and of federal and state law.

278.  Plaintiff's education and future have been severely affected and he has suffered extensive damage from Defendant's actions and inactions. Without appropriate redress, the potentially unfair outcome of the investigation, i.e. degree denial, will continue to cause Plaintiff damages by way of missed educational opportunities and career opportunities, as well as damage to his reputation and continued emotional distress.

279. Based upon Defendant's failure to conduct a fair and impartial investigation and adjudication, Plaintiff requires that Defendant to take all appropriate actions to correct any and all statements made to any source in any format that stated or implied that Plaintiff had committed sexual misconduct and/or abuse. Plaintiff further requires that any and all disciplinary records concerning Plaintiff be expunged from College records.

280. Plaintiff requests that this Court enjoin Defendant from enforcing the sanction against Plaintiff in the ongoing proceeding, i.e. the retaliatory counter complaint.

281. Plaintiff requests that this Court order the College to allow Plaintiff to earn his degree.

282. Plaintiff requests that this Court enjoin Defendant from violating Plaintiff's right to privacy under FERPA and Massachusetts Privacy Act (M.G.L. C. 214, § 1B).

283. Plaintiff further requests that this Court declare that Defendant's rules and policies and actions, as applied herein, were unconstitutional or in violation of the contractual equivalent of due process, i.e. good faith and fair dealing and fundamental fairness.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant on all counts of this complaint. Plaintiff further requests that this Court:

A. Issue an Injunction and declaratory judgment as herein requested.

B. Retain jurisdiction of this matter for the purpose of enforcing this Court's order.

C. Enter a finding that Defendant intentionally discriminated against Plaintiff in violation of Title IX with erroneous outcome, improper procedure, selective enforcement, and deliberate indifference.

D. Enter a finding that Defendant engaged in discrimination with malice and reckless disregard to Plaintiff's federally protected rights under Title IX; disciplined Plaintiff in violation of the College's rules and policies, hence its contractual obligations as written and implemented; and due to gross and numerous violations of its disciplinary procedures, its contractual obligations, and its duties of care, engaged in a process that was inherently flawed and fundamentally unfair.

E. Enter a finding that Defendant violated the Massachusetts Civil Rights Act (M.G.L. C. 12, §§ 11H, 11I); Massachusetts Unfair and Deceptive Practices Act (M.G.L. C. 93A and M.G.L. C. 93 §102); and principles of due process and fundamental fairness.

F. Enter a finding that Defendant violated Plaintiff's right to privacy under the Family Educational Rights and Privacy Act ("FERPA") (20 U.S.C. § 1232g; 34 CFR Part 99) and Massachusetts Privacy Act (M.G.L. C. 214, § 1B).

G. Enter a finding that Defendant is liable for employee Smith's defamation of Plaintiff.

H. Order the College to expunge Plaintiff's disciplinary records from College records and to represent his good standing to third parties.

I. Award Plaintiff compensatory damages in an amount to be determined at trial.

J. Award Plaintiff punitive damages in an amount to be determined at trial.

K. Allow a trial in this matter and enter a judgment for Plaintiff on each count of this complaint, awarding him damages in an amount to be determined at trial; as well the reasonable pre- and post-judgment interest, including attorney's fees, costs and expenses, in

accordance with 42 U.S.C. § 1988 or pursuant to any other statute or common law doctrine providing for such award.

L. Grant such other and further relief as this Court deems equitable and just under the circumstances.

IN THE ALTERNATIVE, should this Court find no remedy at law available to Plaintiff, Plaintiff pleads Unjust Enrichment against Defendant:

Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein. The College received a monetary benefit, approximately $32,300 in the form of payments towards four years' tuition, costs, and fees paid by Plaintiff or on his behalf. As set forth above, due to gross and numerous violations of its disciplinary procedures, its contractual obligations, its duties of care, and its duties under Title IX and MGL Chapter 93A, the process by which Defendant may find Plaintiff responsible for the alleged act was inherently flawed and fundamentally unfair, causing Plaintiff significant prejudice. Plaintiff's further education and career plans have already been compromised by the unfair, biased, and harmful actions and omissions upon Plaintiff. Plaintiff has already suffered irreparable injury by the delayed process that has prevented him from applying to graduate and law schools. Plaintiff could also be left with a permanent collegiate record marred with a disciplinary sanction that bars him from attending graduate or law school. For the reasons set forth herein, under the circumstances it would be inequitable for Williams to retain the tuition, fees, and costs it has received.

## JURY DEMAND

PLAINTIFF hereby makes demand for this case to be tried by a jury insofar as the claims herein are triable.

Date: November 23, 2016

**JOHN DOE**
**PLAINTIFF**


By: _____/s/ Stacey Elin Rossi_____
STACEY ELIN ROSSI, BBO# 681084
ROSSI LAW FIRM
P.O. Box 442
Hoosick Falls, New York 12090
(413)248-7622

**VERIFICATION**

I, John Doe, am the Plaintiff in this action. I have read the foregoing Complaint and know the contents thereof.

I declare and affirm under the pains and penalty of perjury under the laws of the Commonwealth of Massachusetts and of the United States that to the best of my knowledge the allegations set forth above are true and correct.


Date: November XX, 2016               _____/s/_____

                                      JOHN DOE

**CERTIFICATE OF SERVICE**

I, Stacey Elin Rossi, Attorney for Plaintiff John Doe, HEREBY CERTIFY that this document in connection with the above-captioned proceeding, filed through the Electronic Case Filing System (CM/ECF), will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November XX, 2016.

 /s/ Stacey Elin Rossi
STACEY ELIN ROSSI, BBO# 681084
ROSSI LAW FIRM
P.O. Box 442
Hoosick Falls, New York 12090
(413)248-7622