**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| WILLIAMS COLLEGE, | ) |
| | ) |
| Defendant. | ) |

———————————————————

CIVIL ACTION NO.:  3:16cv-30184-MAP

**Leave to file Third Amended Complaint
granted on April 28, 2017.**

<u>**JURY TRIAL DEMANDED**</u>

**THIRD AMENDED COMPLAINT AND**
**REQUEST FOR DECLARATORY JUDGMENT**
**AND INJUNCTIVE RELIEF**

NOW COMES the Plaintiff, John Doe[1], by and through counsel, Stacey Elin Rossi, and for

his Third Amended Complaint at Law for declaratory judgment, monetary damages, and injunctive

relief, states and alleges as follows:

**NATURE OF THE ACTION**

This is an action for injunctive relief, declaratory judgment, and damages arising from

Defendant Williams College's ("Defendant," "Williams," and "College") wrongful, improper, and

negligent disciplinary actions of Plaintiff resulting from the application of "disciplinary procedures"

that were in violation of the College's rules and policies, hence its contractual obligations as written

and implemented; the requirements of Title IX of the Education Amendments of 1972 (20 U.S.C. §§

1681-1688 ["Title IX"]) and its implementation of regulation at 34 C.F.R. 106; Massachusetts Equal

Rights Act (M.G.L. C. 93 §102); principles of good faith, fair dealing, due process and fundamental

fairness; and negligence. Defendant also violated Plaintiff's right to privacy under Family

---

[1] Plaintiff refers to himself as "John Doe" and to his accuser as "Susan Smith" throughout the Complaint.

Educational Rights and Privacy Act ("FERPA") (20 U.S.C. § 1232g; 34 CFR Part 99) and

Massachusetts Privacy Act (M.G.L. C. 214, § 1B).

## PARTIES

1.  Plaintiff John Doe[2] ("John" and "Plaintiff") is and at all times relevant to this Complaint a resident of the State of New York. John, a first-generation Ecuadorian-American, was admitted to Williams in reliance on full financial aid, including substantial grants from Williams, loans, and work-study employment. He is not identified to protect his academic and career plans.

2.  Defendant Williams College is an elite private college located in Williamstown, Massachusetts. Four years of tuition, costs, and fees at Williams totals approximately $256,000.

3.  At all times material hereto, Williams College acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of Williams' business, mission, and/or affairs.

4.  Williams College, a recipient of federal funding, is not allowed to discriminate on the basis of gender under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over Plaintiff's federal claims under Title IX, 20 U.S.C. § 1681, et seq.; 28 U.S.C. § 1331, and 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000, exclusive of costs and interest.

6.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

---

[2] All personally identifying information has been redacted to protect the privacy of the party herein referred to as John Doe, the complainant.

7.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendant resides in Berkshire County, Massachusetts and because the events and omissions giving rise to Plaintiff's claims occurred within Massachusetts.

8.  This Court is authorized to grant Plaintiff's prayer for relief regarding costs, including reasonable attorney fees, under 42 U.S.C. § 1988.

## FACTUAL ALLEGATIONS

### A. Background and Relationship of the Parties

9.  John was a full-time student at Williams from September 2011 until his scheduled date of graduation in spring 2016.

10.  SARAH BOLTON ("Bolton") was at all times material to this complaint the "Dean of the College" at Williams and acted within the course and scope of authority as Dean. In 2010, Bolton was appointed Dean of the College at Williams, a position she held continuously from then until June 30, 2016.

11.  Bolton's bias against accused males is evidenced in a July 9, 2014 youtube video titled "Sexual Assault Prevention and Response: Work at Williams and Beyond." https://www.youtube.com/watch?v=iS_oBIZIf34 In this presentation, she recites the "1 in 5 women on college campuses have been sexually assaulted" myth and mentions the statistics regarding male student victims of sexual assault as an afterthought. She also refers to female victims as, "we," indicating that she identifies with female victims of alleged sex assault.

12.  MARLENE SANDSTROM ("Sandstrom") was at times material to this complaint the "Dean of the College" at Williams and acted within the course and scope of authority as Dean. On July 1, 2016, Sandstrom was appointed Dean of the College at Williams, replacing Bolton.

13.  SUSAN SMITH[3] ("Smith and "employee Smith"") was a student of Williams until graduation in spring 2015 and was an employee of Williams from the time of her graduation until June 30, 2016. Employee Smith is referred to as such because all claims in this Complaint refer to her actions during her time as an employee of the College and afterwards.

14.  From October 2013 to winter 2015-2016, Susan Smith and John were in an exclusive, romantic, and sexually-active relationship.

15.  On information and belief, prior to and including 2016, Sandstrom had no training or experience conducting sexual misconduct investigations or adjudications. John's case was the first sexual misconduct case for which she was responsible.

16.  The Hearing Panel panelists at the College do not receive adequate training in conducting sexual misconduct investigations or adjudications despite the College's policy that "procedures will be conducted by college officials who receive annual training on issues related to domestic violence, dating violence, stalking, sexual exploitation and sexual assault, as well as on conducting a hearing process that protects victim safety and promotes accountability."

17.  According to a College employee, Brian Marquis, who received the College's training, employees receive a seven-hour training that consists of reviewing key definitions used in the college policy and reviewing studies of past cases as "case studies." Meg Bossong, the College's Director of Sexual Assault Prevention and Response who conducts the training, is not professionally trained in Title IX law and regulations nor is she part of the Title IX team at the College. (Doc. 58.)

18.  According to Marquis, the training is "not comprehensive by any stretch of the imagination, not even close." He further says that the training's primary focus is to teach the employees that "the reputation of the college is the number one priority." Prospective panelists are

---

[3] John Doe agreed to use a pseudonym for this third party who is referred to as "Susan Smith" throughout the pleadings.

drilled to consider the College's reputation before anything else when adjudicating sexual misconduct cases. (*Id.*)

19. Ill-trained administrators adjudicate the alleged criminal conduct, sitting in judgment and meting out lifelong punishments.

20. Also, according to Marquis, the College "makes things up as it goes along" regarding policies in order to protect itself and "does not report incidents to police when it should." The College will "go through the motions and say one thing, to appear to be in compliance with the law, but do another." (*Id.*)

21. Further, Marquis reports that the College treats people according to perceived pedigree and importance: the more important and elevated one's pedigree determines the how the College will treat the person. Moreover, the College will "use its deep pockets and endless resources to destroy" its adversaries. (*Id.*)

22. Incredibly, hearing panelists are not even trained in college policy. They are only provided definitions of a few key terms employed in the policy. They are not trained at all in the College's non-consensual sex policy or its policy calling for impartiality and fairness which would require a study of how to assess credibility, factor motivation, apply critical thought to contradictory statements and conflicting evidence, and rationally determine the f/actual truth. (Doc. 54-1.)

23. By failing to train hearing panelists in the college's policy and only providing panelists key definitions, the Hearing Panel did not receive adequate training as to what conduct constitutes sexual harassment, which includes alleged sexual assaults, at Williams.

24. The training material contains pro-female biased content including false statistics, such as 1 in 5 women on college campuses have been sexually assaulted, and baseless claims that "Women are more likely to experience stalking. Most people who stalk are male." (*Id.*)

25. Employee Joshua Costa's affidavit affirmed the arbitrary and capricious nature of the College's application of its sexual misconduct policies. (Doc. 59.)

26.  The College terminated the employment of both Marquis and Costa immediately upon and consequent to the publication of their sworn-to statements.

**B. Statutory and Regulatory Requirements Regarding Sexual Assault Allegations**

27.  The issue of sexual assaults at educational institutions is primarily addressed by an act of Congress known as Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681-1688. The statute prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations. 20 U.S.C. § 1681(a), 1687. A school specifically agrees, as a condition for receives federal funds, to operate all of its programs and activities in accordance with Title IX and the Department of Education's Title IX regulations.

28.  Office for Civil Rights ("OCR") of the United States Department of Education investigates and enforces Title IX as it relates to sexual harassment. "Sexual harassment" is broadly defined as "unwelcome conduct of a sexual nature" that includes dating violence, sexual assault, and rape.

29.  In January 2001, OCR published a set of compliance standards for schools to apply in sexual harassment matters, including standards for "Prompt and Equitable Grievance Procedures" and "Due Process Rights of the Accused." ("OCR Standards") Exhibit P-1.

30.  The OCR Standards require schools not only to "ensure the Title IX rights of the complainant," but also to "accord due process to both parties involved."  The Standards require schools to adopt "prompt and equitable" procedures that "accord due process to both parties involved" including, at a minimum:

a.  Notice . . . of the procedure, including where complaints may be filed;

b.  Application of the procedure to complaints alleging [sexual] harassment carried out by employees, other students, or third parties;

c.  **Adequate, reliable, and impartial investigation of complaints,** including the opportunity to present witnesses and other evidence; (emphasis added)

d.  Designated and reasonably prompt timeframes for major stages of the complaint process;

e.  Notice to the parties of the outcome of the complaint; and

6

f.   An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate. *Id.* at 20.

31.  In April 2011, OCR issued guidance to all educational institutions receiving federal funds ("Dear Colleague Letter") stating, "A school's investigation and hearing processes cannot be equitable unless they are impartial." Exhibit P-2 at 12. The Dear Colleague Letter also emphasizes that the procedures must be fair and prompt, citing the OCR Standards. *Id.* at 9.

32. The Dear Colleague Letter re-affirmed the OCR Standard requiring schools ensure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 12.[4]

### C.  Bias in Application of the College's Policies and Procedures; Grossly Improper Procedure, and Description of Pre-Appeal Events

33.  On the night of December 5, 2015, John attended a party on the Williams campus. While dancing with another woman, employee Smith confronted him for dancing with someone other than herself as she wanted to dance with him. When John walked away, Smith followed John. The time was sometime between 11:30 pm of December 5, 2015 to midnight of December 6, 2015. Smith followed John all the way to his dormitory. John pointed out Smith's wrongdoing, that she had violated the terms of her employment by attending a student party, as Smith held the position of Alumni Coordinator at Williams. Smith slapped John. She also grabbed and took away his phone. She continued to follow John who repeatedly told her to get away from him. John retreated to his room. Smith escalated the situation even further afterwards by telephoning John's sister, Lady Doe.[5]

34.  At 12:14 a.m. December 6, 2015, Smith telephoned Lady Doe, admitting that she had smacked John. During the phone call, Smith kept repeating "he's gonna report me for assault and I'm gonna lose my job!! They're gonna fire me!!" Smith also kept repeating to Lady Doe, "my life is over" and that she wants to kill herself. Exhibit P-3.

---

[4] See also, OCR Standards, Exhibit P-1 at 21.
[5] Surname has been redacted to "Doe" to protect the identity of John Doe.

35.  At 2:27 a.m. December 6, 2105, one hour after the phone call with Lady Doe ended, Smith emailed Bolton claiming that she (Smith) had written essays for John in violation of the College's Honor Code. Exhibit P-4.

36.  At the time of the December 6, 2015 email until the spring 2016, Williams' policy for reporting Honor Code violations stated, "For Faculty and TA's -- If you have any reason to suspect one of your students has violated the honor code on any assignment, you must contact the Faculty Chair of the Honor Committee." The procedures further stated, "Chairs decide that there is sufficient evidence to proceed."

37.  As an employee of Williams, Smith fell closest to the category of "faculty and TAs" as opposed to "students" who are to report to the Student Chair of the Honor Committee.

38.  As the Dean of the College was not the appropriate official to field reports of Honor Code violations, Bolton should have directed Smith to provide the information to the Faculty or Student Chair of the Honor Committee as it is their purview to take complaints and to decide whether there is sufficient evidence to proceed. Instead, Bolton allowed her impartiality to be compromised, demonstrating an unfair bias against John.

39.  Smith was, in effect, reporting an improper relationship she was having with a student in violation of the Employee Handbook which states, in relevant part, "All faculty and many staff are potentially in a position of power with regard to students; hence, sexual relationships between employees and students are in almost all cases inappropriate." Bolton ignored this fact as evidenced by the absence of action to discipline Smith.

40.  In February 2016, John took the LSAT in anticipation of applying to law school.

41.  On February 10, 2016, Bolton texted private educational information regarding John to Smith and, by doing so, violated John's right to privacy under FERPA and under state law.

42.  Under FERPA, a school may not disclose personally identifiable information from an eligible student's education records to a third party unless the eligible student has provided written

consent. One of the exceptions to the prior written consent requirement in FERPA allows "school officials," including teachers, within a school to obtain access to personally identifiable information contained in education records provided the school has determined that they have "legitimate educational interest" in the information.

43.   As Alumni Coordinator, Smith was not a school official with a legitimate educational interest in an Honor Code disciplinary proceeding against John. Even as an "accuser," she had no interest in the outcome. Only complainants in sexual misconduct cases have a right to such information as provided in the College procedures and as required by Title IX.

44.   On February 23, 2016, the College's Honor Committee held a hearing at which John was charged with violating the Honor Code based on Smith's claims. Smith alleged that she wrote various sections of three papers of John's for three classes.

45.   John was found not responsible for the allegations pertinent to Spanish 308 and 403, taught by Professor Michael Martinez-Raguso and Professor Jennifer French, but was found responsible [temporarily as the finding was to be reversed upon appeal] for the allegation regarding Spanish 201.

46.   John was cleared of the accusation that he had plagiarized two of the three papers questioned at the 2016 hearing and the third one (Spanish 201) was not even presented for examination. The professor for the Spanish 201 class, Soledad Fox, was also not present. The Committee based its finding solely on the allegation of the spurned ex-girlfriend Smith.

47.   The Honor Code Hearing policy states that the process is held in strictest confidence: nothing that transpires may be described or discussed outside the hearing. Exhibit P-5.

48.   On February 23, 2016, Bolton telephoned Smith, telling her that John would be expelled and that the expulsion was absolutely guaranteed. Bolton instructed Smith not to tell John about this conversation. John was in the same room while this phone conversation took place and Smith revealed to John what Bolton said.

49.  On or around March 3, 2016, on information and belief, Bolton again communicated private educational information regarding John to Smith, informing her that there was virtually no chance that John would prevail if he was to appeal the disciplinary decision. Such statements further evidence Bolton's bias against John.

50.  On or around March 4, 2016, Smith relayed what Bolton had said about John to John. John communicated to Smith that he did not wish to hear from Smith. That was his final communication to Smith.

51.  The aforementioned actions and statements demonstrate Bolton's continuous bias against John and predetermination of the case's outcome.

52.  On March 8, 2016, Dean Dave Johnson admitted to John and John's sister, Lady Doe, that the disciplinary process is "unfair to students" and that the procedures are deliberately written in a way that allows Williams to maneuver itself in its favor. Johnson also stated that Smith should not have been aware of the outcome of the hearing or the likelihood of an appeal.

53.  In fact, the College's "Student Handbook" consists of the williams.edu website as Williams ceased publishing hard copy handbooks in 2013. The code of conduct, honor hearing procedures, appeal procedures, etc. are ever-changing and continually edited with no notice to the students. The students have no way of knowing what the policies and procedures were at a past time or when they changed unless they had downloaded the information themselves.

54.  On information and belief, Bolton again communicated private educational information to Smith on March 8, 2016. Bolton telephoned or texted employee Smith and spoke to her about the meeting she had with John.

55.  Between March 8, 2016 and March 12, 2016, employee Smith telephoned John forty-eight (48) times, left two voicemails, and texted nine times.

56.  On March 13, 2016, John's attorney emailed employee Smith a cease and desist letter, bcc'ing it to Bolton. By this action, John, through his attorney, reported a complaint for assault and

harassment against employee Smith with Williams authorities as the letter referenced the assault of December 6, 2015 and subsequent harassment. Exhibit P-6.

57.   On March 14, 2016, John and his attorney met with Bolton and College Counsel. John, through his attorney, expressed deep concern that Williams was protecting an employee who had assaulted and harassed him, a student. Further, John put the College on notice of employee Smith's abuse of and abuse of power against one of its students who had spurned her advances.

58.   Title IX requires that in cases involving potential criminal conduct, school personnel must determine, consistent with State and local law, whether appropriate law enforcement or other authorities should be notified.

59.   Bolton appeared completely unconcerned about the harassment of and the assault upon John, a student, by one of the College staff. No report to legal authorities was made and no action was taken by Human Resources. Bolton, on information and belief, did not even consider reporting the assault to police.

60.   On March 16, 2016, John requested an appeal hearing for the one remaining plagiarism charge based on new evidence and improper procedures.

61.   On April 7, 2016, the Student Chair of the Honor Committee granted the appeal hearing.

62.   Also on April 7, 2016, in an in-person meeting between Bolton and John, Bolton informed John that the College was putting a mutual no-contact order in place between employee Smith and John at Smith's request. John had not contacted Smith in any way since March 4, 2016, as described above, nor was he ever the harassing or assaultive party in the relationship with Smith. The no-contact order was Smith's response to John's attorney's cease and desist letter.

63.   On information and belief, Bolton had informed employee Smith that John's appeal hearing had been granted and it was on this basis and upon Bolton's recommendation that employee Smith request that the College put in place a no-contact order.

64.   John received no equivalent advice. In fact, it was employee Smith who had always been the assaultive harasser in the relationship, as it would later become known.

65.   As a consequence of the no-contact order, Bolton requested that John not participate in a College dance team performance scheduled for that upcoming weekend so as to accommodate Smith's attendance. Despite the fact that Smith was the sole aggressor, it was John who faced [even further] punishment and again was denied educational opportunity based on his gender.

66.   On April 13, 2016, John's attorney delivered a "formal" Title IX complaint on John's behalf to Williams' Title IX Coordinator, Toya Camacho, against Defendant, Bolton, and employee Smith for the dating violence, i.e. assault and harassment, Smith committed against John plus the deliberate indifference towards this as demonstrated by Defendant and Bolton. Exhibit P-7.

67.   As described above, on March 13 and March 14, 2016, Bolton had earlier been given notice of the dating violence and harassment of John by employee Smith as Bolton had been bcc'ed the letter from John's attorney to Smith. Between then and April 13, 2016, the only institutional response was to discriminate against John in the no-contact order implementation, i.e. the incidents were not investigated as required under Title IX.

68.   Title IX requires schools to minimize the burden on the complainant, John, when taking steps to separate the complainant and the perpetrator. In penalizing John with the no-contact order, i.e. denying him participation in the dance contest, Defendant failed to follow this mandate. Exhibit P-1, *supra* at 15.

69.   On April 21, 2016, Bolton's confirmed by email that she, as a "responsible party" charged with the authority to address the misconduct and harassment of employee Smith under College policy and Title IX requirements, had not investigated or even considered the notice of assault and harassment given to her on March 13 and 14, 2016 as worthy of an investigation.

70.   Bolton's email begs the question why Williams persisted in allowing such a partial school official, expressly named in the Title IX complaint to the Title IX Coordinator as failing to

12

adequately address John's concerns about the dating violence and harassment, to take the lead with John's Title IX complaint.

71.  On April 26, 2016, the appeal hearing for the Spanish 201 paper was held without Bolton present as the Student and Faculty Chairs honored John's request for her recusal. John presented a statement that Smith had fabricated her story and presented evidence corroborating his allegation. He also described the events of the night of December 5, 2015, in part and not in strict order:

> Smith was, in his opinion, was very inebriated. Upon seeing John, Smith approached him and asked that he dance with her. He was hesitant to do so, since he knew she was not allowed to be at the event, given that she is an employee of the College. This caused Smith to become extremely angry; she initiated an extensive argument. In an attempt to diffuse the situation, John left the event and headed to his dormitory. Smith followed him, demanding that he confront her. Noting that he was not giving in to her demands, she physically hit him with her hand and took away his phone. Smith left him alone only after he mentioned he would go to Campus Safety and Security to explain her outrageous behavior.

72.  Lady Doe also presented a statement at the said hearing, presenting additional evidence as to employee Smith's behavior and state of mind on the night of December 5/6, 2016 when Smith made the allegation against John. Exhibit 3, *supra*.

73.  On April 27, 2016, the Honor Committee reconvened to deliberate the case. The Committee found John "not responsible" of violating the Honor Code. Therefore, the grounds for Bolton's original sanction of expulsion were nullified by the Committee's finding.

74.  Also on April 27, 2016, Bolton, despite being recused from the appeal hearing process, wrote an email to employee Smith that not only informed Smith that John had again been cleared of the plagiarism violation but consoled Smith about the outcome of the hearing. Furthermore, Bolton wrote, "For now, the most important things are to continue to get support, and to ensure that you are safe" as if it wasn't employee Smith who had assaulted and harassed John.

75.  On May 3, 2016, Camacho met with John to discuss the Title IX complaint that had already been officially filed on his behalf by his attorney April 13, 2016 with notice already having been given one month earlier. Camacho's first question was whether John wanted to file an "official"

Title IX complaint. She then asked why John wanted to file it at this particular moment. John told her that it wasn't that he wanted to file it just then, but that he had reported the complaint over a month earlier and that the college disregarded the compliant until recently.

76.   On information and belief, at a time between April 27, 2016 and May 4, 2016, employee Smith decided that she would be finally able to accomplish an expulsion of John, with the encouragement of Bolton, by lodging a counter complaint against John. Personally named in John's attorney's April 13, 2016 Title IX complaint letter as discriminating against John, Bolton was motivated by malice and anti-male bias.

77.   On May 10, 2016, less than one month from graduation and just at the beginning of John's final final exams, Camacho met with John to explain to him that in response to John's Title IX complaint against her, a complaint that could result in termination of her employment, employee Smith had filed a counter complaint against him claiming that he had "displayed abusive behavior towards her during the past two years." When John asked how this act cannot be seen as an act of retaliation, Camacho could not provide an answer. Exhibit P-8.

78.   Attached to Camacho's letter were the College's procedures and written timeframes for investigation and adjudication. The timeline provides for an eleven (11) week process from start to finish, with "finish" being the hearing. If Defendant had commenced the investigation of employee Smith when John first reported the assault and harassment, March 14, 2016, and not allowed employee Smith to counter complain, John would not have been subjected to this investigation and adjudication. He would have earned his degree at graduation on June 5, 2016.  Exhibit P-9.

79.   Defendant did not commence the investigation until May 10, 2016. Therefore, the hearing should have been held no later than July 26, 2016. At the time of the filing of this complaint, approximately thirty (30) weeks, has passed [much greater than twice the time] since the investigation began.

80.  Defendant did not adhere to the written timeframes. By doing so, Defendant breached its contractual obligation to provide a prompt process as well as Title IX's requirement for a prompt process.

81.  In fact, John was ongoing disciplinary action as early as February 2016 when he faced the plagiarism charges. As a result, his status with the College was precarious and his degree in limbo for over ten months.

82.  It is important to note that Smith was highly aware of the academic disciplinary case's outcome and knew fully well that there could be no better way to take revenge on John and achieve her goal of having him expelled than by accusing him of abuse as loosely and vaguely as it is defined in the College's Code of Conduct.  Smith had not been in a relationship with John since winter 2015, had engaged in numerous conversations with Bolton about John over the past year, but only just then lodged such a complaint. That she did so within moments of learning that the College was finally going to investigate her makes clear it was an act of retaliation.

83.  Employee Smith's baseless complaint, in clear response to John's complaint constitutes blatant retaliation. Incredibly, Defendant sanctioned and facilitated the retaliation in direct violation of the College's policy prohibiting retaliation.

84.  Furthermore, under Title IX, employees are not protected from sexual harassment by students. Employees' gender-based protections fall under Title VII employment discrimination in the context of employee complaints against employees. Therefore, employee Smith was not and entitled to and should not have been allowed to lodge a complaint against John.

85.  Defendant subjected John to a charade of an investigatory process when the role of abuser was actually the College employee.

86.  On May 20, 2016, the interviews for the investigation of John and employee Smith commenced. Williams hired attorney Allyson Kurker to conduct the investigation and to provide a report. John was not allowed any input into the selection of the investigator. College policy provides

for the Dean to direct the investigator as to what evidence to include.  The investigator has unilateral discretion in whom to interview and the questions to ask.

87.   Kurker denied John's attorney the right to confer with client by sharing notes throughout the first two interviews despite the College's policy that allows for such.

88.   Also on May 20, 2016, John wrote to Camacho an email regarding questions he asked the college's external investigator at his first interview on same date:

1. Is this is a Title IX investigation? (to which Ms. Kurker answered, "Yes.")

2. Are you aware that Title IX does not protect employees? (to which Ms. Kurker said that Title IX applies to all schools that accepts federal funding, an answer that did not make sense)

3. Why are you investigating Susan 's Title IX complaint against me? (to which Ms. Kurker said that I would have to direct these questions to you) Exhibit P-10.

89.   On May 23, 2016, Camacho responded to John's email, "Title IX protects employees as well as students. Ms. Kurker is investigating both your complaint against Susan and Susan 's complaint against you. The college's policies prohibit harassment by students and by employees." *Id.*

90.   On May 24, 2016, John emailed Camacho, in relevant part, "When we met a couple of weeks ago, I asked why the college did not see Susan's complaint as an act of retaliation. I remember your answer not being at all clear. Could you please explain to me why what seems a blatant retaliatory act is being facilitated by the college?" *Id.*

91.   On May 26, 2016, Camacho replied, in relevant part, "Susan [employee Smith] is allowed to file a complaint and the investigation/adjudication process will determine whether it is a legitimate complaint." *Id.*

92.   "Title IX protects employees as well as students" constitutes incorrect information. *Id.* Never in the history of Title IX has the OCR or any court of law ever considered school employees to be protected from sexual harassment by students. Only students are referred to as protected by the statute and in the regulations. In fact, in every single DOE and OCR documentation on Title IX, "Title IX is intended to protect students from sex discrimination" appears. Exhibit P-1, *supra* at 22.

93.  A "school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities **filed by students** against school employees, other students, or third parties." (emphasis added) *Id*. at 19.

94.  "Sexual Harassment Guidance: Harassment **of Students** by School Employees, Other Students, or Third Parties," states that its purpose is to provide the principles that a school should use to recognize and effectively respond to sexual harassment **of students** in its program as a condition of receiving Federal financial assistance. *Id*. at 2. Not once is sexual harassment of employees addressed in any Title IX regulation or sub-regulatory document. The same applies to the Dear Colleague Letter.

95.  On June 5, 2016, John "walked with his class" at graduation but was not given his degree. He had completed all the coursework, credits, and other requirements for earning the bachelor degree. His final cumulative GPA was 3.12.

96.  On June 8, 2016, John asked Camacho if he could receive transcripts of all the interviews from the investigation.

97.  On June 10, 2016, Camacho responded that, "Yes, you can request the transcripts of student records under FERPA. The request should be made to Dean Bolton. We do have to alert everyone whose records would be released if we do release the records."

98.  On June 14, 2016, per Camacho's instruction, John requested Bolton provide transcripts of all the interviews from the investigation.

99. On June 15, 2016, Bolton promised John that she would request these from Kurker.

100. On August, 22, 2016, after waiting over two months, John emailed Camacho asking about the transcripts as he had not received any yet.

101.  On August 24, 2016, Sandstrom emailed John a transcript of two of three of his interviews, not the third, and none of the witnesses' interviews.

102.   On September 1, 2016, Sandstrom denied John's request, now claiming that parties are not entitled to transcripts or tapes of the investigator's interviews with others.

103.   John's attorney responded by forwarding College Counsel the earlier emails from Bolton and Camacho promising all the transcripts and describing them as "student records" to which he was entitled under FERPA.

104.   College Counsel replied, "As John has been informed, the college procedures do not provide for giving interview transcripts to the parties to a sexual misconduct disciplinary proceeding. The interview transcripts are not routinely provided to the college, and therefore they are nor provided to the adjudication panel and are not part of the record on which the panel makes its decision…And, as you know, under FERPA John has a right to inspect, but not to receive copies of, his educational records.   If John wishes to make a formal FERPA request to review his educational records the college will of course respond appropriately, but in the meantime the adjudication process will proceed in accordance with the college's usual procedures."

105.   On September 13, 2016, John received the investigative report. Exhibit P-11.

106.   The report explained that John was investigated for allegations that he violated the 2015-2016 Relationship Abuse policy, 2013-2014 Student Code of Conduct provision regarding non-consensual sex, and 2014-2015 Dating and Domestic Violence policy. The investigative report laid out the purportedly applicable policies proposed by the College and did not include the 2013-2014 Student Code of Conduct which was entirely missing from the report.

107.   The September 13, 2016 report contained an exhibit that demonstrates Defendant's disparate treatment towards females, Smith in particular, compared to males, John in particular. Exhibit P-12. In said exhibit, Bolton responded to an email from Smith describing trivial difficulty she was having in her relationship with John. Bolton categorized what Smith had written as "scary and upsetting" and said that "People who love you shouldn't treat you in ways like that." Bolton and Dean Reyes' overreacted to Smith with sympathy, allowing her to take a week off from school. *Id*.

18

108.  The Deans' responses to Smith's email and Bolton's sympathy towards and encouragement of Smith "to continue to get support and to ensure that you are safe" when John was found "not guilty" of plagiarism compared with Defendant's dearth of response to John's complaint of assault shows a stark contrast between how females, e.g. Smith, and males, e.g. John, are systematically treated.

109.  On September 24, 2016, John submitted his response to the September 13, 2016 report. Exhibit P-13.

110.  John's September 24, 2016 response attacked the report for being biased against John as incorrect policies were applied, critical policies were not included as was John's Title IX complaint letter, statements from a partial Dean were included, and the term "testify" was used to describe Smith's statements. *Id.*

111.  John's response also attacked all the allegations made by the employee Smith as insufficiently meeting the criteria of the corresponding College policies as presented in the report. *Id.* The response provided more than sufficient counter arguments regarding how, even if the stated policies did apply, nothing described by employee Smith amounted to policy violation.

112.  Employee Smith openly admitted to assaulting John at approximately midnight on December 5 or December 6, 2015. This fact is not in dispute although the exact time at which the incident occurred is uncertain.

113.  Employee Smith also invaded John's right to privacy by logging in to his Facebook and Snapchat accounts. John presented evidence supporting these claims in his responses.

114.  During the investigation and report production, Defendant had had the opportunity to confer with the investigator and to clarify applicable policies. However, even though John pointed out that the report did not contain the applicable policy, Defendant made no effort to ensure the Hearing Panel would receive a correct report.

115.   Upon reviewing John's comprehensive response, on information and belief, Sandstrom

feared that there was a likelihood that the Hearing Panel would determine that there was insufficient

evidence to find John "responsible" for policy violations based on the report as written.  On

September 28, 2016, four days after the response to the investigator's report period had expired,

September 24, 2016, Sandstrom wrote John:

> I also want to clarify how our code of conduct and sexual misconduct policy apply to this
> case, which includes allegations that span over several years.
>
> (1) The investigative report carefully lays out the relevant college policies that were in effect in
> 2013-2014, 2014-2015, and currently (see pages 4-8). While there were some shifts in
> specific language over time, there was always a code of conduct which prohibited sexual
> misconduct of any kind.
>
> (2) Some of the complaints at issue here involve relationship abuse.  Specific wording about
> relationship abuse was added to the college code of conduct in October of 2015. It is
> important to note, however, that the fact that the code of conduct did not include an explicit
> "relationship abuse" provision prior to 2015 does not mean that the existing code of conduct
> could not be applied to the types of misbehavior that have been alleged.  Our code of conduct
> has always contained general guidelines that are intended to permit the college to address
> problematic behavior even if it isn't explicitly identified in the code.  Students are told that
> "they must respect the rights of others in the community," that sexual harassment is not
> permitted, that they will be held responsible "if they fail to maintain good conduct on the
> campus or elsewhere."  In addition, the code states that "the College does not attempt to
> describe every act that constitutes a violation of the code of conduct, but rather the College
> reserves the right to make determinations on a case by case basis...."

116.   The report did not include the policy that was in effect in 2013-2014 at all. The "shifts in

specific language" to which Sandstrom referred actually were monumental changes to the College

policies.

117.   On October 7, 2016, John submitted his response to employee Smith's response, his

"second response."

118.   On October 21, 2016, the Hearing Panel convened for the "hearing." The Panel consisted

of Ninah Pretto from the Dean's Office; Steve Klass, Vice President for Campus Life; and Aaron

Gordon, Administrative Director of Divisional Affairs and Vice President for Campus Life.

119.  At the "hearing," the Hearing Panel was provided the revised investigative report, John's original and second responses, and employee Smith's original and second responses. The "hearing" held by the Panel is not a "hearing" in any ordinary sense of the term. The accused student is not present; there is no "in person" meeting with the Panel at the "hearing."  The accused student has no opportunity to speak to the Panel before it decides whether to find the student responsible for violating the Code of Conduct. The accused student also has no opportunity to question or cross examine the accuser or the accuser's witnesses.

120.  On November 22, 2016, John received a determination letter from the Hearing Panel finding him responsible for violating the Code of Conduct by engaging in non-consensual sex. This was the "primary adjudication" phase of the process.

121.  The Hearing Panel completely ignored the fact that the correct Code of Conduct stated that "both parties have the obligation to communicate consent or the lack of consent." Exhibit P-13 at 5, 10, 11, 29, 30. The Hearing Panel also ignored the fact that the College did not have an "affirmative consent" policy at the time but used it in its decision making.

122.  The Hearing Panel's letter stated, in relevant part, "Susan [Smith] also indicated that you engaged in non-consensual sexual intercourse with her in September of 2014. Based on the preponderance of the evidence we find it more likely than not that you did *not* have affirmative consent to have sexual intercourse with Susan during the incident in question. Susan indicated that the unusual sexual position and roughness were indicators that you did not have consent. In additional [sic.], several witnesses recalled that Susan had described this incident of nonconsensual sex to them. Taken together, the Hearing Panel found this evidence to be credible, and therefore find you responsible for violation of the code of conduct in regard to sexual misconduct."

123.  However, Smith never made any statement to anyone that the sex was rough at all. The Hearing Panel simply made that up. Essentially, the Hearing Panel based their determination that the sex was non-consensual solely on an allegedly unusual position.

21

124.  As aforementioned, the Hearing Panel wrote that an unusual position taken together with several "witnesses" recalling that Susan described this incident was credible evidence "and therefore [found John] responsible for violation of the code of conduct in regard to sexual misconduct." The College's procedural standard for determining responsibility is preponderance of the evidence, not mere credibility. The Hearing Panel itself admitted to using "credibility" as its burden of proof instead of the required preponderance of the evidence standard.

125.  The Hearing Panel's finding did not address the credibility of John's refutations of the allegations at all. By doing so, it failed to indicate any assessment of why Smith was more credible than John.

126.  The only so-called "evidence" that exists is the allegation by Smith that she started to believe she was raped, as that is what non-consensual sex is, many months after engaging in sex with John in an allegedly unusual position. Many months later, Smith recalled this version of events to friends, with increasing degrees of severity and embellishment, during a period at which the relationship had begun to deteriorate.

127.  The Hearing Panel did not address the fact that Smith and John had been in a sexually active relationship for a year before the alleged incident and continued that relationship for over one year following said incident.

128.  The Hearing Panel did not address the fact that Andrea Estrada, the first person Smith allegedly told of the incident approximately one month later, informed Kurker that she did not recall Smith confiding in her about any episode of sexual contact with John that Smith described as either non-consensual or upsetting.

129.  The Hearing Panel did not address the fact that other so-called "witnesses" were friends of Smith to whom Smith spoke in the late spring to summer 2016 after the Title IX complaints were lodged and counter lodged. In fact, there were no actual witnesses and **no extrinsic evidence**

**whatsoever**. There were only the several friends who repeated what they recalled Smith had told

them much later.

130.  Most importantly, the Hearing Panel ignored the fact that Smith told Kurker that she did

not express to John that she did not want to be having sex. Exhibit P-11, *supra* at 12. The Hearing

Panel disregarded the fact that the College Code of Conduct in September 2014 stated that "Both

parties have an obligation to communicate consent or the lack of consent." Other substantial errors

included:

a.  The Hearing Panel treated the couple's long term relationship and the fact that the alleged incident occurred midway through the relationship as unimportant. The existence of a relationship should have unquestionably been a central issue in assessing John's behavior and resolving the issue of consent. However, the Hearing Panel dismissed the issue out of hand.

b.  The Hearing Panel found all of Smith's other allegations (fourteen [14] counts) against John that he "abused," "coerced," and "forced" her in other contexts to be insufficient to meet the criteria of the College's policy against "relationship abuse." Smith inaccurately labelled mundane behaviors (e.g. Smith described herself as being forced off a bus by John [Doc. 33-1 at 14], forced to wait outside for an hour in 19 degree weather by John [Doc. 33-1 at 21], forced to watch the Super Bowl by John [Smith's response to report], forced to buy John an iPad for his birthday [Doc. 33-1 at 24-25], forced out of their shared dorm room when she didn't even call John to let her in [Doc. 33-1 at 16-17], forced to buy food and cook for John [Doc. 33-1 at 24], forced her to take the blame for alcohol possession [Doc. 33-1 at 22-23], and even forced her to hit him across the face [Doc. 33-1 at 29-33]) as such, exaggerating to the extreme. Smith's wild and loose use of the term "force" should have been questioned by the Hearing Panel when deliberating on the non-consensual sex allegation. However, it does not appear that it did so.

c.  The Hearing Panel also failed to consider Smith's credibility unreliable based on the numerous conflicting statements she made to her friends and to Kurker and on how Smith embellished upon her statements with conflicting information during each subsequent recounting.

d.  The Hearing Panel also ignored how Smith made no mention of ever feeling afraid of or threatened by John to the Dean, no mention ever to her friends, no mention ever to Lady Doe, nor spoke of it ever with John in any of her texts. It was only during this process that Smith felt the need to embellish her story in order to play the victim card that she was so exceptionally good at playing.

e.  The Hearing Panel disregarded how Smith's credibility was further impugned by the evidence that she did, in fact, lie to Kurker about logging in to John's Facebook account from her phone and into his Snapchat account while she was in Colombia. She also lied to the investigator about her December 6, 2015 phone conversation with Lady Doe in which she repeatedly said that she was "gonna kill herself," claiming that she did not say this.

f.  The Hearing Panel ignored the fact that Smith's credibility was doubtful by the evidence that she frequently accused John of behavior of which Smith, herself, was actually guilty.

g.  The Hearing Panel unquestionably found Smith's recountings of the alleged incident to her friends to be "credible" although the timing of Smith's discussions was highly suspect and appeared to be grooming of friends to be witnesses and the planting of evidence against John.

h.  The Hearing Panel ignored the fact that Smith's friend Ava Atri told Kurker that sometime during the 2015-2016 academic year, Smith said to her in response to Ava's question whether John had ever abused her physically or engaged in non-consensual sex with her, "No, he's never done that. He doesn't do that." Smith changed her story in May 2016, after the commencement of the College's investigation of her, telling Ava that they had had sex when Smith was "really tired and not in the mood," and "didn't want to" have sex. Smith claimed that this was the night that she and John moved in together in August 2014. *NB*: The day that she and John moved in together in August 2014 was not the same night as Labor Day 2014. The Hearing Panel ignored these numerous contradictory statements.

131.  In his Second Response to the Report, John presented the aforementioned issues to the Hearing Panel and summarized:

> Smith speaks of being psychologically and emotionally abused but she produces virtually no evidence to that effect. In fact, the evidence that she produced actually evidences her psychological and emotional abuse of me. She can wax eloquently all she wants about living a life in silence out of fear and isolation; yet, the actual facts paint a very different story. We were 'together' for at least two years and there were people around us all the time. Not one of Smith's witnesses have stated any personal knowledge, i.e. something heard or seen, of any action, physical or verbal, on my part that corroborates Smith's claims. Doc. 41-3 at 3.

132.  Nor had Smith ever reported any assault or any concern about any behavior that might be characterize remotely as assaultive at any point during the relationship. In his annotated report, John questioned the significant delay in Smith's reporting and wrote:

> It is a matter of common sense and experience that, in general, recollection is likely to be better closer to the index incident than further from the event in question. Put bluntly, memories are likely to fade and the more time that passes the greater that risk. There is a real danger that with the significant passage of time a witness may replay the events in their mind resulting in a greater chance that their "recollection" becomes influenced by hindsight, sympathy or extraneous materials. In such a case there is a real risk that the witness may recount what they consider to be a genuine recollection of the events although the same has been affected by the passage of time and tainted by hindsight. Doc. 43- 2 at 20.

133.  None of this appeared to have had any impact on the Hearing Panel's decision regarding Smith's credibility on the allegation of non-consensual sex.

134.  The Hearing Panel's finding ignored the context of a romantic, exclusive, sexually active relationship and was not supported by the evidence. The Panel also ignored the fact that consent can be communicated through conduct. The finding of non-consensual sex cannot be squared with the evidence, and elevated a commonplace, everyday interaction into a serious sexual transgression.

135.  The Hearing Panel also did not appear to consider the motivations behind Smith's counter-complaint against John. In Kurker's report, the allegations by John regarding the December 6, 2015 email Smith sent to Bolton, that Smith presented false information at the appeal hearing (Leyla Rouhi's paper), and that Smith retaliated against John by lodging a counter-complaint to his Title IX complaint against her were stitched together as if they were one claim. However, they were not; John was very specific about Smith's counter-complaint as a discrete event. By melding these allegations together into Smith's "belief she had written papers for John," the Panel erroneously concluded that there was not a preponderance of evidence that Smith retaliated.

136.  The Hearing Panel ignored the fact that John had established a clearly discernable pattern of escalating behavior by Smith towards John when she did not get her way. This, combined with Smith's multitude of inconsistent statements, statements that do not align with evidence, invariable use of misnomers for attributing "force" to John, and embellished upon her statements during each subsequent recounting, should have cast doubt on Smith's credibility pertaining each and every allegation she made. Instead, the Panel accepted Smith's allegation of non-consensual sex as gospel, unquestioningly believing Smith without the existence of any proof and demonstrating the entrenched gender-bias of Defendant.

137.  These substantive shortcomings reinforce the conclusion that the procedures followed did not provide basic fairness. Significant procedural lapses plagued the process, particularly the misapplication of policies which had already been brought to the attention to the Dean and Hearing Panel in John's response. Exhibit P-13, *supra*.

138.  There was woefully insufficient evidence to sustain the Hearing Panel's finding.

**D.  John's Appeal of the Hearing Panel's Decision**

139.  On December 11, 2016, John requested an appeal of the Hearing Panel's decision by

emailing Leticia Haynes, VP Office of Institutional Diversity and Equity of Williams College:

> The reason for my appeal is the basis of significant procedural lapses. But for these procedural lapses, most importantly the Hearing Panel's basis of mere "credibility" of the accuser whose credibility was actually impugned thoroughly, the outcome of the hearing would have been to exonerate me of all the complaint's claims. The Hearing Panel itself admitted to using "credibility" as its burden of proof instead of the required preponderance of the evidence standard.
>
> There was no evidence in this case except for the accuser's inconsistent statements both to the investigator and to her "witnesses" who were friends who merely repeated to the investigator what the accuser said to them. With actual extrinsic evidence (of which she had none whatsoever), I established that the accuser consistently exaggerated, fabricated, and outright lied.
>
> Moreover, the Hearing Panel determined that uncomfortable sex in an unusual position constituted "non-consensual sex". The act doesn't come close to meeting the college's definition of non-consensual sex. It is inconceivable how this can be fair. There was nothing fair or impartial about this panel's adjudication and decision.
>
> As you will see in my response to the report, when compared to the Hearing Panel's finding letter of November 21st, one particularly egregious procedural error was the failure to include the Code of Conduct from academic year 2014-2015. That is one of numerous errors that need not be repeated here but can be reviewed in my court filings and the responses. Doc. 33-9.

140.  On December 19, 2016, in response to Haynes' request for a summary, John wrote:

> The two main procedural lapses by the Hearing Panel were the application of an incorrect burden of proof and incorrect college policy [and/or disregard for the correct policy] in determining my responsibility for violation of the college's sexual misconduct code.
>
> The Hearing Panel also did not appear to have read my Responses to the Report. If it had done so, it would have (or should have) applied the correct policy, doubted employee Smith's credibility, and known that my complaint that Smith retaliated against me in her counter-complaint was a discrete event (not one stitched together with her Honor Code claim).
>
> I would like to be able to comply with your request to provide you with a short description of the specific procedural issues that I believe affected the panel's decision. In sum, in addition to the points above, the Hearing Panel ignored evidence that the accuser 1) contradicted her own claims (commenting "No, he's never done that. He doesn't do that."); 2) did not express that she did not want to be having sex, 3) lied to the investigator, 4) had motivation to fabricate, exaggerate, and defame Plaintiff, 4) lacked credibility, 5) applied the terms "force"

and "coerce" inappropriately, 6) never reported any assaultive or sexually assaultive behavior of me until she was facing a complaint investigation into her own behavior, 7) had been engaging in sex with me for a year prior and a year following the alleged incident, 8) planted evidence in the form of groomed "witnesses" to recount her statements, and 9) had no evidence whatsoever.

141.  John also included a document containing highlights of this complaint which were relevant to the appeal. Exhibit P-13A.

142.  On January 3, 2017, John emailed Haynes a summary of his claims regarding procedural lapses as well as his reply brief in opposition to the College's motion to dismiss that "provide[d] a description of the procedural lapses that form[ed] the basis of [his] appeal." The summary included the following sections from the opposition brief: 1) The Panel did not apply the correct standards in determining whether Plaintiff engaged in non-consensual sexual intercourse; 2) The proceedings have not been conducted with basic fairness; and 3) The Hearing Panel's decision was arbitrary and capricious. Exhibit P-13B.

143.  On January 31, 2017, Haynes emailed a letter informing John that she was granting an appeal hearing on the narrow basis of how the Hearing Panel applied a policy not in effect at the time of the alleged misconduct. Haynes' letter stated, "The two policies [referencing the one applied by the investigator and the one in effect at the time of the alleged incident] are different, including with respect to the requirement for affirmative consent." Exhibit P-13C.

144.  The letter further explained,

> The original hearing panel shall reconvene and consider the claim of non-consensual intercourse against you. In reaching its determination, the panel shall rely on the language of the college's policy in effect at the time of the alleged September 2014 misconduct, namely the language included above.

> When the panel reconvenes, pursuant to the college's policy, the panel will consider and weigh all the evidence presented before it, including the "statements gathered by the investigator and the investigator's report, along with the responses to the report (if any) from the complainant and respondent". *Id.*

145.   On February 10, 2017, John's counsel objected to the narrowness of the appeal (the incorrect application of policy alone as the basis for rehearing) and to the contradictory language in the appeal issuing letter from Haynes. The objection stated:

First, in support of the appeal, my client raised a number of procedural concerns. While we agree that the appeal should be based on how the hearing panel did not consider the college policy in place at the time of the alleged misconduct when reaching its determination, we do not agree that that should be the only grounds.

The other bases, as submitted to Ms. Haynes, included:

1. The Panel did not apply the correct standards in determining whether the accused student engaged in non-consensual sexual intercourse.

2. The proceedings were not conducted with basic fairness, including: a) No notice of the non-consensual sex allegation; b) The investigator repeatedly prevented such consultation during the first two interviews, such as sharing notes, in direct violation of College policy; c) The Hearing Panel made up evidence (re: "roughness"); d) The Hearing Panel ignored exculpatory evidence [ignoring the facts that Smith i) contradicted her own claims (commenting "No, he's never done that. He doesn't do that." etc.); ii) lied to the investigator, iii) had motivation to fabricate, exaggerate, and defame the accused student, iv) lacked credibility, v) applied the terms "force" and "coerce" inappropriately, vi) never reported any assaultive or sexually assaultive behavior of the accused student until she was facing a complaint investigation into her own behavior, vi) had been engaging in sex with the accused student  for a year prior and a year following the alleged incident, vii) planted evidence in the form of groomed "witnesses" to recount her statements, and viii) had no evidence whatsoever to support her claim.]; e) The Hearing Panel ignored the fact that Smith told the investigator that she did not express to the accused student that she did not want to be having sex; and f) The accused student was not afforded a hearing in any ordinary sense of the term.

3. The hearing panel's decision was arbitrary and capricious. The decision lacked any rational explanation that reasonable persons might support when there was no evidence whatsoever that could have supported it.

We believe that the appeal is/was unreasonably narrow and that the Hearing Panel should have been provided the documentation that John submitted regarding the above, particularly the Summary for Appeal from Response to Motion to Dismiss.

Second, Ms. Haynes states that a "review of the evidence to make a determination about whether misconduct occurred does not take place during the appeal process." However, this contradicts: "When the panel reconvenes, pursuant to the college's policy, the panel will consider and weigh all the evidence presented before it, including the "statements gathered by the investigator and the investigator's report, along with the responses to the report (if any) from the complainant and respondent". (Investigation and Adjudication Process for Sexual Assault, Sexual Exploitation, Stalking, Relationship Abuse, part II). After reviewing the evidence, "[t]he panel will decide whether there is a preponderance of evidence showing a violation of the college's code of conduct as regards sexual misconduct." (Investigation and

Adjudication Process for Sexual Assault, Sexual Exploitation, Stalking, Relationship Abuse, part II)." We agree with the latter statement but reject the former as we believe, as aforementioned, the Hearing Panel should have been provided John's review of the evidence (namely the Summary for Appeal from Response to Motion to Dismiss) in light of the other procedural lapse claims.

A reasonable expectation of the College's appeal policy includes an ability to challenge the determination whether misconduct did or did not not occur.

146. Counsel for Defendant replied to this objection stating, "The Vice President was entirely within her discretion to handle the appeal in the manner that she did."

147. On February 13, 2017, John received a letter ("post appeal letter") from Sandstrom and the Panel stating its final decision. It stated, in relevant part:

The panel originally found you responsible based on its determination that "it [was] more likely than not you did not have *affirmative* consent to sexual intercourse with Smith during the incident in question." Although the version of the policy in effect at the time did not use the term "affirmative" consent, it used other language, still present in the newer version, to express the same concept. The version in effect at the time stated, "Any intercourse (anal, oral or vaginal), however slight, with any object, by a man or a woman upon a man or a woman, without *effective* consent [is non-consensual sexual intercourse]." It went on to say, "Consent means that at the time of the sexual contact, words or conduct indicate freely given approval or agreement, without coercion, by both participants in the sexual contact."

The panel's decision to find you responsible for non-consensual sex was influenced by two factors: Smith credibly reported that both the sexual position and roughness during the incident in question were unusual, and clear indicators that you did not have consent, and witnesses recalled that Smith had described this incident to them as nonconsensual. When the panel reconsidered the evidence again, focusing specifically on the version of the Code of Conduct in effect at the time, they concluded it was more likely than not that Smith did not provide *effective* consent -- i.e., "words or conduct [that] indicate freely given approval or agreement." Thus the panel has affirmed the original finding of responsibility for non-consensual sex.

The panel made no change to the sanction. Exhibit P-13D.

148. It seems John was presumed guilty from the start as the investigation was rife with bias and grossly improper procedure that doubtlessly would influence the outcome. Especially important in this presumption of guilt is the fact that the Hearing Panel was instructed to protect the College's reputation as the absolutely paramount concern when deciding whether a violation of the Code of Conduct concerning sexual misconduct occurred.

149.  A fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder not predisposed to reach a particular conclusion. A fair determination of the facts further requires objectivity and a fair process that is not prejudiced against the accuser when utmost concern is placed upon the College's reputation.

150.  Since panelists are trained to be partial and unfair, it is no surprise that the Panel did not make any change to its determination finding John responsible for non-consensual sex. They had to find John responsible since the College had chosen a course of action to protect employee Smith; and a sexual misconduct charge was certain to "stick" given the biased circumstances.

151.  On information and belief, the Hearing Panel chose to find John guilty of the particular accusation of non-consensual sex instead of one of Smith's other fourteen counts of relationship abuse, dating violence, stalking, and other Code of Conduct violations because it knew John had a previous "sexual assault" violation and knew the prejudice from another count would cement stigma. Defendant, in an effort to paint John in the most negative light possible as a serial rapist, knew that finding John guilty of non-consensual sex would have a "Scarlet Letter" effect and would justify the imposition of the harshest punishment available.

152.  For the same reason, Haynes decided to choose only the narrow issue of the misapplication of policy for the basis of the appeal as the College had asserted that the before-October 2014 policy was the same as the after-October 2014 policy. Hence, a final outcome unfavorable to John was guaranteed under this albeit false theory.

153.  The Hearing Panel's final decision was a "doubling down" on its initial decision. To reverse itself would be to admit wrongdoing. To admit wrongdoing would tarnish the College's reputation. Sticking with the pre-determined outcome, the College could proceed with using its vast resources to drag out this case in the courts. And, since the College treats people according to perceived pedigree and importance, it saw no problem with playing a game of attrition and destroying John.

154.  The Hearing Panel did not apply any critical analysis to the facts under the conflicting policies and under instruction to apply the correct policy. The Panel continued to ignore all of the policy except the definition of the key term of "non-consensual sex." Also, the February 13, 2017 "post appeal decision" letter made no indication that the Panel actually "reconsidered the evidence again."

155.  Instead, the Hearing Panel simply rephrased its original decision from "it [was] more likely than not you did not have *affirmative* consent to sexual intercourse with Smith during the incident in question" to "it was more likely than not that Smith did not provide *effective* consent -- i.e., 'words or conduct [that] indicate freely given approval or agreement.'" *Id.*

156.  The repeated use and rephrasing of the definition of the one key term in the non-consensual sex policy on which the Hearing Panel received training confirms that the Hearing Panel, as well as Sandstrom, received no training on the full policy and, hence, were inadequately trained.

157.  Furthermore, the Hearing Panel did not examine the differences in the varying policies with even a modicum of care, failing to do any real comparisons. It also did not question the term "effective" in the pre-October 2014 policy's definition of non-consensual sexual intercourse. The "post appeal decision" letter conflates the concept of an affirmative consent policy with the use of the term "effective" in the definition of non-consensual sexual intercourse. Exhibit P-13E.

158.  The applicable pre-October 2014 policy is essentially what is known as a "no means no" policy. NB: "A verbal 'no' (no matter how indecisive) or resistance (no matter how passive) constitutes the lack of consent" and "both parties have the obligation to communicate consent or the lack of consent." *Id.*

159.  The correct policy did not contain any affirmative consent language that is present in the later policies. Notably absent are: "*The Williams College Code of Conduct requires affirmative consent for all sexual activity*" and "*In the absence of affirmatively expressed consent, sexual activity is a violation of the code of conduct.*" Also absent is: "*Consent may not be inferred from*

*silence or passivity."* *"A verbal 'no' (no matter how indecisive) or resistance (no matter how passive)*

*constituted the lack of consent"* is not *"In addition [to] a verbal "no" (no matter how indecisive) or*

*resistance (no matter how passive) constitutes the lack of consent."* Lastly, the correct policy

contained, *"both parties have the obligation to communicate consent or the lack of consent."*

160.  In the post-October 2014 (incorrect) affirmative consent policies, non-consent in the form

of verbal 'no' or resistance is **additional** to the requirement of an expressed agreement through

words or actions. Saying no and/or resisting constitutes non-consent *in addition to* "[i]n the absence

of affirmatively expressed consent, sexual activity is a violation of the code of conduct." The policy

also states that "consent may not be inferred from silence or passivity." **In other words, it does not**

**matter whether or not the accuser expressed consent or lack of consent.** These policies are

known as "only yes means yes" policies - only with an expressed "yes" can any sex be consensual. In

other words, no sexual activity is consensual without an expressed agreement through words or

actions. *Id.*

161.  In the pre-October 2014 (correct) policy, "a verbal 'no' or resistance constituted the lack

of consent" and that was the extent to which the policy describes lack of consent. Nothing else but

saying no and/or resisting constitutes non-consent. **In other words, it matters a whole lot whether**

**the accuser expressed consent or lack of consent through conduct or words.** The policy did **not**

say, "[i]n the absence of effectively expressed consent, sexual activity is a violation of the code of

conduct." It also did **not** say, "consent cannot be inferred from silence or passivity." It was clearly a

"no means no" policy, monumentally different from an affirmative consent policy, despite the

College's repetition of the claim that the version of the policy in effect at the time expressed "the

same concept" as the newer versions. *Id.*

162.  Sandstrom's claim that, "[a]lthough the version of the policy in effect at the time did not

use the term 'affirmative' consent, it used other language, still present in the newer version, to

express the same concept" is simply not true. In fact, Sandstrom's claim could not be any further from the truth. Exhibit P-13D.

163.   The correct policy provided no definition of what "effective" means in its definition of non-consensual sex. In fact, the term is undefined and confusing: "Non-Consensual Sexual Intercourse: Any sexual intercourse (anal, oral or vaginal); however slight; with any object; by a man or a woman upon a man or a woman; without effective consent."

164.   The term "effective consent" in tort law, for example, applies to the state of mind of the alleged victim and whether or not the victim "effectively" consented to the sexual act. In order for consent to be "effective," it must be both "real" and "freely given." "Real" means that an individual must have knowledge sufficient to enable them to understand the interference to which they are consenting. "Freely given" means not under duress. Exhibit P-13E. The term is particularly problematic from a reasonable undergraduate student's point of view as he is not trained in legal terminology.

165.   An ordinary definition of "effective" is "successful in producing a desired or intended result"; syn: successful, effectual, potent, powerful, etc. If one applies a common-sense ordinary understanding to the word in the context in which the term is used, [again, solely to define non-consensual sex: any sexual intercourse (anal, oral or vaginal); however slight; with any object; by a man or a woman upon a man or a woman; without effective consent] then the College's definition of non-consensual sex is tautological and circular, if not also oxymoronic. This can be demonstrated by replacing the term with an ordinary definition, e.g. non-consensual sex is any sexual intercourse… without *successful* consent. Obviously, non-consensual sex is sex without consent, be it *successful* consent, *powerful* consent, *effectual* consent, or effective consent and the complaining person is asserting that he or she was supposedly unsuccessful in producing a desired or intended result.

166.   The College's definition of non-consensual sexual intercourse at the time is no paragon of clarity, nor is the remainder of the policy defining consent. What is clear, however, is that the policy

did not contain, as Sandstrom disingenuously implies, any affirmative consent provisions such as: "*The Williams College Code of Conduct requires affirmative consent for all sexual activity*"; "*[i]n the absence of affirmatively expressed consent, sexual activity is a violation of the code of conduct*"; and "*consent may not be inferred from silence or passivity*."

167.  With an ever-morphing (especially evident when examining the different policies in place discussed above) set of standards, either the College does not know what it is doing or it is deliberately muddying the waters to ensure a predetermined outcome by forcing a standard upon John that was not in effect at the time. Given the pattern of behavior by the College throughout this case and the statements provided by employees, the latter is much more plausible.

168.  On appeal, the Hearing Panel completely ignored the policy requirement that "both parties are required to communicate consent or lack of consent." It also continued to completely ignore the compelling questions about Smith's credibility; failed to address any of the concerns raised in John's two responses to the report; and, again, simply doubled down on its original opinion, repeating that Smith had "credibly reported that both the sexual position and roughness during the incident in question were unusual (which were clear indicators that [John] did not have consent), and witnesses recalled that Smith had described this incident to them as nonconsensual." All procedural lapses present in the original hearing went completely unaddressed at the appeal. Exhibit P-13D.

169.  Here, the Hearing Panel again assumed "roughness" in the sex, when Smith made absolutely no statement of such sort to the investigator or her friends.

170.  Actually, what Smith said was, at the very end of Smith's initial interview after making fourteen other allegations of abuse, physical assault, and dating violence: One time, shortly after they moved into their shared dorm room in Dodd House, she "didn't want to have sex, but he still did it anyway." He "kind of just forced himself in, and it hurt." Doc. 33-1 at 9-10. Here, what Smith far more plausibly describes is not "rough sex" but intercourse without enough foreplay that provided her adequate stimulation and lubrication, hence resulting in discomfort that was not new to Smith.

171.   The Hearing Panel never addressed John's explanation to the investigator that because Smith was on the birth control pill, her body often did not self-lubricate causing her discomfort, and so they would use synthetic lubrication. This biochemical explanation provided a physiological etiology of Smith's discomfort. Doc. 33-1 at 11.

172.   In fact, Smith herself explained in her second interview that "she 'just felt really uncomfortable' because she 'wasn't lubricated, and it hurt.'" *Id.* She also stated that her body sometimes would and sometimes would not self-lubricate. Doc. 33-1 at 12.

173.   Smith further misrepresented the facts by claiming that she and John did not start using lubricant until the fall of 2015. As evidenced by the report, by the time of Fall 2015, the relationship between Smith and John had begun to sour. In fact, it was that time during which they were having sex less and less frequently. The truth is that they began using lubricant in Spring 2014, a few months before the alleged incident.

174.   Therefore, the Hearing Panel's claim that the so-called "roughness" during the incident in question was unusual was further fabrication by the Panel. (*See*, "…both the sexual position and roughness during the incident in question were unusual, and clear indicators that you did not have consent…" Exhibit P-13D, *supra*.) The Hearing Panel had no evidence, and Smith made no statement to the effect, that this discomfort was at all new or unusual.

175.   What the Hearing Panel essentially concluded, by erroneously applying an "affirmative consent" policy concept, is that John was required to seek prior verbal agreement from Smith to have sex in the "unusual" position (e.g. "Can we start out from behind?") and to make sure that Smith was sufficiently lubricated (e.g. "Are you wet enough? Are you still wet enough?"). Such is the absurd reality of fundamentally unfair affirmative consent policies. Under the correct policy, this type of explicit agreement is not required.

176.   On appeal, in addition to continuing to disregard the numerous concerns that cast doubt on the alleged "evidence," the Hearing Panel continued to ignore the fact that the alleged incident

occurred in the context of a good relationship of one year duration at the time, as the prior year was virtually free of any discord. In fact, the couple's relationship was proceeding so swimmingly that they had moved in together around the time of the night in question.

177.   The Hearing Panel continued to accept carte blanche Smith's belief that the sex was non-consensual. This acceptance was partially based a College culture that promotes female victimhood and assumes male rapacity.

178.   The Hearing Panel also completely disregarded all of John's statements to the investigator and his responses to the report which demonstrate reasonable, consistent, honest, and credible contrary evidence attacking Smith's claims and support a finding in John's favor.

179.   The Hearing Panel ignored the fact that there were no medical reports, 911 calls, reports to police, or reports of witnesses to any alleged incident.

180.   On appeal, the Hearing Panel not only failed to examine Smith's statements, how they contradicted each other as well as the statements she allegedly made to her friends, it also failed to support its claim that "several witnesses recalled that Smith had described this incident of nonconsensual sex to them." Exhibit P-13D, *supra*.   In fact, the evidence actually does not support this claim, as one would see upon a careful examination of the evidence.

   a.   First, in October 2014, Smith claims that she told her friend, Andrea Estrada, about this situation…She told Andrea that she felt really uncomfortable when she and John had been having sex because "it was a really different position…" Doc. 33-1 at 9-10. *Here, all that Smith's recollection was to Andrea was that she had uncomfortable sex in an unusual position. She says nothing about force, coercion, lack of consent, or anything supporting a claim of non-consent. This was also her first recount of the event to anyone. Besides, Andrea told the investigator that she does not recall Smith confiding in her about any episode of sexual contact that Smith described as either non-consensual or upsetting. One would think one would recall such a "really surprising and worrying" revelation by someone close to you.*

   b.   Second, sometime during the 2015-2016 academic year, Ava Atri asked Smith whether John had **ever abused her physically or engaged in non-consensual sex with her. Smith replied, "No, he's never done that. He doesn't do that."** [Emphasis added.] *Id*. at 10. *However, in May 2016, after the investigation of John's complaint against Smith commenced, Smith's new story to Ava was that* the night that she and John moved in together in August 2014, they had intercourse even though she was "really tired and not in the mood,"

and "didn't want to" have sex. *Id. This statement still does not allege non-consent as all it describes is that Smith was tired, not in the mood, and, on that basis, it was sex when it was inconvenient for her.*

c.  Next, in mid July 2016, well after the investigation began and in the midst of the interviews, Smith told Elanie Wilson that "on one occasion when she had been intoxicated and asleep, she awoke to John having sex with her." *Id* at 13. *Note that Smith contradicts her claim in the first interview that she was aware when the sex commenced. It is at this point of time that Smith appears to be formulating a story that will be convincing enough to an uncritical examiner.*

d.  Lastly, Eman Al-Ali stated that Smith recalled that John "forced himself on her" when she didn't want to engage in sexual activity with him. According to Al-Ali, Smith told her that they had been drinking and, when they returned to their bedroom, he forced her to engage in sexual activity, and she cried during the incident. [Smith] just said [to Eman] that she didn't want to, but he kept forcing himself. *Id. First, regarding crying, Smith said that she doubts that John noticed it. Id.* at 10. *Second, none of Smith's own statements describe John "forcing himself on her" when they returned to their bedroom or while in their shared bed. Third, Eman's information amounts to nothing greater than a simple recitation of Smith's side of the story, with ever-evolving claims and never ending inconsistencies. Also, the account of Eman Al-Ali could easily be mistaken for a time in the spring (March 2016) when the couple was going through their final break up instead of the reported "spring 2015." Id. This confusion seems reasonable as Eman lives in Houston and she believed that they were not dating at the time of the alleged sexual assault.* Doc. 41-2 at 44.

181.  The logical conclusion from these statements, together with all the facts, the timeline, the relationship history, and the discernible pattern in Smith's escalation of allegations, is that Smith gave implied consent and went along with having sex, as she described herself doing -- in a voluntarily self-sacrificing manner (unwanted sex where one party agrees not out of desire but to please or placate the partner as distinct from non-consensual sex) just like she depicts herself in her lengthy fourteen count complaint. The discernible pattern shows Smith putting John's needs and interests before her own, wishing he would "mind read" (which he obviously couldn't/can't), failing to communicate her needs or desires, regretting the outcome, hating him for this, and then portraying herself as the victim.

182.  Unless the College actually equates uncomfortable sex in an unusual position with rape, the Hearing Panel would have to have assumed facts not in evidence to come to the woefully unsupported conclusion that the sex was non-consensual as none of Smith's statements describe John

as forcing himself on her when they returned to their bedroom or while they were in their shared bed. Smith made no statements that indicated that she was in their bed in any circumstances other than of her own free will and accord, that she had removed her clothing and gotten into bed with John as she had many times previously. She told the investigator that she was awake and aware when the intercourse commenced without objection. She told the investigator that she did not express to John at any time that she did not want to be having sex. All of these factors demonstrate conduct indicating implied consent, particularly in the context of a long-term sexual active relationship in which partners use non-verbal cues to communicate.

183.  In fact, at the time of the sexual contact, consent was present in the form of conduct indicating freely given approval or agreement, without coercion, by Smith. This, coupled with the exhaustive facts that cast doubt on Smith's version of events, supports the conclusion that John should not have been found responsible for non-consensual sex under any version of the College's policies. The preponderance of the evidence actually weighs against Smith and favors John.

184.  The policy language used in the investigative report does not exactly match any of the College's written policies. Exhibit P-13C, *supra*, Exhibit P-13E, P-13E(i) and P-13E(ii). Defendant nefariously submitted this fabricated policy to Kurker for the purpose of influencing the outcome.

**E. Conclusion**

185.  On information and belief, Defendant's flawed procedures and mishandling of John's case were symptomatic of a broader culture of inherent, systematic and intentional gender bias against male students accused of sexual misconduct, through which males are unable to receive a fair and impartial disciplinary process when a complaint is made against them by a female.

186.  On information and belief, the sexual misconduct policy has only been enforced against male students at Williams.

187.   The flawed procedures and mishandling of John's case were symptomatic of a broader culture of inherent, systematic, and intentional bias and unfairness specifically designed to protect the College from damage to its reputation before all else.

188.   Defendant's violations were knowing and foreseeable, as the Defendant had notice of the flaws in its disciplinary process, as written and implemented, and of its unfair, biased, and discriminatory action from multiple sources. For example, the College was previously sued in federal court regarding similar allegations of anti-male bias by the College. In the 2013 *John Doe v. Williams College* complaint, Bolton was named throughout the complaint as a perpetuator of the discrimination. Case No. 1:13-cv-11740-FDS, Doc. 13.

189.   Sandstrom and the Hearing Panel used Plaintiff as its whipping boy in this kangaroo court. They were especially motivated to protect the College's reputation by appearing to be "tough" on sexual assault, considering the negative publicity the 2013 *Doe v. Williams* case received from both ends of the spectrum. In that case, the accuser and her well-connected family garnered much media attention, damaging the College's reputation and impacting alumni donations.

190.   Defendant's failure to investigate impartially and promptly directly violates Title IX and the College's own policies. Defendant did not adhere to the written timeframes nor did it follow the written procedures as a student would reasonably expect.

191.   The process did not adhere to the College's own policies which call for "prompt, fair, and impartial" procedures and resolution; e.g. not directed by Defendant to achieve a desired outcome, policy violations not changed midway and after the opportunity to respond; and did not meet the reasonable expectations of the student.

192.   Defendant deliberately failed to exercise reasonable care in the appeal in order to ensure the pre-determined outcome. Moreover, Sandstrom falsely equated the pre-October 2014 and the post-October 2014 policies. By these actions, Defendant perpetuated bias against males generally at the College and Plaintiff particularly.

193.  Bolton's decision-making, disciplinary decisions, and disparate treatment towards John were replete with bias. The actions and omissions by Defendant were rife with improper procedures, bad faith, bias, and unfairness to John partially based on his gender.

194.  Defendant persisted in this retaliatory action, harassing, browbeating, and bullying John, abusing the imbalance of power and authority and causing him grave harm. The actions of Defendant and employee Smith have caused and continue to cause John incredible distress and emotional harm.

195.  It is important to ask what purpose this adjudication served, having been conducted after John completed all the requirements for his degree. Reaching back into the past, akin to degree revocation, appears to only serve a vindictive, spiteful, and retaliatory aim. An expulsion at this stage is akin to a revocation of a degree. A student's behavior should be really egregious to warrant such an extreme measure. Plaintiff's behavior not only was not in violation of the applicable Code of Conduct, it can hardly be described as egregious.

196.  The actions taken by Defendant resulted in a deeply flawed investigatory and disciplinary process during which John was denied the most rudimentary elements of fairness due him under contractual equivalents of due process in the private college setting; in violation of Title IX; and in violation of written procedures promised to him by Williams in its Student Handbook.

197.  Defendant inflicted unfair, biased, and harmful actions and omissions upon John, choosing a course of action that foreseeably led to the withholding of his degree at graduation; the permanent denial of his degree; and consequent catastrophic harm to his academic and career prospects, earning potential, and reputation. John is threatened with substantial, imminent, and irreparable harm from Defendant's actions.

198.  In an attempt to continue his academic pursuits, John made inquiries to numerous graduate schools and law schools about admission policies. The majority of these institutions informed John that, if his record indicates a finding of expulsion or sexual misconduct, he will not be

admitted, regardless of his grades, test scores, community activities, or the circumstances surrounding his case.

199. Without his undergraduate degree, John cannot apply to graduate school or law school.

200. The same restrictions apply to John's transfer opportunities. Most colleges and universities explicitly forbid acceptance of transfer students who have been denied a degree from a college or university. Therefore, because Defendant has expelled John, he is unable to enroll at another institution, let alone one of comparable quality, in order to repeat years of requirements and earn a degree. Without one, John cannot apply to graduate school, cannot pursue a professional license that requires an undergraduate degree, nor can he have any reasonable prospects of employment commensurate with his education. The harm that a permanent denial of his degree will cause John will be astronomical.

201. By this action, John seeks to right these grievous wrongs, salvage his reputation, and restore his emotional and psychological well-being.

## COUNT I
## VIOLATION OF 20 U.S.C. §§ 1681-1688 (TITLE IX)

202. Plaintiff reasserts the allegations set forth above as if fully set forth herein.

203. On information and belief, the fundamental unfairness that imbued Plaintiff's disciplinary process is part of a pattern of decision-making that discriminates against male students accused of sexual misconduct and demonstrates the influence of entrenched gender discrimination.

204. The improper procedure, selective enforcement, deliberate indifference, erroneous outcome, and retaliation in Plaintiff's case were due to gender bias.

205. Males invariably lose when charged with sexual harassment at Williams in combination with the totality of the circumstances provides a verifiable causal connection between flawed proceedings and allegations of gender bias.

206.  Title IX states in pertinent part: "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance..." 20 U.S.C. § 1681(a). Title IX bars the imposition of university discipline where gender is partly a motivating factor in the decision to discipline.

207.  Under Title IX, The OCR's Dear Colleague Letter and OCR Standards require schools ensure that all employees involved in the conduct of the procedures have adequate training as to what conduct constitutes sexual harassment, which includes alleged sexual assaults.

208.  Williams receives federal funding under Title IX. As a Title IX recipient, Williams is required to comply with the requirements of Title IX as well as those of the regulations promulgated thereunder by the Department of Education.

209.  The regulations require that sexual misconduct disciplinary procedures are equitable, reliable, fair, and impartial. Exhibit P-2, *supra.* College policy provides for same. Exhibit P-9, *supra* at 9. The regulations further require that "a school's procedures must accord **due process to both parties involved** ..." (emphasis added). Exhibit P-1, *supra* at 22.

210.  Williams' sexual misconduct and disciplinary policies, as implemented in Plaintiff's case, are not equitable and do not accord due process to the accused. Defendant failed to conduct an adequate investigation and adjudication in violation of both Title IX and its own written procedures. Defendant failed to provide Plaintiff a real hearing.

211.  Defendant placed excessive focus on the concerns and interests of the female counter complainant [employee Susan Smith] to the exclusion of the rights and interests of the male Plaintiff.

212.  Defendant's response, or lack thereof, to Plaintiff's report of Smith's assault was not prompt, not unbiased, and not impartial but instead constituted selective enforcement and deliberate indifference. Plaintiff's complaint against Smith was essentially ignored for over one month and efforts to make the complaint were repeatedly frustrated by the College.

213.   A school violates a student's rights under Title IX when the following conditions are met: (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program; and (2) the school, upon notice, fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. *Id.*

214.   According to the OCR, when a responsible employee knows or reasonably should know of possible sexual [or dating] violence, OCR deems a school to have notice of the sexual [or dating] violence. The school must take immediate and appropriate steps to investigate or otherwise determine what occurred, and, if the school determines that sexual [or dating] violence created a hostile environment, the school must then take steps to address the situation. The school has this obligation regardless of whether the student, student's parent, or a third party files a formal complaint. John's attorney had already filed complaints on March 13 and 14, 2016, a month earlier. Williams persisted in violating Title IX by its obstinate refusal to take the assault and harassment of John and discrimination against him seriously. Exhibit P-14 at 15.

215.   The assault that employee Smith made upon Plaintiff constituted dating violence and/or relationship abuse under the terms of the college's sexual misconduct policies; yet the assault was not reported to police per Williams' current policy of reporting all dating violence to law enforcement.

216.   Bolton and Camacho were deliberately indifferent to the complaint against the female employee, to the complaint that employees are not protected by Title IX, and to the complaint that employee Smith was retaliating against John. The unfairness is part of a pattern of decision-making that discriminates against male students accused of sexual misconduct and favors female members of the Williams community.

217.   Title IX makes it unlawful for schools and respondents to retaliate against individuals when they file a complaint alleging a violation of Title IX. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation,

coercion, or discrimination (including harassment), it must take immediate and appropriate steps to investigate or otherwise determine what occurred. If an individual brings concerns about Title IX problems to a school's attention, it is unlawful for the school to retaliate against that individual for doing so. *Id.* at 42-43.

218.  Defendant sanctioned and facilitated the retaliatory counter complaint against Plaintiff for his making a complaint against employee Smith and Bolton.

219.  Defendant denied Plaintiff an educational opportunity by barring him from the dance team competition. Defendant further disparately treated Plaintiff and employee Smith by allowing her to attend said competition.

220.  If Defendant applied the College's policies and procedures in a gender-neutral manner, Plaintiff should not have faced investigation and adjudication and should have been allowed to participate in the dance competition. Moreover, he should have been allowed to receive his degree at the June 5, 2016 graduation.

221.  Defendant placed excessive focus on punishing Plaintiff when he was mistreated by a female College employee, demonstrating continuous indifference towards Plaintiff's concerns, rights, and interests.

222.  Specifically, the College's favorability towards females is further evidenced by:

a.  Defendant demonstrated more favorable treatment towards female counter-complainant Smith in allowing her time off from college in 2014;

b.  Bolton unlawfully revealed private educational information to Smith throughout the spring 2016 plagiarism disciplinary process, guaranteeing Smith that John would be expelled even before he appealed;

c.  Bolton sent a sympathetic email to Smith when John succeeded in his plagiarism appeal, encouraging her to "continue to get support, and to ensure that you are safe" while it was John who had complained about Smith's assault upon him and received no such support from Bolton;

e.  Bolton encouraged Smith to request a no-contact order as a response to John's attorney's cease and desist letter to Smith and his report of Smith's assault but had not given John such advice when he had reported the assault and harassment;

   f.   Bolton allowed Smith to attend the dance competition that Plaintiff was to compete in, but
        barred Plaintiff from participating;

   g.   the Hearing Panel unquestioningly treated the evidence of Smith as gospel while disregarding
        and ignoring evidence and arguments put forth by John;

   h.   the College relied on a report biased towards Smith produced by a College-hired investigator
        who denied John's attorney the right to confer with client during the interviews;

   i.   in a video presentation, Bolton demonstrated anti-male bias; and

   j.   the College employs anti-male, pro-female gender-biased training materials for its hearing
        panels.

   223.   Defendant's discipline of Plaintiff evidences gender-based bias in part because Defendant

demonstrated indifference and selective enforcement regarding Plaintiff compared to employee

Smith; in sum, Defendant's actions constituted differential treatment and led to an erroneous

outcome.

   224.   Defendant violated Plaintiff's rights and Title IX protections in part because Defendant

knew or should have known its actions would have an adverse impact on male students alleged to

have engaged in sexual misconduct with a female student and was deliberately indifferent to this

impact.

   225.   Because female students and employees at Williams rarely (if ever) face charges of

sexual misconduct, they are not disadvantaged by Williams' sexual misconduct policies that place

onerous burdens on the accused students and deny them rudimentary due process safeguards. As the

accused (male) is disproportionately affected by the sexual misconduct proceedings, the policies

disproportionately adversely affect male students.

   226.   By failing to promptly investigate, evaluate, and adequately address the conduct of

Bolton and employee Smith; failing to remedy the discriminatory effect that was consequent of the

dating violence upon and the erroneous adjudication of Plaintiff; and facilitating unlawful retaliation,

Defendant violated Title IX.

227.  By failing to adequately train the Hearing Panelists as to the College's non-consensual sex policy and what conduct constitutes sexual harassment, which includes alleged sexual assaults, as required under Title IX, Defendant violated Title IX. This failure was one of the factors that lead to the erroneous outcome.

228.  As a result of Defendant's enforcement of this biased policy and failure to comply with the other requirements under Title IX with respect to disciplinary procedures, Plaintiff has been denied the benefits of Williams' educational program in violation of Title IX.

**COUNT II**
**BREACH OF CONTRACT**

229.  Plaintiff reasserts the allegations set forth above as if fully set forth herein.

230.  Plaintiff and Defendant had a commercial contractual relationship, either express or implied. Such contract was formed on the one hand by Plaintiff's payment (or payment made on his behalf) of tuition and fees to Williams and on the other, by the terms contained in the Student Handbook, the College Catalogue, and other College materials.

231.  Plaintiff had a reasonable expectation that Defendant would adhere to the terms of such contract, as contained in the disciplinary procedures and other College materials.

232.  By attending a college that accepts federal funding, Plaintiff further had a reasonable expectation that Defendant's stated and implemented procedures would comply with the requirements under Title IX including, but not limited, to provide a fair, reliable, impartial, and equitable process for adjudicating claims of sexual misconduct and to ensure due process to both the accuser and the accused.

233.  In dismissing Plaintiff, the college, in effect, terminated the contract for the student's alleged breach thereof and should, therefore, bear the burden of justifying its action.  A proper application of contract law would place the burden of proof on the college.

234.   The College itself set the terms of its student handbook. When a contract, or a contract-like agreement, is formulated by what the law terms "the stronger party," and "the weaker party" does not have an opportunity to negotiate specific terms, courts lean in favor of the weaker party in resolving any ambiguities in the contract. On this basis, courts interpret rules in a student handbook with whatever meaning the college should reasonably expect students to give them.

235.   The Code of Conduct is not a trifling document, only to be used when it serves the purpose of the college; however, the College acts like it is. In fact, it is purposely written in a vague, overbroad, and confusing way (as well as edited and updated without any notice) so that it is not possible for a student to know either what specific conduct is expected or not or how discipline will be administered.

236.   A student would reasonably expect that the investigation and adjudication would be conducted with basic fairness such as:

   a.   being informed of the charges against the accused (Plaintiff was not informed of the nonconsensual sex charge until the very end of his final interview with the investigator.);

   b.   being given written statements of allegations of witnesses sufficiently in advance of a hearing to investigate and prepare (Plaintiff was denied the right to inspect his educational records, namely the transcripts of Smith and of the witnesses.);

   c.   being allowed to have counsel fully participate in all proceedings (Despite the College's policy that allows the student to consult with his attorney during the interviews and that consultation includes, but is not limited to" sharing notes," the investigator repeatedly refused to allow Plaintiff's attorney to share notes with Plaintiff and other similar participation. In fact, at the conclusion of the first interview, Kurker said that she believed that the policy only allowed counsel to sit there "like a potted plant" when that was not the policy at all.);

   d.   being allowed to confront and question one's accuser (College policy does not allow this.);

   e.   being allowed to question witnesses (College policy does not allow this.);

   f.   not being presumed guilty;

   g.   having adjudicators who are unbiased and competent to reach a logical determination. (College policy requires one of the three panelists be from the Dean's office and the other

two panelists are college staff. Employees are inherently biased in favor of the College and the college was in the hot seat with an employee as the accused/counter-accuser. They also did not reach a logical determination and were incapable of doing so because they were not trained in College policy.);

h. having adjudicators who are not trained in methods to rationalize the failings of the accuser and instructed to abide them. (The Panelists appear to have rationalized the failings of Smith, such as her inconsistencies, vengeful motivations, outright falsehoods, and pattern of story embellishment and vindictiveness. Further, they disregarded exculpatory statements by witnesses and by the accuser herself. All of which was the result of College training.);

i. having adjudicators who are not expressly trained to be partial to the College; and

j. the opportunity for a real hearing, especially when the case is purely he-said/she-said and turns on the credibility of the accused and the accuser.

237. Defendant breached the terms of its contract with Plaintiff and engaged in bad faith and

unfair dealing by violating disciplinary procedures as set forth above, and, in particular, by:

a. conducting disciplinary cases in a manner biased towards females;

b. proceeding with decision-making without adequate evidence and proceeding with an investigation and adjudication initiated by an employee against a student in violation of the College's own written policies;

c. treating Plaintiff and employee Smith in a highly disparate manner;

d. acting with deliberate indifference towards Plaintiff's report that he had been harassed and assaulted and failing to promptly respond to and to impartially investigate Plaintiff's complaints;

e. arbitrarily and capriciously making decisions and applying policies as to Plaintiff;

f. discriminatorily denying Plaintiff an educational opportunity, i.e. dance team, in violation of the College's anti-discrimination policy;

g. failing to follow through on Plaintiff's request for transcripts of interviews;

h. failing to adhere to the College's policy of confidentiality in disciplinary matters, failing to protect confidential information as a matter of reasonable expectation of students, and violating Plaintiff's right to privacy under state law;

i. failing to adhere to the College's written timeline for the investigation and adjudication process and to adhere to Title IX requirements for a timely, i.e. "prompt" process;

j. hiring, without allowing Plaintiff input, an external investigator who produced a biased report as said report i) did not include and apply the correct policies, ii) did not include the

Title IX Complaint, iii) included a Dean as a "witness", and iv) improperly employed the term "testify" to describe employee Smith's statements;

k.   i) failing to adhere to the College's written procedure for using the preponderance of the evidence standard for determining whether a student is responsible for violation of the code of conduct with regards to sexual misconduct, ii) failing to apply the applicable written policy of 2014, iii) finding Plaintiff responsible for non-consensual sex with insufficient evidence to sustain the findings; iv) finding Plaintiff responsible on the basis of mere credibility, and v) determining that what was credible was an unusual sexual position and that an unusual sexual position is tantamount to non-consensual sex (conflating discomfort in an unusual position with non-consent);

l.   not providing Plaintiff a meaningful appeal and employing a sham of an appeal;

m.   retaliating and facilitating retaliation against Plaintiff in his Title IX complaint in violation of the College's express prohibition against retaliation;

n.   impaneling a Hearing Panel that is expressly taught to, and clearly did, prioritize the College's reputation over anything else in direct violation of its policy that assures a fair and impartial proceeding; and

o.   applying, during the primary adjudication and on appeal, a sexual misconduct policy not in effect at the time of the alleged non-consensual sex.

238.   Defendant's procedural violations, acts and omissions as described herein rendered the proceedings fundamentally unfair, contravening the specific policy provisions entitling students to "procedures that seek to ensure a prompt, fair, and impartial investigation and resolution" and to a process which is "within the confines of good order and fairness."

239.   The implemented procedures effectuate a failure of fairness and impartiality for the student population, especially the male student population, because they 1) encourage and facilitate the reporting of potentially false reports of sexual misconduct without any recourse for those who may be falsely accused, 2) allow employees to complain against students, and 3) sanction and facilitate unlawful retaliation.

240.   Defendant has created an environment in which an accused male is effectively denied fundamental principles of fairness and justice by being prosecuted through the disciplinary process under the cloud of presumption of guilt. Such a one-sided process deprived Plaintiff, as a male student, of educational opportunities at Williams on the basis of his sex.

241.  Defendant employed a sham process from start to finish that denied him basic rights and failed to comply with Williams' obligations, thus breaching the contract with Plaintiff.

242.  Such failures combined to cause Plaintiff significant prejudice in that he was denied an even-handed assessment of the facts and even-handed application of policy and procedures, resulting in the denial of his degree and the need to hire an attorney to appeal the claims made against him.

### COUNT III
### BREACH OF THE IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING

243.  Plaintiff reasserts the allegations set forth above as if fully set forth herein.

244.  Massachusetts law recognizes an implied covenant of good faith and fair dealing in all contracts, either express or implied.

245.  Defendant's covert prioritization of its reputation ahead of fair and impartial disciplinary proceedings violates the covenant of good faith and fair dealing.

246.  Defendant's nefarious employment of a non-existent sexual misconduct policy indicates bad faith and unfair dealing.

247.  By the conduct alleged herein, Defendant has breached the implied covenant of good faith and fair dealing, causing multiple forms of damage to Plaintiff.

### COUNT IV
### MASSACHUSETTS EQUAL RIGHTS ACT
### (M.G.L. C. 93 §102)

248.  Plaintiff reasserts the allegations set forth above as if fully set forth herein.

249.  Defendant offers educational services for sale to the public.

250.  At all times material hereto, Plaintiff was an individual consumer of Defendant's educational services.

251.  The purpose of M.G.L. Chapter 93 §102 is to ensure that all persons within the commonwealth, regardless of sex, race, color, creed or national origin, have, "except as is otherwise

provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce

contracts, to inherit, purchase, to lease, sell, hold and convey real and personal property, to sue, be

parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security

of persons and property, and shall be subject to like punishment, pains, penalties, taxes, licenses,

and exactions of every kind, and to no other."

252.   In connection with the sale of its educational services and collection of tuition, fees, and

costs related thereto, Defendant's gender-based bias against Plaintiff constituted discrimination in

violation of M.G.L. Chapter 93 §102.

**COUNT V**
**NEGLIGENCE**

253.   Plaintiff reasserts the allegations set forth above as if fully set forth herein.

254.   Defendant owed duties of care to Plaintiff. Such duties include, without limitation, a duty

of reasonable care in investigating and adjudicating the charges against him. Defendant negligently

supervised and retained employees, including, but not limited to, Bolton and Sandstrom. In the case

of Bolton, as early as 2013, Defendant became aware or should have become aware of problems with

her that indicated her unfitness and failed to take further action.

255.   Defendant owed duties of care to Plaintiff to protect him from defamation, harassment,

assault and battery by Defendant's own employees. The fact that employee Smith assaulted Plaintiff

is undisputed. Smith slapped Plaintiff December 6, 2015. Employee Smith violated Plaintiff's right

to privacy by the unauthorized use of his Facebook and Snapchat accounts.

256.   Employers are responsible for the tortious acts of their employees.

257.   At all times material hereto, Defendant had a duty to hire competent personnel,

adequately train its personnel, adequately supervise its personnel, and terminate and/or sanction

personnel for substandard performance.

258.   Defendant owed a duty of care to Plaintiff to ensure that its policies and procedures, without limitation, written and implemented, were fair and reasonable.

259.   Defendant breached these duties of care owed to Plaintiff and, independent of its breach of contract set forth above in Count II, was negligent in the following respects:

a.   failing to hire well-trained agents and employees;

b.   failing to train its employees, agents or representatives in the proper method to thoroughly investigate and adjudicate, without bias, complaints of sexual misconduct;

c.   failing to properly train its employees, agents, or representatives regarding the requirements of Title IX and of the College's specific Title IX policies;

d.   failing to properly train its employees, agents, or representatives in basic due process as it pertains to the investigation, adjudication, and appeal from adjudication of complaints of sexual misconduct;

e.   failing to supervise its employees, agents, or representatives to ensure complains of sexual misconduct are adequately investigated and fairly adjudicated; and

f.   failing to maintain proper policies and procedures designed to fairly, reasonably, and adequately adjudicate claims of sexual misconduct without bias or favor.

260.   As a direct, proximate, and foreseeable consequence of Defendant's aforementioned conduct, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained enormous damages including but not limited to emotional and psychological damages, damages to reputation, past and future economic losses, lost educational and professional opportunities, lost future career prospects, and other direct and consequential damages.

## COUNT VI
## VIOLATION OF FUNDAMENTAL FAIRNESS

261.   Plaintiff reasserts the allegations set forth above as if fully set forth herein.

262.   Defendant owed a duty to Plaintiff to provide him with a process that was fundamentally fair to him as a Williams student.

263.   Defendant failed to provide a fundamentally fair process by:

a.   not informing Plaintiff of the charges against him (Plaintiff was not informed of the non-consensual sex charge until the very end of his final interview with the investigator.);

b.  not giving Plaintiff written statements of allegations of witnesses sufficiently in advance of a hearing to investigate and prepare (Plaintiff was denied the right to inspect his educational records, namely the transcripts of Smith and of the witnesses.);

c.  not allowing counsel to fully participate in all proceedings (Despite the College's policy that allows the student to consult with his attorney during the interviews and that consultation includes, but is not limited to "sharing notes," the investigator repeatedly refused to allow Plaintiff's attorney to share notes with Plaintiff and other similar participation. In fact, at the conclusion of the first interview, Kurker said that she believed that the policy only allowed counsel to sit there "like a potted plant" when that was not the policy at all.);

d.  not allowing Plaintiff to confront and question one's accuser (College policy does not allow this.);

e.  not allowing Plaintiff to question witnesses (College policy does not allow this.);

f.  presuming Plaintiff's guilt;

g.  not having adjudicators who are unbiased and competent to reach a logical determination. (College policy requires one of the three panelists be from the Dean's office and the other two panelists are college staff. Employees are inherently biased in favor of the College and the college was in the hot seat with an employee as the accused/counter-accuser. They also did not reach a logical determination and were incapable of doing so because they were not trained in the College's policy.);

h.  having adjudicators who rationalize the failings of the accuser and instructed to abide them. (The Panelists appear to have rationalized the failings of Smith, such as her inconsistencies, vengeful motivations, outright falsehoods, and pattern of story embellishment and vindictiveness. Further, they disregarded exculpatory statements by witnesses and by the accuser herself. All of which was the result of deficient College training.);

i.  having adjudicators who are expressly trained to be partial to the College;

j.  not providing Plaintiff the opportunity for a real hearing, especially when the case is purely he-said/she-said and turns on the credibility of the accused and the accuser;

k.  conducting disciplinary cases in a manner biased towards females and treating Plaintiff and employee Smith in a highly disparate manner;

l.  proceeding with decision-making without adequate evidence and proceeding with an investigation and adjudication initiated by an employee against a student in violation of the College's own written policies;

m.  acting with deliberate indifference towards Plaintiff's report that he had been harassed and assaulted and failing to promptly respond to and to impartially investigate Plaintiff's complaints;

n.   arbitrarily and capriciously making decisions and applying policies as to Plaintiff;

o.   discriminatorily denying Plaintiff an educational opportunity, i.e. dance team, in violation of the College's anti-discrimination policy;

p.   failing to follow through on Plaintiff's request for transcripts of interviews;

q.   failing to adhere to the College's policy of confidentiality in disciplinary matters, failing to protect confidential information as a matter of reasonable expectation of students, and violating Plaintiff's right to privacy under state law;

r.   failing to adhere to the College's written timeline for the investigation and adjudication process and to adhere to Title IX requirements for a timely, i.e. "prompt" process;

s.   hiring, without allowing Plaintiff input, an external investigator who produced a biased report as said report i) did not include and apply the correct policies, ii) did not include the Title IX Complaint, iii) included a Dean as a "witness", and iv) improperly employed the term "testify" to describe employee Smith's statements;

t.   i) failing to adhere to the College's written procedure for using the preponderance of the evidence standard for determining whether a student is responsible for violation of the code of conduct with regards to sexual misconduct, ii) finding Plaintiff responsible for non-consensual sex with insufficient evidence to sustain the findings; iii) finding Plaintiff responsible on the basis of mere credibility, and iv) determining that what was credible was an unusual sexual position and that an unusual sexual position is tantamount to non-consensual sex (conflating discomfort in an unusual position with non-consent);

u.   not providing Plaintiff a meaningful appeal and employing a sham of an appeal;

v.   retaliating and facilitating retaliation against Plaintiff in his Title IX complaint in violation of the College's express prohibition against retaliation;

w.   impaneling a Hearing Panel that is expressly taught to, and clearly did, prioritize the College's reputation over anything else in direct violation of its policy that assures a fair and impartial proceeding; and

x.   applying, during the primary adjudication and on appeal, a sexual misconduct policy not in effect at the time of the alleged non-consensual sex; and

y.   allowing the Hearing Panel to:

     i.   ignore the fact that the Code of Conduct at the time of September 2014 stated that "both parties have the obligation to communicate consent or the lack of consent" and provided for implied consent;

     ii.   ignore the non-consensual sex policy and apply only one key definition;

     iii.   fail to provide any meaningful analysis of the incorrect policy compared to the correct policy;

iv.    fabricate an allegation that the sex on the night in question was "rough" and that such "roughness" was out of the ordinary;

v.    base its determination solely on an "unusual" position, equating uncomfortable sex in such a position as tantamount to rape;

vi.    by failing to properly assess Plaintiff's credibility, use a burden of proof of mere "credibility" rather than a heightened standard and not even the College's own, albeit low, standard of preponderance of the evidence; and

vii.    ignore exculpatory evidence that the accuser 1) contradicted her own claims (commenting "No, he's never done that. He doesn't do that."); 2) did not express that she did not want to be having sex, 3) lied to the investigator, 4) had motivation to fabricate, exaggerate, and defame Plaintiff, 4) lacked credibility, 5) applied the terms "force" and "coerce" inappropriately, 6) never reported any assaultive or sexually assaultive behavior of Plaintiff until she was facing a complaint investigation into her own behavior, 7) had been engaging in sex with Plaintiff for a year prior and a year following the alleged incident, 8) planted evidence in the form of groomed "witnesses" to recount her statements, and 9) had no evidence whatsoever to support her claims.

264.  Even when Plaintiff provided the opportunity for Defendant to take action to correct the injury, Defendant's refusal to do so perpetuated the injury.

265.  Wrongfully apply a policy not in effect at the time of the alleged incident. The misapplication an affirmative consent policy was fundamentally unfair.

266.  Affirmative consent policies themselves are inherently fundamentally unfair as they place the onus squarely on the men or the initiators of the sexual activity. Society has yet to agree upon what body language (i.e., conduct) unambiguously signals a willingness to engage in sexual intercourse. It is impossible to imagine a more nuanced scene than that which takes place in the bedroom, and the College's attempt to implement an affirmative consent standard only serves to confuse students more about how to set and abide by sexual boundaries.

267.  Affirmative consent policies conflate criminal sexual acts such as coercion by physical force, threat, or incapacitation — which should obviously be prosecuted and punished — with bad or selfish behavior and even normal, commonplace behavior. These "only yes means yes" policies classify as sexual assault many, if not most, "passionately wanted" acts of sex because of the

technicality that such mutually-wanted sexual intercourse is welcomed after -- not affirmatively consented to before -- the sex is initiated.

268. Affirmative consent policies, such as the one erroneously applied to Plaintiff, as this policy was not in place at the time, define nearly all sex as rape unless unambiguously consented to at every stage of activity. Provable consent would have to be a transactional model of sexual relations conducted in a very prescribed asexual pattern of behaviors.

269. No student would reasonably expect that the only way to have sex without running afoul of the Code of Conduct is to have it in exact same prescribed way every single time without varying the position.

270. Given the balance of evidence, or more aptly lack thereof, the Hearing Panel, in effect, used a standard that expected Plaintiff to be able to prove that he received consent.

271. With woefully insufficient evidence to sustain the finding (again, none but the jilted employee's word), the Hearing Panel did not have a preponderance of the evidence regardless of the version of policy used.

272. The doctrine prohibiting "arbitrary and capricious" discipline, also known as requiring fundamental fairness, also prevents colleges from disciplining students maliciously or dishonestly. A protection from arbitrary punishment is also a protection from discipline meted out with an outrageous or improper purpose.

273. The College pursued an outrageous and improper purpose of seeking to protect its reputation in deciding the disciplinary matters. By pursuing a pre-determined outcome intentionally designed to railroad Plaintiff as a "serial sex offender" deserving the harshest punishment, Bolton, Haynes, Sandstrom, and the Hearing Panel rendered decisions against Plaintiff maliciously and dishonestly.

274.  Defendant failed to exercise reasonable care in the disciplinary action against Plaintiff by advancing their own agendas and imposing personal bias in deferring to the vindictive female employee and perpetuating that bias in the subsequent proceedings.

275.  The Hearing Panel acted arbitrarily and capriciously toward Plaintiff. A decision is arbitrary and capricious when it lacks any rational explanation that reasonable persons might support. The Hearing Panel's decisions in the original and appeal hearings lack any rational explanation that reasonable people might support.

276.  Furthermore, Bolton, Sandstrom, and the Hearing Panel treated Plaintiff in such a fundamentally unfair manner to protect its reputation and to make an example of how the College treats people who get out of line.

277.  As a direct, proximate, and foreseeable consequence of Defendant's aforementioned unfair conduct, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained enormous damages including but not limited to emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**COUNT X**
**INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT**

278.  Plaintiff reasserts the allegations set forth above as if fully set forth herein.

279.  Defendant committed numerous violations of Plaintiff's rights.

280.  Plaintiff's education and future have been severely affected and he has suffered extensive damage from Defendant's actions and inactions. Without redress, the denial of his degree will continue to cause Plaintiff damages by way of missed educational opportunities and career opportunities, as well as damage to his reputation and continued emotional distress.

281.  Based upon Defendant's failure to conduct a fair and impartial investigation and adjudication, Plaintiff requires that Defendant to take all appropriate actions to correct any and all statements made to any source in any format that stated or implied that Plaintiff committed sexual misconduct. Plaintiff further requires that any and all disciplinary records concerning Plaintiff be expunged from College records.

282.  Plaintiff requests that this Court order Defendant to vacate its sanction of permanent separation from the college, i.e. "expulsion."

283.  Plaintiff requests that this Court order the College to give Plaintiff his degree.

284.  Plaintiff requests that this Court enjoin Defendant from violating Plaintiff's right to privacy under FERPA and Massachusetts Privacy Act (M.G.L. C. 214, § 1B).

285.  Plaintiff further requests that this Court declare that Defendant's rules and policies and actions, as applied herein, were in violation of the contractual equivalent of due process, i.e. good faith and fair dealing and fundamental fairness and in violation of Title IX.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant on all counts of this complaint. Plaintiff further requests that this Court:

A. Issue an Injunction and declaratory judgment as herein requested.

B. Retain jurisdiction of this matter for the purpose of enforcing this Court's order.

C. Enter a finding that Defendant intentionally discriminated against Plaintiff in violation of Title IX with erroneous outcome, selective enforcement, and deliberate indifference.

D. Enter a finding that Defendant 1) engaged in discrimination with malice and reckless disregard to Plaintiff's federally protected rights under Title IX; 2) disciplined Plaintiff in violation of the College's rules and policies, hence its contractual obligations as written and implemented; and 3) due to gross and numerous violations of its disciplinary procedures, its contractual obligations, and its duties of care, engaged in a process that was inherently flawed and fundamentally unfair.

E. Enter a finding that Defendant violated the Massachusetts Equal Rights Act (M.G.L. C. 93 §102); and principles of due process and fundamental fairness.

F. Enter a finding that Defendant violated Plaintiff's right to privacy under the Family Educational Rights and Privacy Act ("FERPA") (20 U.S.C. § 1232g; 34 CFR Part 99) and Massachusetts Privacy Act (M.G.L. C. 214, § 1B).

G. Enter a finding that Defendant engaged in negligent supervision and retention.

H. Order the College to expunge Plaintiff's disciplinary records from College records and to represent his good standing to third parties.

I. Award Plaintiff compensatory damages in an amount to be determined at trial.

J. Award Plaintiff punitive damages in an amount to be determined at trial.

K. Allow a trial in this matter and enter a judgment for Plaintiff on each count of this complaint, awarding him damages in an amount to be determined at trial; as well the reasonable pre- and post-judgment interest, including attorney's fees, costs and expenses, in accordance with 42 U.S.C. § 1988 or pursuant to any other statute or common law doctrine providing for such award.

L. Grant such other and further relief as equitable and just under the circumstances.

IN THE ALTERNATIVE, should this Court find no remedy at law available to Plaintiff, Plaintiff pleads Unjust Enrichment against Defendant:

Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein. The College received a monetary benefit, approximately $32,300 in the form of payments towards four years' tuition, costs, and fees paid by Plaintiff or on his behalf. As set forth above, due to gross violations of its disciplinary procedures, contractual obligations, duties of care, and under Title IX, the process by which Defendant found Plaintiff responsible for the alleged act was severely flawed and grossly unfair, causing Plaintiff significant prejudice. Plaintiff's education and career plans have been tremendously harmed by unfair, biased, and harmful actions upon

Plaintiff. Plaintiff has already suffered irreparable injury by a delayed process that has prevented him from applying to graduate and law schools. Plaintiff's collegiate record is marred with a disciplinary sanction that bars him from attending graduate or law school and even from transferring to another undergraduate program. For the reasons herein, under the circumstances it would be inequitable for Williams to retain the tuition, fees, and costs it has received.

## JURY DEMAND

PLAINTIFF hereby makes demand for this case to be tried by a jury insofar as the claims herein are triable.

Date: May 12, 2017

**JOHN DOE, PLAINTIFF**

By: _____/s/ Stacey Elin Rossi_____
STACEY ELIN ROSSI (BBO# 681084)
ROSSI LAW FIRM
P.O. Box 442
Hoosick Falls, New York 12090
(413)248-7622

## CERTIFICATE OF SERVICE

This document was served electronically upon all counsel of record by filing through the ECF system on May 12, 2017.

 /s/ Stacey Elin Rossi_____
STACEY ELIN ROSSI