UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, | |
| Plaintiff | Civil Action No. 3:16-CV-30184 |
| v. | |
| WILLIAMS COLLEGE, | |
| Defendant | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

1.   In September 2014, "sexual misconduct (which includes rape and sexual assault)" was

defined in the Williams Code of Conduct as follows, in relevant part:

> ***Non-Consensual Sexual Intercourse***: Any sexual intercourse (anal, oral or vaginal); however slight; with any object; by any person upon any other person; without effective consent. ***Consent:*** Consent means that at the time of the sexual contact, words or conduct indicate freely given approval or agreement, without coercion, by both participants in the sexual contact. Both parties have the obligation to communicate consent or the lack of consent. A verbal "no" (no matter how indecisive) or resistance (no matter how passive) constitutes the lack of consent. In addition, consent once given may be withdrawn at any time. If consent is withdrawn, the other party must immediately stop whatever sexual contact is occurring. **Ex. 1** at 18; WMS12042.

> **Response:**   Undisputed, except that the policy also states that "Consent is a crucial part of both the Williams Code of Conduct and Massachusetts Law."

2.   College policy did not provide any definition for or clarification of the term "effective"

nor did it contain the term "affirmative." Id.

> **Response:**   Undisputed that the policy in September 2014 did not contain the term "affirmative."  Otherwise disputed.  *See* Ex. 1 at 18.[1]

---

[1] Citations to "Ex." refer to the Exhibits 1-166 filed with Plaintiff's Statement of Material Facts and the Exhibits the Defendant has attached hereto beginning at Ex. 167.  Citations to "Tab" refer to the Tabs attached to the Appendix in Support of Defendant's Motion for Summary Judgment at Dkt. No. 127.

3.   In September 2014, the Code of Conduct was only available online at the College's website. After the 2012-2013 academic year, the code of conduct was no longer done in printed form and there were no hard copies of the code from year to year – only an evolving website. Id. at 1, WMS12025; **Ex. 2** at 2, WMS10976 (Ex. 80 Sandstrom Dep.).

**Response:**  Undisputed.

4.   At the start of the 2014-2015 academic year, Williams did not personally provide John Doe with a copy of the Code of Conduct that became effective October 2014. **Ex. 3**, John Doe Affidavit ¶¶ 6-9.

**Response:**  Undisputed.

5.   During his entire time as a student at Williams College, John did not receive any training pertaining to the College's sexual assault/harassment policies. **Ex. 3**, John Doe Affidavit ¶ 3.

**Response:**  Undisputed for these purposes because whether Doe received training on the College's policies is immaterial.

6.   In October 2014, the College defined consent as:

**Consent** is a crucial part of both the Williams Code of Conduct and Massachusetts law. The Williams College Code of Conduct requires affirmative consent for all sexual activity. Consent means that at the time of the sexual contact, words or conduct clearly indicate freely given approval or agreement, without coercion, by both participants in the sexual contact. Both parties have the obligation to communicate consent or the lack of consent. In addition, a verbal "no" (no matter how indecisive) or resistance (no matter how passive) constitutes the lack of consent. In addition, consent once given may be withdrawn at any time. If consent is withdrawn, the other party must immediately stop whatever sexual contact is occurring.

**Ex. 4** at 3, WMS10098; **Ex. 5**. WMS12070.

**Response:**  Undisputed.

7.   The changes to the sexual misconduct policy with the addition of the College's Statement on Sexual Assault and Other Sexual Misconduct in October 2014 were never announced to the

college community. **Ex. 6**, Bossong Dep. Vol. II Excerpts 41:16-42:23, 43:13-14; **Ex. 7**, Rossi Affidavit ¶ 4.

> **Response:** Disputed. The policy was published on the College website. Ex. 6, Bossong Dep. Vol. II at 41:16-42:2.

8.   Williams denied this fact in Statement No. 6 in its Admission No. 3. **Ex. 8**. D. 1st Admissions.

> **Response:** Undisputed.

9a   The College's procedures state that students have

> The right to inspect and review the student's education records within 45 days after the institution receives a request for access. Even though the law allows 45 days, at Williams "requests are normally honored at the time they are submitted." Students submit their requests to the persons maintaining the records to which they wish access, e.g. the registrar, dean, department chair, or other appropriate officials. **Ex. 9**, Dkt. 60-3.

> **Response:** Undisputed.

9b   In October 2015, the College deleted "Both parties have the obligation to communicate consent or the lack of consent" and added "Consent may not be inferred from silence or passivity" to the sexual misconduct policies. The College also removed "clearly" from the definition of the term "consent" and added a new relationship abuse policy. **Ex. 10** at 3-5, WMS10119-WMS10121.

> **Response:** Undisputed.

9c   The College's standard of evidence for adjudicating sexual misconduct policy violations is preponderance of the evidence. **Ex. 11** at 9, WMS07004 (Dkt. 76-9 at 12).

> **Response:** Undisputed.

10.   The College's policy promises to provide students with "procedures that seek to ensure a prompt, fair, and impartial investigation and resolution." **Ex. 11** at 9, WMS07004 (Dkt. 76-9 at 12).

> **Response:** Disputed. The policy states that "the College's procedures seek to ensure a prompt, fair, and impartial investigation and resolution." *Id.*

11. The College's policy states, "Any person who experiences conduct that the person believes violates the College's Sexual Misconduct policy is encouraged to report that conduct to Campus Safety and Security or the Dean's Office. The person is also encouraged to make a report to the police for legal action." **Ex. 11** at 9, WMS07004 (Dkt. 76-9 at 12).

> **Response:** Undisputed.

12. The College claims that it has "no 'threshold' determination for initiating a disciplinary process"; that every complaint is investigated and adjudicated; and that no complaints are "screened out" or otherwise resolved in any manner other than through the investigation/process. **Ex. 12** at 3, Defendant's Response to Request for Production No. 13; **Ex. 7**, Rossi Affidavit ¶ 5.

> **Response:** Disputed. Plaintiff's account of the College's discovery responses on this issue is incomplete and misleading. The November 7, 2017 letter from the College's counsel to Doe's counsel stated, "Regarding our Answer to Interrogatory Number 4, we now understand your argument to be that the College has withheld data for physical and sexual misconduct complaints that were not investigated or adjudicated. That is not the case. As noted in the information provided to you, all of the physical assault complaints in the relevant time frame were handled by a "Dean Meeting," rather than a formal investigation/adjudication process, and all resulted in "No Action." As for sexual misconduct complaints in the relevant time frame, the information we provided correctly demonstrates that each complaint was investigated and adjudicated. Put another way, there were no such complaints that the Dean's office 'screened out' (as you put it) or otherwise resolved in any manner other than through the investigation/adjudication process." Ex. 167.

13. The College's policy states that "If a person reports a sexual assault by a student but does not wish to participate in the investigation and adjudication process, the situation will be reviewed by the Title IX Committee for student concerns...[which] determine[s] whether there is sufficient information to proceed with an investigation and adjudication without the participation of the complainant..." **Ex. 11** at 10, WMS07005 (Dkt. 76-9 at 13).

**Response:** Undisputed.

14. The policy provides that "Final decisions about whom to talk with and what to ask are made by the investigator." **Ex. 11** at 10, WMS07005 (Dkt. 76-9 at 13).

    **Response:** Undisputed.

15. The policy provides that, at the adjudication phase, "the decision and the sanction are communicated simultaneously and in writing to the complainant and the respondent by the Dean of the College." **Ex. 11** at 12, WMS07007 (Dkt. 76-9 at 15).

    **Response:** Undisputed.

16. The policy provides that the "results of any appeal will be communicated simultaneously and in writing to the complainant and the respondent by the Dean of the College." **Ex. 11** at 12, WMS07007 (Dkt. 76-9 at 15).

    **Response:** Undisputed.

17. The College's Discipline Process Outline designates an eleven (11) week timeline from the commencement of the investigation to the time at which the College provides a list of possible disciplinary panel members. **Ex. 13**, WMS01179 (Dkt. 76-9 at 1-2).

    **Response:** Disputed. The guidelines provide "approximate" timeframes and state that "the length of [time for the investigator to produce a written report] depends on the number of witnesses to be interviewed or other evidence to be compiled." *Id.*

18. The College's adjudication of sexual misconduct complaints involving students does not include any "in person" credibility assessment. The Panel bases its decision on the "report" rather than "live" testimony by students. **Ex. 14**, Admission No. 5., D. 1ˢᵗ Admissions; **Ex. 15**, Admission No. 10, D. 2ⁿᵈ Admissions; **Ex. 16**, WMS06966.

    **Response:** Undisputed that there is no "in person" hearing during the initial findings phase of the conduct process; disputed as to the sanction phase of the process; and disputed insofar as the above statement implies that the hearing panel does not assess credibility based on the information contained in the investigation report. *Id.*

19. The College claims that the Panel makes credibility assessments during the adjudication in various ways, including assessing:

> the inherent credibility of the respondent's version of events, the credibility of that account relative to internal consistencies or inconsistencies, the credibility of that account relative to the accounts of the complainant or other witnesses, the credibility of that account relative to the respondent's motive to lie not to be truthful or forthcoming, and so on. **Ex. 15**, Admission No. 12, D. 2nd Admissions.

**Response:** Undisputed.

20. College policy states that the "decision about whether there has been a violation of the College's Code of Conduct regarding sexual misconduct...will be made by a hearing panel of three staff members." The determination whether conduct violates the Code of Conduct is made by the "hearing panel, not the Dean of the College..." **Ex. 11** at 11, WMS07006; **Ex. 12** at 3, Defendant's Response to Request for Production No. 13.

**Response:** Undisputed.

21. College policy states, "**Potentially Coercive Relationships Between Students and Faculty or Staff**. All faculty and many staff are potentially in a position of power with regard to students; hence, sexual relationships between employees and students are in almost all cases inappropriate." **Ex. 17** at 6, WMS01762.

> **Response:** Disputed as incomplete. Doe cites to an incomplete draft of the investigator's report and there is no evidence in the record concerning where the investigator obtained the language or when it was in place.

22. The Williams College Wiki on "Sexual Misconduct Investigation and Adjudication Process – Employee Information" designates three categories of cases: 1) Cases involving student respondents, 2) Cases involving a student and a faculty or staff member, and 3) Cases involving faculty and/or staff members only. **Ex. 18** at 1 and 5 (Ex. 81 Camacho Dep.).

**Response:** Undisputed.

23. Since John was the complainant on March 13, 2016, with follow-up complaints on March 14, 2016, April 14, 2016, and in person on May 2, 2016, this case between John and employee Smith fell in the category of "Cases involving a student and a faculty or staff member." **Ex. 19**, Camacho Dep. Excerpts 7:17-9:14, 23:12-22.

> **Response:** Disputed. Doe did not assert a complaint until April 13, 2016. Ex. 159, Doe Dep. Vol. I at 90:16-91:8. Undisputed that Doe was a student and Smith was an employee at the time the complaints were asserted.

24. The "Cases involving a student and a faculty or staff member" section states, in relevant part, "A student who reports an experience of sexual assault or other sexual misconduct is called the 'complainant.' The staff or faculty member who is accused of committing sexual assault or sexual misconduct is called the 'respondent.'" The College's policy does not contemplate a student respondent to a staff or faculty member complaint. **Ex. 18** at 1.

> **Response:** The quoted sections are undisputed. The last sentence is disputed. In Exhibit 18, in the first category of cases, entitled "Cases involving student respondents," the document specifically contemplates the circumstances where a staff or faculty member is a complainant against a student respondent and states that the investigation and adjudication process will be those outlined in the Sexual Misconduct Policy relating to student sexual misconduct. *Id.*

25. In fact, there has never been a case other than this one in which Williams adjudicated a complaint against a student by an employee in sexual misconduct complaint circumstances. **Ex. 19**, Camacho Dep. Excerpts 24:1-9.

> **Response:** Undisputed.

26. Williams' Retaliation Policy states, "Retaliation is harmful action taken against someone who has filed a complaint, provided testimony, or in some way participated in a disciplinary investigation or process...If the actions directed at that individual would deter a reasonable person in the same circumstances from reporting misconduct, participating in a disciplinary

process, or opposing behavior in violation of our Code of Conduct, it is deemed retaliatory." **Ex. 20** at 6, WMS01845.

>     **Response:**   Undisputed.

27.  The right to appeal at Williams "is limited to (a) significant procedural lapses or (b) the appearance of substantive new evidence not available at the time of the original decision. **Ex. 11** at 12, WMS07007 (Dkt. 76-9 at 15).

>     **Response:**   Undisputed.

28.  Appeal hearings are "granted only in cases where the procedural problems or new evidence are considered substantive enough to have had significantly affected the outcome of the initial hearing." **Ex. 11** at 12, WMS07007 (Dkt. 76-9 at 15).

>     **Response:**   Undisputed.

29.  On September 16, 2013, an Amended Verified Complaint and Request for Preliminary and Permanent Injunctive Relief was filed by John Doe (not the same John Doe as in this case) against Williams College alleging discrimination against male students and that the College's procedural violations, acts, and omissions rendered the proceedings unfair. **Ex. 21.** Case No. 13-11740-FDS.

>     **Response:**   Undisputed for these purposes as immaterial.

30.  Dean of the College Sarah Bolton is named throughout the complaint as a perpetuator of the procedural violations and gender-based discrimination. Id.

>     **Response:**   Undisputed that the complaint makes those allegations, which are disputed and immaterial in any event.

31.  In April 2014, the College hired Williams alumna Meg Bossong as its Director of Sexual Assault Prevention and Response at Williams College. Bossong Affidavit ¶ 2 (Dkt. 54).

>     **Response:**   Undisputed.

32.   John (Class of 2016) and Smith began (Class of 2015) an exclusive, romantic, and sexually active relationship in October 2013. **Ex. 3**, John Doe Affidavit ¶ 14.

   **Response:**  Undisputed.

33.   Smith went on birth control sometime in early 2014. **Ex. 3**, John Doe Affidavit ¶ 15.

   **Response:**  Undisputed.

34.   According to Smith, "her body sometimes would and sometimes would not self-lubricate" during sex. **Ex. 20** at 12, WMS01851.

   **Response:**  Undisputed.

35.   According to John, because Smith was on the birth control pill, Smith's body often did not self-lubricate and so they used synthetic lubrication. **Ex. 20** at 11, WMS01850.

   **Response:**  Undisputed.

36.   According to Smith, she and John "did not start using [synthetic] lubricant until the fall of 2015." **Ex. 20** at 12, WMS01851.

   **Response:**  Undisputed.

37.   Late at night on December 5, 2015, John and Smith had an argument that started with John rejecting Smith's request that they dance together. Smith "found this very hurtful." **Ex. 20** at 30, WMS01869.

   **Response:**  Undisputed.

38.   The disagreement culminated in Smith hitting John in the face. **Ex. 20** at 30, WMS1869.

   **Response:**  Undisputed, except that it was a "slap." *Id.*

39. After the incident, Smith took John's phone from him. When she refused to give it back and kept blocking him from leaving, John threatened to report her to security if she did not let

him leave and then started walking towards security. They parted ways, with John's phone still in Smith's hands. **Ex. 20** at 29, WMS01868.

> **Response:** Undisputed that the above was Doe's account of the incident, but disputed to the extent Smith had a different account in which she said she tried to give Doe his phone back but he would not take it. *Id.* at 30.

40. At 12:14 a.m. December 6, 2015, Smith proceeded to call John's sister and had a 79-minute phone conversation during which she repeated, "he's gonna report me for assault and I'm gonna lose my job!! They're gonna fire me!!" She also admitted hitting John and repeatedly said that she wanted to kill herself. **Ex. 22** at 151-152, WMS07347-WMS07348 (Dkt. 76-3).

> **Response:** Undisputed for these purposes as immaterial.

41. At 2:27 a.m. December 6, 2015, Smith emailed Bolton, subject line "Help," an email saying that she "can't live like this anymore" and that she wrote part of an essay for John, among other things. **Ex. 23**, WMS00064*[2] (Dkt. 76-4).

> **Response:** Undisputed.

42. Bolton replied to Smith's December 6, 2016 1:29 a.m. email at 8:49 a.m., saying she is "so sorry to hear that John is continuing to cause [Smith] so much suffering," encouraging Smith to separate from John, and asking her if she has "help in staying safe." **Ex. 24** at 3, WMS00094.

> **Response:** Undisputed.

43. At 9:49 a.m said morning, Bolton emailed Bossong, in reference to Smith's email, "She says [she] and John are still together, so I don't know that this is going to really go anywhere...I've encouraged her to start by getting support for herself, and we will work from there." **Ex. 25**, WMS00086.

> **Response:** Undisputed.

---

[2] Bates numbers followed by asterisk (*) indicate documents with email headers in Central Time. See Exhibit 165.

44. In the morning on said date, Smith told John what she had done regarding emailing Bolton hours earlier and "that she would email the dean [] saying it was all a lie." **Ex. 26** at 22, WMS03506.

**Response:**  Undisputed for these purposes as immaterial.

45. At 1:43 p.m. on said date, Smith emailed Bolton,

> I was very emotional last night and this morning. I shouldn't have contacted you, I don't help John with his essays – I made a terrible and rash decision last night and I wasn't in the right state of mind. I know this is very serious and I am very ashamed for it given the consequences my actions could have. I think I need different type of help, and I'm saying this in the right state of mind right now. I am so sorry, I need to stop being impulsive and rash. Nothing warrants this type of behavior. **Ex. 24** at 1, WMS00092.

**Response:**  Undisputed.

46.   Bolton forwarded said email to Meg Bossong, saying, "This gives me grave concern for Smith's safety...I believe that this last message is not written by Smith." **Ex. 24** at 1, WMS00092.

**Response:**  Undisputed.

47. The College's Honor Hearing Procedures state that Chairs decide whether there is sufficient evidence to proceed. **Ex. 27**, Honor Hearing Procedures, Dkt. 76-5.

**Response:**  Disputed.  The Honor Hearing Procedures state that a person "normally" brings the suspected violation to the attention of the chairs who will then decide if there is sufficient evidence to proceed.  The Procedures also state that the committee and its officers are free to act flexibly in ways consistent with fairness, and minor variations should not be considered violations of procedure.  *Id.*

48. On February 1, 2016, Smith and John engaged in the following texts, the extent to which they communicated that day and for the following four days:

> Smith: I know you're probably just going to ignore me for the next few days, and that really really sucks for me. But I just wanted to let you know that I have a meeting with Dean Bolton on Thursday [February 4, 2016]. I wasn't going to tell you until later but I know you're just not going to talk to me, so there you go. I'm telling you.
> John:    Okay, good luck on Thursday.
> Smith: See, why do you have to be such a jerk.

11

But whatever, I'm not even mad. I'm just annoyed at your attitude. I'm sorry I
bother
you so much. I don't even know why you're with me if I annoy you so much.
And, actually, good luck to you.
**Ex. 28** at 117-119, WMS09858-WMS09860; **Ex. 3**, John Doe Affidavit ¶ 21.

> **Response:**  Undisputed.

49. On February 2, 2016, Smith met with Bolton and Bossong. Bolton put Smith on the

"no questions asked" list at Campus Safety and Security. **Ex. 29**, WMS11420.

> **Response:**  Undisputed.

50. Also on said date, Bossong emailed Smith her cell phone number, a "safety plan," and

instructions on "Circle of 6," a safety app that would alert her contacts to call the police. **Ex. 30**,

WMS11429-WMS11433; **Ex. 31**, WMS10141. (Ex. 24-25 Bossong Dep. Vol. I.)

> **Response:**  Undisputed.

51. Based on Smith's report and without following College procedures that provide for

Honor Code violation reports to go to the Chair for evaluation, Bolton initiated academic

disciplinary proceedings against John for alleged plagiarism involving three papers in three classes

for three professors: Fox, French, and Martinez Raguso. **Ex. 32**, WMS00140-WMS00144; **Ex. 27**.

> **Response:**  Disputed that Dean Bolton failed to follow College procedures.  Exhibit 32
> confirms that Dean Bolton consulted the honor committee chair.  Otherwise, undisputed.

52. On February 10, 2016, Smith sent John a text she had received from Bolton updating

her on the honor code proceedings against John. **Ex. 22** at 70, WMS07266.

> **Response:**  Undisputed.

53. At 5:35 a.m. February 22, 2016, Bolton emailed the Student and Faculty Chair of the

Honor Code Committee that two of the three professors "seem at base to believe that the

allegations aren't likely true. One even feels that it is his/her role to advocate for John against

[Smith] – which I confess concerns me." **Ex. 33**, WMS00204; **Ex. 34**, WMS00198.

**Response:** Disputed as incomplete.  Dean Bolton's email stated, "It's worth your knowing, as you think about this, that the faculty have had very different responses to the case being brought to them.  One had some reason for concern about John's work before this case came forward.  The other two, though, seem at base to believe that the allegations aren't likely true.  One even feels that it is his/her role to advocate for John against the other student—which I confess concerns me." *Id.*

54. At 9:53 a.m. on February 22, 2016, Bolton confirmed Professor Soledad Fox's participation by phone at the honor code hearing that was scheduled for the next day. Fox (who was in Spain) was to be telephoned at 4:00 p.m. for a twenty-minute participation. **Ex. 35**, WMS00260.

**Response:**  Undisputed.

55.    At 1:05 p.m. on February 22, 2016, Bolton emailed the Student Chair of the Honor Code Committee claiming that Professor Fox "is in Spain and can't participate." **Ex. 36**, WMS00313.

**Response:**  Undisputed for these purposes as immaterial.

56. Also in said email, Bolton said she would speak to the Panel about Smith's credibility. Id.

**Response:**  Undisputed.

57. At the honor code hearing on February 23, 2016, Bolton did not telephone Professor Fox as she told Fox she would. **Ex. 37**, WMS10139.

**Response:**   Undisputed for these purposes as immaterial.

58. The Honor Code Committee found John responsible for plagiarism in one paper allegedly submitted in Professor Fox's class (the paper was not at the hearing). **Ex. 38** at 3, WMS00678.

**Response:**  Undisputed that the Honor Code Committee found John responsible for plagiarism in one paper submitted in Professor Fox's class.  The remainder is disputed as unsupported by the evidence cited.  The evidence submitted during the hearing is outlined in the decision letter.  Tab 24.

59. On February 23, 2016, Bolton telephoned Smith and told her the outcome of the hearing and that the "Committee had voted to expel John." **Ex. 20** at 36, WMS01875.

**Response:** Undisputed for these purposes as immaterial.

60. On February 29, 2016, John took the LSAT. **Ex. 39**, Ex. 96 John Doe Dep. Vol. I.

**Response:** Undisputed.

61. On March 4, 2016, John texted Smith that she was that last person he wanted to talk to the day before given the circumstances he was in. This was John's final communication of any kind to Smith. **Ex. 22** at 108, WMS07304; **Ex. 3**, John Doe Affidavit ¶ 10.

**Response:** Undisputed.

62. Smith continued to text John March 4, 5, 6, 8, 11, and 12, 2016. **Ex. 22** at 108-111, WMS07304-WMS0737.

**Response:** Undisputed.

63. On March 13, 2016, after Smith telephoned John twelve (12) times between 9:49 p.m. and 10:55 p.m. and texted twice on March 8, 2016; telephoned forty-one (41) times between 6:39 p.m. and 10:36 p.m. on March 10, 2016; telephoned three (3) times and texted once on March 11, 2016; and texted six (6) times between 12:39 a.m. and 1:20 a.m. March 12, 2016, John's attorney emailed Smith a Cease and Desist Demand Letter. **Ex. 22** at 129-130, WMS07325-WMS07326.

**Response:** Undisputed.

64. Said letter to Smith was blind-copied to Bolton. **Ex. 40**, WMS00408.

**Response:** Undisputed.

65. On March 14, 2016, Bossong referred Smith to the Elizabeth Freeman Center, a local organization that addresses domestic abuse and sexual violence. **Ex. 41** at 8, WMS10151.

**Response:** Undisputed as immaterial.

66.     On March 15, 2016, with the encouragement of Bossong, Smith left the campus to go "home" to Houston indefinitely without informing her supervisor at the Alumni Affairs office. **Ex. 41** at 9-11, WMS10151-WMS10154.

**Response:** Undisputed as immaterial.

67.     On April 4, 2016, Bolton told the Student Chair to keep certain evidence out of the honor code appeal hearing. **Ex. 42**, WMS00501; **Ex. 43** (**Ex. 7**, Rossi Affidavit ¶ 20); **Ex. 44**, WMS00503.

>     **Response:** Disputed.  When Doe sent the Honor Committee Chair an addendum to his appeal letter, which contained information related to Doe's prior sexual assault case and another sexual assault case at Williams, which were irrelevant to the honor hearing, the chair told Dean Bolton, "My gut tells me this is outside the purview of [the Honor and Discipline Committee]," and Dean Bolton agreed.  *Id.*

68.     Sometime on or around April 5, 2016, Smith complained to her supervisors in the Almuni Department and to Bolton that she would be in John's presence at an upcoming College dance performance in which John was to participate. **Ex. 45** at 1-2, WMS00581-WMS00582.

**Response:** Undisputed for these purposes as immaterial.

69.     As a result of Smith's request, the Alumni Department wanted to bar him from performing in the dance and to bar him from attending the events that weekend. **Ex. 45** at 2, WMS00582.

**Response:** Undisputed for these purposes as immaterial.

70.     Responding that she "may be able to make some arrangements," Bolton set up a mutual no-contact order between Smith and John for the purposes of excluding John from the dance performance and accommodating Smith. **Ex. 45** at 1, WMS00581; **Ex. 46**, WMS00586.

>     **Response:** Undisputed that Dean Bolton helped to facilitate the no-contact order and that she asked Doe to refrain from attending the dance event.  Bolton Aff., Tab 61 at ¶ 9. Otherwise disputed and not supported by the evidence cited. Smith requested the no-

15

contact order out of concern that Doe might retaliate against her for the outcome of the honor proceeding.  Compl. ¶ 62; Bolton Aff. Tab 61 at ¶ 5.

71.    John did not perform at the event in question because of the no-contact order. **Ex. 47**, WMS08044; Dkt. 82, Defendant's Answer to Complaint, ¶ 65.

    **Response:**  Undisputed.

72.    On April 26, 2016, the Honor Code Committee reconvened for John's appeal hearing, this time with Professor Fox's participation. **Ex. 48**, WMS08038-WMS08042.

    **Response:**  Undisputed.

73.    At said hearing, Smith, who was crying hysterically and exclaiming that she was in fear for her life, had to be escorted out of the room. **Ex. 28** at 3, WMS09744.

    **Response:**  Undisputed that Doe submitted to the hearing panel the statement in Exhibit 28 that contained this information, but the content of the statement is disputed as unsupported hearsay.

74.    The Honor Code Committee vacated their previous determination that John had violated the honor code. **Ex. 49**, WMS11317.

    **Response:**  Undisputed.

75.    On April 27, 2016, Bolton emailed Smith the outcome of the hearing and said, "the most important things are to continue to get support, and to ensure that you are safe." **Ex. 50**, WMS07785.

    **Response:**  Undisputed.

76.    March 13, 2016, when Bolton received the blind-copied letter sent to Smith, is the date on which the College had actual notice of John's complaint against Smith. **Ex. 51**, WMS09278.

    **Response:**  Disputed. The letter does not express a desire to initiate a disciplinary complaint against Smith; it accused Smith of harassment by telephone calls and texts but not relationship abuse, and it only vaguely referenced an undescribed "battery" by Smith. Ex. 22 at 129-130.

77.    John's complaint included charges of harassment, stalking, and assault by Smith. Id.

**Response:** Disputed. The cease and desist letter referenced harassment and a "battery."
Ex. 22 at 129-130.

78.    Bolton forwarded the March 13, 2016 Cease and Desist Letter to College Counsel

Jeffrey Jones but no one else. **Ex. 52**, WMS09274; **Ex. 7**, Rossi Affidavit ¶ 7.

**Response:** Undisputed.

79.    On March 14, 2016, John and his attorney met with Bolton and College Counsel to speak

in person about John's complaint against Smith. **Ex. 28** at 3, WMS09744; **Ex. 3**, John Affidavit ¶

12.

**Response:** Disputed. Doe reached out to schedule the meeting with Dean Bolton and
College Counsel on March 8, 2016, before the cease and desist letter and some of the
events describe therein. Ex. 168, WMS00394. At the meeting Doe, through his attorney,
expressed concern that Williams was protecting an employee who allegedly had assaulted
and harassed him, a student. Ex. 159 Doe Dep. Vol. I at 88:13-89:15. Doe admittedly did
not indicate that he wished to initiate any kind of college process against Ms. Smith and
did not expect the College to take any action as a result of this meeting. *Id.* at 89:17-26.

80.    At said meeting, College officials did not encourage John to "make a report to the

police for legal action." **Ex. 3**; John Affidavit ¶ 12.

**Response:** Undisputed.

81.    Also at said meeting, John's attorney expressed concern that Williams was protecting a

school official who had assaulted, abused, harassed, and used her position because John had

spurned her advances. **Ex. 28** at 3, WMS09744; **Ex. 3**, John Affidavit ¶ 12.

**Response:** Disputed as inadmissible hearsay which also contradicts Doe's deposition
testimony. In his deposition testimony, Doe recalled only that he expressed concern that
Williams was protecting an employee who allegedly had assaulted and harassed him. Ex.
159, Doe Dep. Vol. I at 88:13-89:15. Doe did not recall that he put the College on notice
of that Smith allegedly "used her position" against him because he spurned her advances.
*Id.* at 89:13-19.

82.     The College made no report of Smith's actions to legal authorities and no action was taken with the College's Human Resources Department. Dkt. 82, Defendant's Answer to Complaint, ¶ 59.

**Response:**  Undisputed.

83.     On April 13, 2016, John's attorney sent a letter to Toya Camacho, Title IX Coordinator at Williams. Said letter attached the March 13, 2016 letter, described the events of December 5/6, 2015, and contended that the College's implementation of a no-contact order a month after John's last communication to Smith was discriminatory. **Ex. 28** at 84-85, WMS09825-WMS09826 (Dkt. 76-7).

**Response:**  Undisputed.

84.     On April 28, 2016, John requested Bolton recuse herself from this case which she said she would do. **Ex. 53**, WMS00888.

**Response:**  Undisputed.

85.     On May 2, 2016, John met with Camacho to discuss his complaint against Smith. **Ex. 54**, WMS09203.

**Response:**  Undisputed.

86.     On May 4, 2016, Camacho scheduled a meeting with Smith for May 6, 2016 to discuss the allegations John made about Smith. **Ex. 38** at 17, WMS10160.

**Response:**  Undisputed.

87.     On May 5, 2016, at 8:32 a.m., Smith and Bossong worked on an email together for Smith to send to Camacho stating, "I will be happy to meet with you tomorrow to discuss John Doe's complaint, but I want to make you aware that I would like to file a counter complaint regarding relationship abuse and retaliation. John's complaint is a small part of the story within

the broader context of his abusive behavior towards me during the past two years..." **Ex. 55**,

WMS00904.

> **Response:**  Disputed.  The evidence cited shows that Ms. Bossong only made an edit to
> one word in the email.  Ex. 56.

88.    Before Smith sent said email to Camacho, Bossong deleted the word "counter" from

"counter complaint." **Ex. 41** at 17-18, WMS10160-10161; **Ex. 56**, WMS11670.

> **Response:**  Undisputed.

89.    On May 6, 2016, Bolton, who was supposed to be recused from this case, updated

Bossong about Smith's meeting with Camacho earlier that day. Regarding Smith's counter

complaint against John, Bolton wrote, "I know this isn't great, but I hope it will work ok." **Ex. 57**,

WMS08431.

> **Response:**  Disputed as incomplete.  Dean Bolton's email to Ms. Bossong stated, "I
> wanted to let you know that I talked with Toya [Camacho].  She is going to bring in
> Allison [Kurker, the investigator], but also write up the notes from the conversation today
> and give them to Allison so she has them as a starting place and Smith doesn't have to go
> over the same ground again.  I know this isn't great, but I hope it will work ok."  *Id.*

90.    On May 10, 2016, John met with and received a letter from Camacho informing him

that the College was investigating a complaint by Smith that John "displayed abusive behavior

towards [Smith] during the past two years." **Ex. 58**, WMS07010. (Dkt. 76-8)

> **Response:**  Undisputed.

91.    At said meeting, John asked Camacho why the College did not see Smith's complaint

as an act of retaliation, a question to which he did not receive a clear answer. **Ex. 59**, Dkt. 76-10.

> **Response:**  Undisputed for these purposes as immaterial.

92.    At his first interview with investigator Allyson Kurker on May 20, 2016, John asked

why Kurker was investigating Smith's Title IX complaint against him. **Ex. 59**, Dkt. 76-10.

**Response:** Disputed as incomplete.  The text of the conversation is at Tab 31, WMS06262-63.

93.     On May 23, 2016, Camacho emailed John, claiming "Title IX protects employees as well as students...The college's policies prohibit harassment by students and by employees." Id.

**Response:** Undisputed.

94.     On May 26, 2016, Bossong connected Smith to attorneys at the Victim Rights Law Center in Boston for free legal representation in this case. **Ex. 60**, WMS08432.

**Response:** Undisputed that Ms. Bossong told Smith about the Victim Rights Law Center and the fact that it provides pro bono representation. *Id.* Otherwise disputed as unsupported by the evidence cited.

95.     John's advisor at the College, Dean Dave Johnson, has no equivalent pro bono legal resources to which he can refer his advisees. **Ex. 61**, Johnson Dep. Excerpts 13:18-20.

**Response:** Disputed. The testimony is as follows:

Q.  When you have advisees in these sexual misconduct cases, do you
    ever advise them to obtain legal representation?
A.  I make sure that they understand that that's an option for them, yes.
Q.  And are you able to provide them with free legal counsel?
A.  No.

*Id.* at 13:13-20.

96.     Bossong reports directly to the Dean of the College who was Bolton until June 30, 2016 and Sandstrom starting July 1, 2016. **Ex. 62**, Falk Dep. Excerpts 35:13-16.

**Response:** Undisputed.

97.     At her deposition, Bossong said that she does not advise student or employee respondents in sexual assault complaints. **Ex. 63**, Bossong Dep. Vol. I Excerpts 12:22-13:9.

**Response:** Undisputed.

98.     Bossong served as employee Smith's partial advisor and support during the process as well as for months after Smith's employment ended. **Ex. 41**, WMS10144-WMS10218.

**Response:**  Undisputed that Smith sought and received support from Ms. Bossong prior to and during the disciplinary process involving Smith and Doe.  Otherwise disputed as unsupported by the evidence cited.

99.      In this case, Smith was the employee respondent. <u>See</u> Statement Nos. 22-24.

**Response:**  Undisputed that Smith was both a respondent and a complainant and that at the time the disciplinary complaints were initiated, Smith was an employee. Otherwise disputed.  *See* Responses to Statement Nos. 22-24.

100.    Bossong has never had a concern about a conflict of interest in being responsible for training panelists who adjudicate these cases in which she holds an advisory support role for one side of the parties. **Ex. 63**, Bossong Dep. Vol. I Excerpts 15:22-16:5.

**Response:** Undisputed.

101.    Bossong has stated to the media that "Title IX is being re-imagined as a due process measure for respondents, not as a measure to halt harassment in educational settings and prevent its recurrence." **Ex. 63**, Bossong Dep. Vol. I Excerpts 93:22-94:4; **Ex. 64** (Ex. 42 Bossong Dep.).

**Response:** Undisputed.

102.    Bossong works closely with Ninah Pretto. **Ex. 63**, Bossong Dep. Vol. I Excerpts 10:2-8.

**Response:**  Disputed as unsupported by the evidence cited. The testimony was that Ms. Bossong and Dean Pretto work next door to each other and occasionally have lunch together.  *Id.*

103.    Bossong provided Dean Sandstrom, brand new to her role as Dean in July 2016, with guidance on the John Doe – Susan Smith case. **Ex. 63**, Bossong Dep. Vol. I Excerpts 30:1-20.

**Response:**  Undisputed.

104.    During her deposition, Bossong said that research on heterosexual couples reveals that male partners are most often the aggressor. **Ex. 63**, Bossong Dep. Vol. I Excerpts 22:2-9.

**Response:**  Disputed as incomplete.  Ms. Bossong's testimony was as follows:  "I would say that most of the research has been done on heterosexual couples and what that research reveals is that male partners are most often the aggressor in that research but

21

certainly there is research on same sex couples which indicate that people of all genders can be aggressors in intimate relationships." *Id.* at 22:2-13.

105.    On April 21, 2016, when Smith texted Bossong a quote from radical feminist bell hooks that said, "All too often women believe it is a sign of commitment, an expression of love, to endure unkindness or cruelty, to forgive and forget...," Bossong stated that she loves bell hooks and "this is an awesome quote." **Ex. 41** at 14, WMS10157.

> **Response:**  Disputed, insofar as there is no evidence in the record that bell hooks is a "radical feminist," nor any evidence what that term means.   Otherwise undisputed.

106.    Dean Sandstrom became Dean of the College on July 1, 2016 in the middle of the investigation in this case. **Ex. 65**, Sandstrom Dep. Excerpts 8:8-11, 9:1-6.

> **Response:**  Undisputed.

107.    The John Doe – Susan Smith case was of [sic] one of Dean Sandstrom's first cases as a few were ongoing at the time she became Dean. **Ex. 65**, Sandstrom Dep. Excerpts 8:12-23.

> **Response:**  Disputed.  Dean Sandstrom testified that the Doe/Smith case was one of a few cases she oversaw that were underway when she became Dean of the College.  *Id.*

108.    Hearing Panelists are trained on the "confluence model" which asserts that impersonal sex combined with hostile masculinity leads to sexual aggression. **Ex. 66** at 38, WMS11759.

> **Response:**  Undisputed for these purposes as immaterial.

109.    The training materials state that the "hostile masculinity pathway combines two interrelated ideas: an insecure, defensive hypersensitive, and hostile-distrustful orientation, especially toward women – gratification from controlling or dominating women." **Ex. 66** at 40, WMS11761.

> **Response:**  Undisputed.

110.    Hearing Panelists are shown a video called "The Undetected Rapist," an interview of "Frank", who is an aggregation of several interviews by a sexual assault "expert" whose

materials are thirty-two years out of date and is edited to make a point about serial predators not

backed by research. **Ex. 66** at 43, WMS11764; **Ex. 67**, WMS11813; Dkt. 107 at 6, Dkt. 107-9.

> **Response:** Disputed as unsupported by the evidence cited. The statements in Dkt. 107 and Dkt. 107-9 are by Plaintiff's counsel and what appears from a political website, which are inadmissible hearsay and immaterial in any event, as the panel had no occasion to consider whether Doe is a "serial predator."

111.   Panelist training materials do not contain the terms "fair," "impartial," and "thorough"

nor any of their synonyms. **Ex. 66**, WMS11722-11811.

> **Response:** Disputed insofar as the training materials address the importance of examining bias in connection with the respondent's identities, the complainant's identities, and the panelists' identities with attention to what family, culture, institutions, and societies teach about who perpetuates the acts, who is victimized, who is credible, and who has suspect past or future potential . *Id.* at 49-50; *see also* Ex. 171 for a clearer copy.

112.   The training does not instruct panelists on how to assess the credibility of the parties'

statements. **Ex. 66**, WMS11722-11811; **Ex. 68**, Pretto Dep. Vol. I Excerpts 60:12-14.

> **Response:** Disputed. Mr. Gordon testified that there was training on credibility in "the sense that you do have to make assessments about the content and what parts you find to be more credible than others, … although there is not a specific training component that talks about finding credibility." Ex. 69, Gordon Dep. at 86:21-87:3.

113.   The Panelists were not trained to look for consistency in the accuser's statements. **Ex.**

**68**, Pretto Dep. Vol. I Excerpts 60:9-11; **Ex. 69**, Gordon Dep. Excerpts 86:14-16.

> **Response:** Undisputed.

114.   The materials train panelists to ask, when reaching a finding of sexual misconduct,

"Did the complainant **feel** able to stop the respondent's behavior or leave the room and seek

help?" and "How do they describe their **feelings** and why they didn't leave of stop the

behavior?" (emphasis added.) **Ex. 66** at 70, WMS11796.

> **Response:** Disputed as incomplete. The training materials state:
> - Did the complainant feel able to stop the respondent's behavior or leave the room and seek help? If not, what was preventing this?

- What was the complainant's reaction to the respondent's behavior?
- How do they describe their feelings and why they didn't leave or stop the behavior?
- Would a reasonable person understand the complainant's reactions?
  *Id.*

115.    Clearly communicating unwanted advances and boundary setting are not important in the College's sexual assault prevention work. **Ex. 63**, Bossong Dep. Vol. I Excerpts 29:12-23.

> **Response:**  Undisputed that Ms. Bossong testified it is not part of her prevention work at the College to emphasize that students need to clearly communicate unwanted advances. *Id.* Otherwise disputed as inaccurate.

116.    Bossong trained the Panelists - Aaron Gordon, Steven Klass, and Ninah Pretto - in this case. Sandstrom also attended this training which was held in late June or July 2016. **Ex. 70**, WMS11720; **Ex. 65**, Sandstrom Dep. Excerpts 11:20-12:5; **Ex. 71**, WMS06498 (Ex. 67 Sandstrom Dep.).

> **Response:**  Undisputed.

117.    Bossong also trained Sandstrom on how to oversee Title IX investigations and adjudications. **Ex. 65**, Sandstrom Dep. Excerpts 11:11-19.

> **Response:**  Disputed.  Ms. Sandstrom testified she received training from her predecessor Dean Bolton, not Ms. Bossong, on how to oversee Title IX investigations and adjudications, and received training from Ms. Bossong on how the hearing panel works. *Id.*

118.    The training materials do not contain the entire sexual misconduct policy. **Ex. 66**.

> **Response:**  Undisputed that not every word in the sexual misconduct policy is contained in the training materials.  Disputed that any material sections of the policy were omitted. *Id.*

119.    Said materials, relative to the sexual misconduct policy, contained the definition of the discrete terms "consent" and "non-consensual sex" in isolation from (without) the remainder of the

policy. **Ex. 66** at 30, WMS11751 and at 32, WMS11753. <u>Compare</u> to Statement Nos. 1 and 6

above.

> **Response:**  Undisputed that not every word in the sexual misconduct policy is contained
> in the training materials.  Disputed that any material sections of the policy were omitted.
> *Id.*

120.    Sandstrom and the Panelists in this case were trained to believe that the Code of

Conduct defines consent as "words *<u>and</u>* conduct indicat[ing] freely given approval or agreement,

without coercion, by all participants in the sexual act." **Ex. 66** at 32, WMS11753.

> **Response:**  Undisputed that this particular training presentation used the above language.
> Otherwise disputed as unsupported by the evidence cited.

121.    The actual definition of consent in effect at the time of the alleged incident, September

2014, defined consent as "words **or** conduct indicat[ing] freely given approval or agreement,

without coercion, by all participants in the sexual act." (emphasis added.) <u>See</u> Statement No. 1.

> **Response:**  Undisputed that the Code of Conduct definition of consent in September 2014
> included the phrase "words or conduct … ."  Disputed that the Code said "all
> participants"; it said "both participants."  *See* Statement No. 1.

122.    The Panelists were trained to also believe that the Code of Conduct "requires active,

specific and clearly expressed consent for all sexual activity." **Ex. 66** at 30, WMS11751.

> **Response:**  Undisputed for these purposes as immaterial, as the panel determined that
> Smith did not communicate consent in any way – not that she communicated consent but
> in a way that was not "active, specific and clearly expressed."

123.    The Code of Conduct in effect at the time of the alleged incident, September 2014, did

not require active, specific and clearly expressed consent for all sexual activity. <u>See</u> Statement No.

1.

> **Response:**  Undisputed that the Code of Conduct in September 2014 did not contain the
> phrase "active, specific, and clearly expressed consent," but disputed insofar as the Code
> required "effective consent" that is "communicated by words or conduct"; consent is not
> "effective" if it is passive, unspecific, and not clearly expressed.

124.    In her second deposition, held May 15, 2018, Bossong, as the College's Rule 30(b)(6) organizational representative, described how she and Bolton, along with College Counsel, Defendant's counsel of record Daryl Lapp, among others, worked on revising the College's "sexual misconduct and gender-based violence policies" in the summer of 2014. **Ex. 6**, Bossong Dep. Vol. II Excerpts 8:3-11:22; **Ex. 72**, WMS11963-WMS11964 (Ex. 147 Bossong Dep. Vol. II).

      **Response:**  Undisputed.

125.    Revisions made to the shared doc/draft during said time included: 1) addition of "affirmative" to the policy in a newly added sentence, "Williams College Code of Conduct requires affirmative consent for all sexual activity; 2) addition of "clearly" in the sentence defining the term consent; 3) addition of the sentence, "In the absence of affirmatively expressed consent, sexual activity is a violation of the code of conduct"; and 4) insertion of "In addition" prefacing the sentence, "a verbal "no" (no matter how indecisive) or resistance (no matter how passive) constitutes the lack of consent." **Ex. 6**, Bossong Dep. Vol. II Excerpts 13:9-11:22; **Ex. 73**, WMS12081, WMS12083-WMS12084 (Ex. 148 Bossong Dep. Vol. II).

      **Response:**  Undisputed.

126.    The revisions to said shared doc/draft policy were made by Bossong, Bolton, College Counsel, and two Title IX Coordinators. **Ex. 6**, Bossong Dep. Vol. II Excerpts 13:12-14:4.

      **Response:**  Undisputed.

127.    Said policy made use of the term "affirmative" for the first time "because there was a need for clarification: That [Williams] had an affirmative consent policy...so what we wanted was to provide clarification and certainty to the Williams community that we had an affirmative consent policy." **Ex. 6**, Bossong Dep. Vol. II Excerpts 14:17-15:9.

**Response:**  Disputed as incomplete.  Ms. Bossong stated, "It was added because there was a need for clarification:  That we had an affirmative consent policy and the national conversation at that time was around affirmative consent policies, and so what we wanted was to provide clarification and certainty to the Williams community that we had an affirmative consent policy."  *Id.*

128.    The College considers the term "affirmative consent" to be industry jargon. **Ex. 6,**

Bossong Dep. Vol. II Excerpts 45:19-46:7.

**Response:**  Disputed as incomplete.  Ms Bossong stated, "Because affirmative consent was almost what I would describe as industry jargon within the group of people who are having conversations about sexual misconduct on college campuses.  So affirmative consent was talked about freely on list services by Title IX officers, by people engaged in sexual violence prevention, but it needs some additional -- not everyone knows automatically what affirmative consent means and so it needed some additional policy language flushing that out."  *Id.*

129.    The College admits that "not everyone knows automatically what affirmative consent

means." **Ex. 6**, Bossong Dep. Vol. II Excerpts 46:4-5.

**Response:**  Undisputed.

130.    Since not everyone knows automatically what affirmative consent means, additional

policy language "flushing that out" was needed. **Ex. 6**, Bossong Dep. Vol. II Excerpts 45:14-46:7.

**Response:**  Undisputed.

131.    According to the College, an affirmative consent policy is an 'only yes means yes

policy'; "that consent is only present in the presence of affirmatively or positively stated yes."

**Ex. 6**, Bossong Dep. Vol. II Excerpts 15:19-16:1.

**Response:**  Disputed as incomplete.  Ms. Bossong also explained that affirmative consent means that "an absence of clearly communicated words or conduct indicating affirmative consent would mean that consent is not present."  *Id.* at 16:11-14.

132.    The section on "consent" in the draft in question (*sans* the mark-up underlining) is

identical to the "consent" section in the College's Statement on Sexual Assault and Other Sexual

Misconduct effective October 2014. **Ex. 73**, WMS12083-WMS12084; **Ex. 4** at 3, WMS10098.

**Response:**  Undisputed.

27

133.    According to the College, the Statement on Sexual Assault and Other Sexual Misconduct

effective October 2014 is a 'yes means yes' policy. **Ex. 6**, Bossong Dep. Vol. II Excerpts 16:2-

16:5.

 **Response:**  Undisputed.

134.    The College's policy effective October 2014 was a "new policy with regard to sexual

misconduct." **Ex. 6**, Bossong Dep. Vol. II Excerpts 18:18-20.

 **Response:**  Disputed.  Ms. Bossong stated, "We put in place a new policy with regard to
 sexual misconduct in October 2014.  It provided clarifications but it did not differ
 substantively with regard to sexual misconduct and consent with the prior policy."  *Id.*

135.    The College claims that the new policy "provided clarifications but it did not differ

substantively with regard to sexual misconduct and consent with the prior policy." **Ex. 6**,

Bossong Dep. Vol. II Excerpts 18:20-23.

 **Response:**  Undisputed.

136.    The College admits that the new policy provides greater specificity than the policy that

was in effect previously. **Ex. 6**, Bossong Dep. Vol. II Excerpts 20:7-13.

 **Response:**  Undisputed.

137.    Bossong answered the question, "So are they essentially the same policies before and

after October 2014?" with, "They are essentially the same policies. There were not dramatic --

we did not change from a no means no to a yes means yes policy. We did not change from some

kind of substantively different understanding of consent prior to 2014 to a radically different

understanding of consent afterwards." **Ex. 6**, Bossong Dep. Vol. II Excerpts 77:2-10.

 **Response:**  Undisputed.

138.    According to the College, shifting around during intercourse "would not be enough in

and of itself to communicate nonconsent." **Ex. 6**, Bossong Dep. Vol. II Excerpts 59:18-61:14.

**Response:** Undisputed.

139.    All but one of John's complaints against employee Smith involved events that occurred while Smith was an employee (academic year 2015-2016). **Ex. 20** at 38-39, WMS1877-WMS01878.

**Response:** Undisputed.

140.    The investigative report asked the Panelists, "...did Smith's conduct, either discretely or collectively, amount to a violation of the 2015-2016 Williams College Employee Handbook Sexual Misconduct Policy...?" **Ex. 20** at 38, WMS01877.

**Response:** Undisputed as immaterial.

141.    The Panelists in this case were not trained to adjudicate complaints against faculty and staff. **Ex. 63**, Bossong Dep. Vol. I Excerpts 12:16-8; **Ex. 19**, Camacho Dep. Excerpts 16:7-18.

> **Response:** Undisputed that there were different training sessions for hearing panels deciding cases involving staff and cases involving students.  Otherwise disputed as mischaracterizing the witnesses' testimony. *Id.*

142.    The College's policy that designates staff/faculty as a respondent to student complaints – and **not the other way around** -- is in the Employee Information section. See Statements Nos. 22-24.

**Response:** Disputed.  *See* Response Nos. 22-24.

143.    Kurker's role is limited to that of fact-finder. Her responsibilities do not include providing opinions or assessing the respondent's credibility. **Ex. 17**, Admission No. 10, D. 2nd Admissions.

**Response:** Undisputed.

144.    Kurker conducted interviews of John on May 20, June 1, and July 13, 2016; and of Smith on May 20, June 15, and July 26, 2016. **Ex. 7**, Rossi Affidavit ¶¶ 8-9; **Ex. 41** at 23, WMS10166.

**Response:** Undisputed.

145.    In the last five minutes of Kurker's first interview with Smith, which took two and one half hours, Smith raised the allegation of non-consensual sex. **Ex. 74**, WMS00947.

**Response:** Undisputed.

146.    Smith provided details about the allegation of non-consensual sex at her June 15, 2016 second interview. **Ex. 26** at 113, WMS03597.

**Response:** Undisputed.

147.    Kurker interviewed John's one witness, his sister, on June 17, 2016. Kurker, who was aware that she and Smith were "very close" friends who talked often, did not ask John's sister questions about John and Smith's sex life or anything that would elicit information about the alleged Sept 1, 2014 incident. **Ex. 26** at 44, WMS03528; **Ex. 20** at 30, WMS01869 ("Smith called John's sister, {Name} with whom she was very close"); **Ex. 75,** WMS05856-WMS05883 (Ex. 2 Kurker Dep.).

> **Response:**  Disputed insofar as this statement suggests Doe's sister had any relevant
> information about the incident at issue, as to which there is no evidence in the record.
> Otherwise undisputed.

148.    The only substantive questions Kurker asked John's sister were: 1) Can you bring me through sort of the evolution of your observations of their relationship?; 2) Can you describe what you mean by, by that they both seems a little immature?; 3) Did you see them exhibiting signs of jealousy either or both of them?; and 4) Can you tell me about the incident that occurred this December..." **Ex. 75**, WMS05856-WMS05883 (Ex. 2, Kurker Dep.).

> **Response:**  Undisputed that the above questions were posed to Doe's sister.  Disputed that
> these were the only substantive questions the investigator asked.  *Id.*

149.    The remainder of Kurker's interaction with John's sister consisted of some explanatory comments and "mm-hmm, okay, and yeah." Kurker said "mm-hmm" twenty-four (24), "okay" sixteen (16), and "yeah" nine (9) times. Id.

**Response:**  Undisputed for these purposes as immaterial.

150.    In her interviews of John, Kurker interrupted John seventy-three (73) times and completed his sentences nine (9) times. **Ex. 26**, WMS03485-WMS03601 **Ex. 7**, Rossi Affidavit ¶ 10.

**Response:**  Disputed.  Doe often ended his answers with "Um…," in response to which Kurker interjected with "okay," "right," and "mm-hmm" as an invitation to him to elaborate, not an "interruption."

151.    Although Smith raised the allegation of non-consensual sex on May 20, 2016, Kurker did not inform John of this accusation at his second interview June 1, 2016. She informed him at the very end of his third and final interview July 13, 2016. **Ex. 26** at 113, WMS03597.

**Response:**    Undisputed.

152.    John was flabbergasted and dumb-struck at the allegation, **Ex. 3**, John Doe Affidavit ¶ 11.

**Response:**  Disputed, as Doe was able to respond to the allegation, denied it, recalled specific facts to support his denial of the allegation, and asked pertinent questions about Smith's allegation. Ex. 26 at 113-17.

153.    Upon hearing this newly alleged claim, John's attorney asked about how Smith would again be interviewed, "if there's anything that she has to say that could impact or warrant a response by John, then will we have another opportunity to speak with you?" to which Kurker replied,

It depends if there's a material discrepancy or not. So, you know, we could do this back and forth for a year. At a certain point, I need to feel confident that I've provided the hearing panel with enough information for them to make a decision. So there is information that the two of you presented that is just inconsistent with each other, and I feel like I have captured both of your perspectives. **Ex. 26** at 116, WMS03600.

**Response:** Disputed as incomplete. Kurker continued:

> If, when I feel like I've captured both your perspectives, that's when my report, I feel like my report will be in a position to go to the panel. But you will have an opportunity to read it, and it there is something material that you think I should follow up on, you'll have an opportunity at that point to go back to the college and to identify something else that you think would be helpful for the hearing panel to know.

*Id.* at 116.

154. As of July 19, 2016, after both parties' second interviews, ten of the twelve non-party witnesses had been identified by Smith. **Ex. 76** at 2, WMS08443.

**Response:** Undisputed.

155. On July 19, 2016, Kurker emailed Camacho that "this context is important for the college to consider in determining how much wider in scope we need to go." **Ex. 76** at 2, WMS08443.

**Response:** Undisputed.

156. Knowing Statements Nos. 154 and 155, Sandstrom emailed Bossong, "even though it may not provide particularly useful information," she was "inclined to go ahead and pursue [whom Sandstrom believed to be an additional interview with a new witness, Jackie Lee] since it apparently **feels important to Smith**." (emphasis added.) **Ex. 77** at 1, WMS06491.

**Response:** Undisputed.

157. Also on said date, Camacho told Kurker that Jackie Lee would be the last person to contact since "both parties had plenty of time to submit their list of witnesses." **Ex. 78**, WMS03639*.

**Response:** Undisputed.

158. On August 1, 2016, Kurker emailed Camacho and Sandstrom, saying she was waiting on two final witnesses [Elanie Wilson who was identified by Smith in her final interview as someone

who could speak to Smith's intoxication and Charles Chirinos who was identified by John as someone who could speak to Smith's lack of excessive intoxication] and that she would have the report finished before she left for vacation [starting August 18]. **Ex. 79**, WMS03698*; **Ex. 80**, WMS3348*.

> **Response:** Undisputed.

159.   On August 3, 2016, Kurker emailed Camacho about whether Camacho had heard from Elaine (sic.) Wilson or Charles Chirino (sic.). Kurker stated, "If they are going to participate, I think it will need to happen in the next few days." **Ex. 81**, WMS01921*.

> **Response:** Undisputed.

160.   On said date, Camacho replied that she had not heard from Charles. **Ex. 82**, WMS03168.

> **Response:** Undisputed.

161.   On Monday August 8, 2016, Kurker emailed Charles [**who had emailed Camacho on July 29, 2016 agreeing to speak with Kurker**] asking him if he would suggest some times to speak that afternoon or Tuesday [the next day] "until 11 or between 3 and 5." **Ex. 83** at 1, WMS02938.

> **Response:** Undisputed.

162.   On August 11, 2016, Kurker emailed Charles, "If you are willing to participate in this investigation, can you please let me know by the end of tomorrow?" to which Charles replied the next morning, Friday, August 12, 2016, "I am willing to participate..." **Ex. 84**, WMS03381.

> **Response:** Undisputed.

163.   Said morning, Kurker informed Charles that she needed to conduct it that day [a Friday] or "Monday at the latest." **Ex. 85**, WMS03385.

**Response:** Disputed as incomplete.  After suggesting Friday or Monday for the interview, Kurker asked Doe, "Would that work for you?"  *Id.*

164.    The Friday, August 12, 2016 email from Kurker was the final communication between her and Charles. **Ex. 7**, Rossi Affidavit ¶ 15.

**Response:** Undisputed.

165.    Smith "was not aware at any point during the investigation that John was filing for retaliation since it never came up during the interviews." **Ex. 86**, WMS07602.

**Response:** Undisputed.

166.    Smith stated, "I didn't realize they were accusing me of false reporting and retaliation." **Ex. 41** at 63, WMS10206.

**Response:** Undisputed.

167.    On June 8, 2016, John requested transcripts of all the interviews from the investigation to ascertain whom Kurker had interviewed and what they alleged. **Ex. 87** at 4, WMS06611; **Ex. 3**, John Doe Affidavit ¶ 18.

**Response:** Undisputed.

168.    On June 10, 2016, Camacho responded that, "Yes, you can request the transcripts of student records under FERPA. The request should be made to Bolton. We do have to alert everyone whose records would be released if we do release the records." **Ex. 87** at 2, WMS06609.

**Response:** Undisputed.

169.    On June 15, 2016, Bolton promised John that she would request these from Kurker. **Ex. 87** at 1, WMS06608.

**Response:** Undisputed.

170.    During the interviews with John, Kurker did not provide any information about whom she interviewed or what had been alleged by anyone other than Smith. **Ex. 26**, WMS3485-WMS03601.

    **Response:**   Undisputed.

171.    On August 22, 2016, after waiting over two months and one month after the conclusion of the interviews, John emailed Camacho asking about the transcripts as he had not received any yet. **Ex. 87** at 6, WMS06613.

    **Response:**   Undisputed.

172.    On September 1, 2016, Sandstrom denied John's request for transcripts other than of his interviews, now claiming that parties are not entitled to transcripts or tapes of the investigator's interviews with others. **Ex. 87** at 5, WMS06612.

    **Response:**   Undisputed.

173.    On September 16, 2016, College Counsel told John's attorney that if John "wish[ed] to make a **formal** FERPA request to review his educational records, the college will of course respond appropriately, but in the meantime the adjudication process will proceed in accordance with the college's usual procedures." (emphasis added.) **Ex. 88** at 1, WMS07137.

    **Response:**   Undisputed.

174.    December 20, 2016, over six months after John's initial request, the College allowed John to review and inspect his records after John's attorney sent a letter to College Counsel explaining the College's non-compliance with its policies and FERPA. **Ex. 89**, WMS09352; **Ex. 90**, WMS10988.

    **Response:**   Undisputed that as of December 20, 2016 the College allowed Doe to review and inspect his records after Doe's attorney submitted a FERPA request on December 4, 2016.  Disputed that the College failed to comply with its policies or FERPA, for which there is no evidence in the record.

175.    On August 15, 2016, Kurker emailed her assistant a draft report that contained the Statement on Sexual Assault and Other Sexual Misconduct, the Stalking Policy, and the Employee Handbook Sexual Misconduct Policy. **Ex. 91**, WMS01755; **Ex. 17** at 3-6, WMS01759-WMS01962.

    **Response:**  Undisputed.

176.    The Statement on Sexual Assault section contained a footnote: "The policy has been effect (sic.) since October 2014. **The policy in effect prior to October 2014 defined sexual misconduct in substantially the same manner.** The definition of non-consensual sexual intercourse was 'any sexual intercourse (anal, oral or vaginal); however slight; with any object; by any person upon any other person; without effective consent." (emphasis added.) **Ex. 17** at 3, WMS01759.

    **Response:**  Undisputed.

177.    Said draft also contained the section from the policy that stated, "**Potentially Coercive Relationships Between Students and Faculty or Staff**. All faculty and many staff are potentially in a position of power with regard to students; hence, sexual relationships between employees and students are in almost all cases inappropriate." **Ex. 17** at 6, WMS01762.

    **Response:**  Undisputed.

178.    Also on August 15, 2016, Kurker asked Camacho to provide her with the College policies that were in effect during summer 2014 and September 2014, stating, in relevant part, that the "policy currently on the college's website is effective October 2014 so I need whatever policies were in place prior to that." **Ex. 92**, WMS03051*.

    **Response:**  Undisputed.

179.    On August 16, 2016, Kurker asked Camacho when she "can get [her] the 'policies that were in effect 2013-2016.'" **Ex. 80**, WMS03348*.

    **Response:**  Undisputed.

180.    In said email, Kurker stated that she emailed Elaine (sic.) August 3 and texted her August 5 informing her that she needed to her [sic] back by August 11. If she conducted this interview, she did not think that she would be able to finish the report before the planned deadline. Id.

    **Response:**  Disputed that there was any deadline for Ms. Kurker to complete her investigation, for which there is no evidence in the record.  Otherwise undisputed.

181.    Camacho answered Kurker's email at 2:10 p.m. on the same date stating that she was "working on the policies" and that she would contact her by the end of the day. She also stated that she would talk with Sandstrom "regarding Elanie Wilson delay." Id.

    **Response:**  Undisputed.

182.    At 3:35 pm on August 16, 2016, Camacho emailed Kurker, "I have a scheduled meeting with [Sandstrom] tomorrow at 11:00 am. I will provide you with an update after the meeting." **Ex. 93**, WMS08347.

    **Response:**  Undisputed.

183.    At 5:10 p.m. August 16, 2016, the draft report contained the applicable policies from October 2014 to the 2015-2016 academic year. The draft also still contained the footnote described in Statement No. 176 and the Potentially Coercive Relationships Between Students and Faculty or Staff section described in Statement No. 177. **Ex. 94**, WMS01714*; **Ex. 95** at 4, WMS01718; **Ex. 95** at 67, WMS01720-WMS01721.

    **Response:**  Undisputed.

184.    Camacho met with Sandstrom on August 17, 2016. **Ex. 86**, WMS08347.

  **Response:**  Disputed.  Ex. 86 does not support the stated fact.

185. At 9:04 a.m. on August 17, 2016, Camacho emailed College Counsel that she had spoken with Bossong about Kurker's request for the sexual misconduct policies in effect in Summer-September 2014. **Ex. 96**, WMS11594 (Ex. 34 Bossong Dep.)

  **Response:**  Undisputed.

186. At 12:08 p.m. on August 17, 2016, Camacho responded to Kurker's August 15th request for the policies in effect during summer 2014 and September 2014: "I'm still waiting on a response from Jeff [College Counsel]." This email was originally redacted by Defendant. **Ex. 97** at 2, 1st WMS03052*; **Ex. 98** at 2, 2nd WMS03052*.

  **Response:**  Undisputed.

187. At 12:12 a.m. on August 17, 2016, Camacho emailed Kurker a request for her to forward the draft to her without Elaine (sic.) Wilson's interview to "review and discuss." **Ex. 99** WMS03354*.

  **Response:**  Undisputed.

188. At 12:18 p.m. on said date, Kurker asked Camacho if she wanted her "to schedule a time to interview Elaine (sic.), and then revise the report to incorporate the information she adds? Smith believes that she may be able to speak to her level of intoxication on a night 2 years ago. I'm moving along with the draft – it's likely I can get it to you late this afternoon." **Ex. 100**, WMS03360*.

  **Response:**  Undisputed.

189. In response to said email, Camacho asked Kurker to forward the draft without Elanie's interview "since this is a complex case it will give us time to review and discuss." **Ex. 99**, WMS03354*; **Ex. 101**, WMS03388*.

  **Response:**  Undisputed.

190.    On August 18, 2016, Kurker emailed Camacho and Sandstrom that she "highlighted where we need to insert the 2013-2014 sexual misconduct policy" and "reached out to Charles Chiniros (sic.) several times, but he didn't schedule a time to speak with me." **Ex. 102,** WMS2104\*.

    **Response:**  Undisputed.

191.    The requested draft report was attached to said email. **Ex. 103**, WMS2105.

    **Response:**  Undisputed.

192.    Said draft report no longer contained the footnote in question or the Potentially Coercive Relationships Between Students and Faculty or Staff section of the employee policy. Id.

    **Response:**  Undisputed.

193.    On August 19, 2016, Camacho forwarded the draft report and exhibits A-R to College Counsel. **Ex. 104,** WMS09889.

    **Response:**  Undisputed.

194.    On August 29, 2016, Elanie emailed Kurker asking about her availability to speak that week. **Ex. 105** at 2, WMS03396.

    **Response:**  Undisputed.

195.    Camacho instructed Kurker to contact Elanie again. **Ex. 105** at 1, WMS03395.

    **Response:**  Undisputed.

196.    On September 8, 2016, Kurker's associate emailed Kurker saying that she added Elanie's perspective to the report and drawing Kurker's attention to the fact that they still had not received the College's sexual misconduct policy for 2013-2014 from the College. **Ex. 106**, WMS01922.

    **Response:**  Undisputed.

197.    On September 12, 2016 at 11:50 a.m., Kurker emailed Camacho a "revised report" that included information from Elanie. **Ex. 107**, 1st WMS03170*; **Ex. 108**, 2nd WMS03170*.

    **Response:**  Undisputed.

198.    On said date at 12:16 p.m., Kurker asked Camacho if College Counsel responded to [their] request for a copy of the sexual misconduct policy in effect from 2013 until October 2014. This email was originally redacted by Defendant. **Ex. 107**, 1st WMS03170*; **Ex. 108**, 2nd WMS03170*.

    **Response:**  Undisputed.

199.    On said date at 4:09 p.m., Camacho told Kurker that she met with College Counsel that day and "he stated that the College's code of conduct for students would apply for the policy section of the investigative report since the college did not have a Sexual Misconduct policy until October 2014." **Ex. 109**, 1st WMS08327*; **Ex 110**, 2nd WMS08327* (Ex. 9 Kurker Dep.).

    **Response:**  Undisputed.

200.    Williams did have a Sexual Misconduct policy prior to October 2014. <u>See</u> Statement No. 1.

    **Response:**  Disputed insofar as Williams did not have a *separate* sexual misconduct policy (the Statement on Sexual Assault and Other Sexual Misconduct) prior to October 2014; rather, sexual misconduct was governed by the Code of Conduct.  Ex. 4; Ex. 6, Bossong Dep. Vol. II at 19:8-14; Ex. 1 at WMS12042.

201.    Camacho started working for Williams in August 2015, a year after College Counsel and Bossong revised the sexual misconduct policies. **Ex. 19**, Camacho Dep. Excerpts 7:21-8:1.

    **Response:**  Undisputed that Camacho started working for Williams in August 2015, a year after the sexual misconduct policies were revised.  Disputed that Ms. Bossong and College Counsel alone revised the policies.  Ex. 6, Bossong Dep. Vol. II at 10:20-11:11; 13:23-14:4.

202.    At 4:22 p.m., Kurker replied to Camacho's email: "I will add a note to the report to reflect that and will turn around another draft tomorrow." **Ex 109/110**, WMS08327* (Ex. 9 Kurker Dep.).

    **Response:**  Undisputed.

203.    The report issued to John September 13, 2016 contained the following relative to the allegations prior to October 2014: "The College's 2013-2014 Student Code of Conduct applies to the allegations that precede the College's adoption of its Statement of Sexual Assault and Other Sexual Misconduct, which went into effect in October 2014." **Ex. 111** at 4, WMS07154.

    **Response:**  Undisputed.

204.    The report did not contain the definition of sexual misconduct from the 2013-2014 Code of Conduct nor the footnote from previous drafts. Id; <u>See</u> Statement No. 1.

    **Response:**  Undisputed.

205.    The report did contain the Statement of Sexual Assault and Other Sexual Misconduct effective October 2014 which, in part, 1) required affirmative consent for all sexual activity; 2) defined consent as words or conduct that **clearly** indicate freely given approval or agreement, without coercion; and 3) provided that "[i]n the absence of affirmatively expressed consent, sexual activity is a violation of the code of conduct." (emphasis added) **Ex. 111** at 4, WMS07154.

    **Response:**  Undisputed.

206.    John's September 24, 2016 Response to the investigative report included a preface that stated, "I would like to take the opportunity to emphatically state that not only should I not have to be answering to Smith's counter complaint to begin with but the College should not be investigating and adjudicating a case against me due to its very retaliatory nature." **Ex. 28** at 1, WMS09742.

**Response:** Undisputed.

207.    Said preface also stated, "On May 3, 2016, Ms. Camacho met with me to discuss [my]

Title IX complaint...On May 10, 2016, Ms. Camacho met with me to explain that in response to

my Title IX complaint against her, a complaint that could result in termination of her

employment, Smith lodged a complaint against me...That she did so within moments of learning

that the College was finally going to investigate her not only does not pass the smell test, but it

reeks of retaliation." **Ex. 28** at 4, WMS09745; **Ex. 112**, Ex. 56 Pretto Dep. Vol. I.

**Response:** Undisputed.

208. John's Response pointed out the numerous inconsistent and discredited statements by

Smith including, but not limited to:

a) alleging she was rendered incapacitated the night of the alleged non-consensual sex
   incident when all she had to drink was a beer and two or three shots of 33% alcohol,
   **Ex. 20** at 9-12, WMS01848-WMS01851;
b) stating that John "kind of just forced himself in, and it hurt" in her first interview; then,
   in her second interview, stating that she "did not remember removing her clothes to
   have sex" and "she just remembers lying on her stomach...confused about why they
   were having sex," **Ex. 20** at 10-11, WMS01849-WMS01850;
c) telling Ava Atri, "No, he's never done that. He doesn't do that" in response to a
   question whether John ever physically abused or engaged in non-consensual sex with
   Smith; but then, in May after commencement of the investigation, telling Ava that they
   had engaged in sex once when she was "really tired and not in the mood" and "didn't
   want to have sex," **Ex. 20** at 13, WMS01852;
d) claiming she described the alleged incident of non-consensual sex to Andrea Estrada
   about one month afterwards as an incident during which "she felt really uncomfortable
   when she and John had been having sex because 'it was a really different position...'"
   (NB: nothing about intoxication); but Andrea did not recall Smith "confiding in her
   about any episode of sexual contact with John that Smith described as either non-
   consensual or upsetting," **Ex 20** at 10, WMS01849 and 13, WMS01852;
e) according to Eman Al-Ali, claiming that John "forced himself on her" but Smith never
   alleged any facts in her interviews that describe John exerting any force on or coercion
   of her to commence intercourse, **Ex. 20** at 13, WMS01852;
f) stating that they "never...just started out from behind" (referring to the alleged
   incident's commencement) in her third interview but telling Elanie in June or July 2016
   that when intoxicated and asleep, she awoke to John having sex with her, Id.;
g) claiming John pressured Smith to spend time with him so much that she shirked her
   summer program responsibilities while also stating that John did not particularly seek

out her company and it was she who invariably went to spend time with him and his family, **Ex. 20** at 9, WMS01848;

h)   stating that John playfully grabbed her arms which resulted in a pinch then later she claimed John grabbed her arms while arguing, **Ex. 20** at 16-17, WMS01855-WMS01856;

i)   claiming that John locked her out of their shared room and it was his fault she could not get in despite the fact that she did not try telephoning him and had a spare key, **Ex. 20** at 16-17 WMS01855-WMS01856; **Ex. 28** at 50-51, WMS09791-WMS09792;

j)   accusing John of forcing her to sit outside her dorm for an hour in 19-degree weather because Smith left a dance without him when Campus Security could have given her access (and also claiming that she did not know how to reach Campus Security), **Ex. 20** at 21-22, WMS01860-WMS01861; **Ex. 28** at 57-58, WMS09798-WMS09799;

k)   accusing John of refusing to contribute to shared expenses although Smith never asked to be reimbursed, **Ex. 20** at 24-25, WMS01863-WMS01964; **Ex. 28** at 61-62, WMS09802-WMS09803;

l)   claiming John pressured her to work on papers for him during her work hours when she was the one to initiate the communications during her work hours, **Ex. 20** at 27-29, WMS01866-WMS01868; **Ex. 28** at 66-68, WMS09807-WMS09809;

m)  stating that she slapped John because he insulted her then later claiming that she slapped John because he was "waving his arms around" and she was threatened by him, **Ex. 20** at 29-31, WMS01869-WMS01870; **Ex. 28** at 70-72, WMS09810-WMS09812; and

n)   claiming that John abused her when she was the confrontational and aggressive party and acknowledged that John "[doesn't] like confrontation", **Ex. 28** at 75, WMS09816.

> **Response:**  Undisputed that in his response to the investigation report, Doe had the opportunity to point out perceived inconsistencies in Smith's story to the panel, and he did so.  Ex. 28.  Disputed that his assertions establish that Smith's story was inconsistent or discredited.

209.    John's Response noted that all of Smith's witnesses who had memory of Smith describing the alleged incident of non-consensual sex were people to whom Smith likely made these revelations during the time of the investigation and interviews. **Ex. 28** at 10-11, WMS09751-WMS09752; **Ex. 28** at 38-39, WMS9779-WMS09780; **Ex. 28** at 43-44, WMS09784-WMS09785.

> **Response:**  Undisputed that Doe made this argument in his response to the investigation report.

210.    John's Response emphasized how Smith did not express that she did not want to be having sex despite the policy requirement, "Both parties have the obligation to communicate

consent or the lack of consent." **Ex. 28** at 10-11, WMS09751-WMS09752; **Ex. 28** at 41,

WMS09782; **Ex. 28** at 43, WMS09784; **Ex. 28** at 45, WMS09786.

> **Response:**   Undisputed that Doe made this argument in his response to the investigation
> report.

211.   John's Response included a section, "FAILURE TO INCLUDE APPLICABLE

POLICIES," which stated, "The following should have been included in the 9/13/16 Report: The

College Code of Conduct defines **Sexual Misconduct** as follows, in relevant part:

> Non-Consensual Sexual Intercourse: Any sexual intercourse (anal, oral or vaginal);
> however slight; with any object; by a man or a woman upon a man or a woman;
> without effective consent.
> …
> Consent means that at the time of the sexual contact, words or conduct indicate freely
> given approval or agreement, without coercion, by both participants in the sexual contact.
> **Both parties have the obligation to communicate consent or the lack of consent**. A
> verbal "no" (no matter how indecisive) or resistance (no matter how passive) constitutes
> the lack of consent. In addition, consent once given may be withdrawn at any time. If
> consent is withdrawn, the other party must immediately stop whatever sexual contact is
> occurring.

**Ex. 28** at 5, WMS09746; **Ex. 113**, Ex. 46 Pretto Dep. Vol I.

> **Response:**   Undisputed.

212.   Said cited policy correctly cited the policy in effect during the alleged September 2014

incident of non-consensual sex except that the correct policy used the phrase "by any person upon

any other person" instead of "by a man or a woman upon a man or a woman." See Statement No.

1.

> **Response:**   Undisputed.

213.   John's Response stated,
> The rule regarding the applicable law in contractual matters relies on the non-
> retroactivity principle. The Hearing Panel is prohibited by law to apply policy ex post
> facto. Each allegation must be adjudicated under the policy that was in effect at the
> time of each of the alleged incidents. **Ex. 28** at 6, WMS09747.

> **Response:**   Undisputed.

214.    Where the report asked, "Did John's conduct violate the 2013-2014 Student Code of Conduct with regard to the parties' sexual encounter that occurred on or about September 1, 2014?", John's Response noted, "Ms. Kurker failed to include the applicable policy. [John has] included it in this Response to Report..." **Ex. 28** at 8, WMS09749.

   **Response:**  Undisputed.

215.    On September 26, 2016, Bossong and Sandstrom independently exchanged emails with College Counsel legal advice concerning issues raised by John in response to the investigative report and disciplinary procedures. **Ex 114**, Privilege Log Nos. 17, 18, 34, 50, 51, 80, 137, 138, and 139.

   **Response:**  Undisputed.

216.    On September 20, 2016, Sandstrom assisted Smith in Smith's writing of her response to the September 11, 2016 report. **Ex. 86** at 1, WMS07602.

   **Response:**  Disputed. Dean Sandstrom responded to a question posed by Smith about submitting additional evidence in her response.  Ex. 86.

217.    On October 11, 2016 Sandstrom, acting upon corrections John requested Kurker make to the report, offered Smith advice on the relevance of one of the corrections. When Smith explained that Sandstrom was mistaken about the issue, Sandstrom offered to amend Smith's response to the September 11, 2016 report. **Ex. 115** at 2-3, WMS07987-WMS07988 (Ex. 70 Sandstrom Dep.).

   **Response:**  Disputed.  Dean Sandstrom responded to Smith's email that she believed the additional information Smith wanted to bring forth was not relevant.  Id. Otherwise undisputed.

218.    On October 11, 2016, Kurker emailed the final investigative report to the College. **Ex. 116**, WMS01839*; **Ex. 20** at 1, WMS01840.

   **Response:**  Undisputed.

219.    The final report was not corrected to contain the College's sexual misconduct policy in effect prior to October 2014. **Ex. 107**, WMS1839*; **Ex. 20** at 1, WMS01840.

> **Response:**  Undisputed.

220.    John and Smith were allowed an opportunity to respond to each other's responses. John's October 7, 2016 Response reiterated how Smith was using this process and her position as an employee close to the College's administration to harm his person, his career, his future, and his reputation. **Ex. 117**, WMS07609 (Ex. 69 Sandstrom Dep.); **Ex. 118**, Ex. 55 Pretto Dep. Vol I.

> **Response:**  Undisputed that Doe and Smith were allowed to respond to each other's responses and that Doe made such arguments in his October 7, 2016 response to Smith's response.

221.    Said Response stated, "There is no logic in [Smith's] myriad inconsistencies, showing how Smith has told so many untruths that she cannot keep her story straight." **Ex. 118** at 3.

> **Response:**  Undisputed.

222.    Said Response concluded with, "Susan made no mention of feeling afraid of or feeling threatened by [John] to the Dean, no mention to her friends, no mention to [John's sister], nor spoke of it with [John] in any of her texts afterwards. It was only during this process that Susan felt the need to embellish her story in order to play the victim card." Id.

> **Response:**  Undisputed.

223.    On September 13, 2016, Sandstrom informed John that the case would be adjudicated by a single panel acting under the student misconduct adjudication procedures. **Ex. 119**, WMS07147.

> **Response:**  Disputed as incomplete.  Dean Sandstrom wrote, "For all of these reasons we are planning to present the entire case for adjudication by a single panel acting under the student misconduct procedures, which I would oversee. …  If you object to this combined approach, please let me know the nature of your objection, which we will consider before making a final decision as to how best to proceed." Id.

224.    On September 14, 2016, John accepted the single panel adjudication process as a matter of impaneling procedure. **Ex. 120**, WMS07191.

>    **Response:**  Undisputed.

225.    John never accepted or considered legitimate the College's investigation and adjudication of the complaint against him by an employee contrary to the College policies in the first place. **Ex. 28** at 1-4, WMS09742-WMS09745

>    **Response:**  Disputed as unsupported by the evidence cited.

226.    On October 7, 2016, twenty-nine (29) weeks after the date the College had actual notice of John's complaint, March 13, 2016, Sandstrom emailed John a list of potential panelists. **Ex. 121**, WMS07963. <u>See</u> Statement No. 76.

>    **Response:**  Undisputed that on October 7, 2016 Sandstrom emailed John a list of potential panelists.  Disputed that the March 13, 2016 cease and desist email from Doe's attorney to Smith contained any indication that Doe wished to file a complaint against Smith.  Ex. 22 at 129-30.

227.    Like Sandstrom, this was one of Pretto's first experiences with a sexual misconduct hearing panel at the College. **Ex. 68**, Pretto Dep. Vol. I Excerpts 8:19-9-6; Statement No. 105.

>    **Response:**  Undisputed.

228.    When requesting Stephen Klass and Aaron Gordon to be on the panel, Sandstrom stated she "would really love to have both of [them] (along with [Pretto]) on this panel. Is it ok (from your office's standpoint) for you both to do it?" **Ex. 122**, WMS08463 (Ex. 68 Sandstrom Dep.).

>    **Response:**  Undisputed.

229.    Klass emailed, "I think it's almost easier to have us both in sync like this." Id.

>    **Response:**  Disputed as incomplete, as the reference to being "in sync" referred to the fact that the same person managed their calendars.  Ex. 69, Gordon Dep. at 133:8-23.

230.    Gordon directly reports to Klass. **Ex. 69**, Gordon Dep. Excerpts 8:11-14.

   **Response:**  Undisputed.

231.    On October 21, 2016, at the Panel's first meeting to "hear" this case, Sandstrom presented them with a "refresher training" at Bossong's suggestion so that the Panelists had a "framework to read from." **Ex. 123**, WMS08458 (Ex. 39 Bossong Dep.); **Ex. 124** at 1, WMS10305.

   **Response:**  Undisputed.

232.    As part of the refresher training, the Panelists had slides in front of them which were excerpted slides from the regular training materials citing the Code of Conduct. **Ex. 6,** Bossong Dep. Vol. II Excerpts 81:17-23; **Ex. 125**, Ex. 167 Bossong Dep. Vol. II.

   **Response:**  Undisputed.

233.    One of the Code of Conduct training slides provided to the Panel at this refresher training defined consent as "...words *and* conduct indicate freely given approval or agreement..." **Ex. 66** at 32, WMS11753.

   **Response:**  Undisputed.

234.    On October 27, 2016, Gordon requested a meeting with "Sandstrom and/or Bossong" for clarity on the "Title IX aspects of the case" which Pretto had already discussed with Bossong. **Ex. 126**, WMS07041 (Ex. 22 Bossong Dep. and Ex. 54 Pretto Dep. Vol. I).

   **Response:**  Undisputed.

235.    After said meeting, Gordon emailed Pretto and Klass, "Something interesting for us to consider about the Retaliation aspects of our policy. [Sandstrom] mentioned that the way this policy is worded is important. Upon review the way the policy reads in order for there to be retaliation it has to be in response to the victim's participation in a disciplinary investigation or

process. It can't just be to get back at them because you're angry/upset with them. This changes my thinking on aspects of the retaliation charge." **Ex. 127**, WMS08488 (Ex. 71 Sandstrom Dep. and Ex. 57 Pretto Dep. Vol. I).

**Response:**  Undisputed.

236.   On or around November 7, 2016, the Panel's original findings letter found Smith guilty of relationship abuse for slapping John and for "falsely reporting [John] for violations of the Honor Code. [The Panel] also found that the severity of the incident in December 2015 meets the definition of relationship abuse – and combined with the false reporting it does also form a pattern of abuse." **Ex. 128**, WMS07052; **Ex. 129**, WMS07127 (Ex. 53 Pretto Dep. Vol I and Ex. 72 Sandstrom Dep.).

**Response:**  Undisputed.

237.   In the letter, Gordon did not include "anything on retaliation based on [his] last message," referring to his email about his conversation with Sandstrom. Id.

**Response:**  Undisputed.

238.   In the section on "Filing of Title IX claim as retaliation" of the Panel's spreadsheet, no notes were recorded in the columns for Pretto and Gordon. Klass' column contains the notation "I need to understand the timing more clearly." **Ex. 130** at 1, WMS08828 (Ex. 49 Pretto Dep. Vol. I).

**Response:**  Undisputed.

239.   John's September 24, 2016 Response to Report detailed the timing. **Ex. 28** at 4, WMS09745.

**Response:**  Undisputed.

240.    On November 17, 2016, Sandstrom emailed the Panel a new version of the finding letter which no longer included the "guilty" finding for Smith's honor code reporting. **Ex. 131**, WMS07063 (Ex. 59 Pretto Dep. Vol I.).

   **Response:**  Undisputed.

241.    On said date, Pretto pointed out that the revised letter written by Sandstrom did not reflect what the panel had decided. **Ex. 132**, WMS07065 (Ex. 60 Pretto Dep Vol. I).

   **Response:**  Disputed as incomplete and misleading.  Dean Pretto also said, "…however if Aaron and Steve are in agreement then I suppose it stands." *Id.*

242.    The Panel's spreadsheet reflecting their votes indicates "Y" at the Guilty (Y/N)? column for all three panelists in the row "testifying at Honor Code hearing as retaliation" and "Y" for Gordon and Pretto's columns in the row "false reporting of academic honor code violations (resource abuse through denial of degree)." **Ex. 130** at 1, WMS08828 (Ex. 49 Pretto Dep. Vol. I).

   **Response:**  Undisputed.

243.    Also on said date, Gordon emailed that he believed that Smith falsely reported John to the Honor Committee but he was willing to move on. **Ex. 133**, WMS07074 (Ex. 63 Pretto Dep. Vol. I.).

   **Response:**  Undisputed.

244.    Pretto's column in the spreadsheet indicates that she analyzed Smith's claims of John's force and coercion upon her, other than the one for non-consensual sex, for consistency and credibility: 1) Smith said that she didn't speak with Theo as much after the alleged summer 2014 jealousy by John but Theo said that they became even closer afterwards; 2) Smith contradicts her statements saying she was pressured to spend time with John but that John did not particularly seek out her company; 3) Smith could have called campus security for access to their room

(alleged "lock out"); 4) Smith's story changes from the first to second interview (first one they are playing around and the second one they are arguing); 5) text evidence contradicts Smith's claim that John would offer to pay Smith back; 6) Smith could have called security instead of standing in the freezing cold – "I just see a lot of inconsistencies in her stories"; 7) it doesn't seem unlikely Smith offered to take the blame for the alcohol purchase based on the "pattern of their relationship"; and 8) "I don't think he should have been facing an honor code violation in the first place, because I believe it was retaliatory on Smith's part." **Ex. 130** at 2-3, WMS08829-WMS08830 (Ex. 49 Pretto Dep. Vol. I).

> **Response:**  Undisputed.

245.     Klass's column indicates that he recognized in the playing around incident that the "story changes pretty dramatically over time..." "[A]s claims escalate in number, they seem to escalate in severity of descriptions." **Ex. 130** at 2, WMS08829 (Ex. 49 Pretto Dep. Vol. I).

> **Response:**  Undisputed.

246.     Relative to the allegation of non-consensual sex, the Panelists reconciled inconsistent statements by employee Smith by citing trauma as the reason for the contradictions. **Ex. 68**, Pretto Dep. Vol. I Excerpts 49:2-54:12; **Ex. 69**, Gordon Dep. Excerpts 99:10-15.

> **Response:**  Undisputed that Mr. Gordon and Dean Pretto believed that Smith's recollection may have not been clear due to trauma.  Otherwise disputed as unsupported by the evidence cited.

247.     The Panelists considered non-consensual sex in itself to be "a form of trauma." **Ex. 69**, Gordon Dep. Excerpts 99:16-19.

> **Response:**  Undisputed.

248.     In his deposition, Gordon explained, "in that we found for non-consensual sex, which is a form of trauma, that's where we would see Susan having trauma in this particular case. And all of her recollections would have been post trauma." **Ex. 69**, Gordon Dep. Excerpts 99:16-21.

**Response:**  Undisputed.

249.    In the spreadsheet, Pretto noted, "An act was performed to initiate sex, which was out of the norm for the couple." **Ex. 130** at 2, WMS08829 (Ex. 49 Pretto Dep. Vol. I).

**Response:**  Undisputed.

250.    In the investigative report, there was no description of any "act" that was performed to initiate sex. **Ex. 20**, WMS01840-WMS01879.

> **Response:**  Disputed as mischaracterizing the evidence in the report.  The "act" was the initiation of sexual intercourse without first discussing sex, as was Smith's and Doe's practice.  *Id.* at WMS01851.

251.    "No affirmative consent given, beyond alcohol there was no consent **asked** or **given** – **new** position and roughness indicate this was not typical interaction" was in the spreadsheet, under "Letter Notes." (emphasis added.) **Ex. 130** at 2, WMS08829 (Ex. 49 Pretto Dep. Vol. I).

**Response:**  Undisputed.

252.    Smith's allegation to the investigator was not that the position was never used but that they "never just started out from behind." **Ex. 20 a**t 11, WMS01850.

**Response:**  Undisputed.

253.    The Panel's decision that there was "roughness" during the alleged incident was based on "other factors" which Pretto identified as "the description of the position and how he was holding her." **Ex. 68**, Pretto Dep. Vol. I Excerpts 45:18-46:20.

> **Response:**  Disputed as incomplete.  Dean Pretto also said that the lack of lubrication and other aspects of Smith's account indicated roughness.  *Id.*

254.    The report stated that Smith "'just felt really uncomfortable' because she 'wasn't lubricated, and it hurt.'" **Ex. 20 a**t 11, WMS01850.

**Response:**  Undisputed.

255.    To Kurker, Smith did not attribute discomfort to anything other than the insufficient lubrication. Id.

**Response:**  Disputed as unsupported by the evidence cited.

256.    In her deposition, Pretto said that the lubrication issue wasn't "a factor that much." **Ex. 68**, Pretto Dep. Vol. I Excerpts 47:18-49:1.

**Response:**  Undisputed.

257.    The Panel understood there to be no evidence - other than by virtue of the particular physical position that John and Smith were in - that Smith was forced into having sexual intercourse. **Ex. 68**, Pretto Dep. Vol. I Excerpts 58:5-60:5.

**Response:**  Disputed. Ex. 136; Ex. 69, Gordon Dep. at 66:9-70:2.

258.    According to Pretto in her deposition, the Panel did not consider the absence of any claim that John physically forced Smith into bed or into any sort of physical situation in coming to its decision: "It wasn't about that part of it." **Ex. 68**, Pretto Dep. Vol. I Excerpts 58:16-59:15.

**Response:**  Undisputed.

259.    The report stated, "During sexual intercourse, Smith did not express to John that she did not want to be having sex." **Ex. 20 at** 12, WMS01851.

**Response:**  Undisputed.

260.    The Panel was not concerned with the fact that Smith did not express that she did not want to be having sex. **Ex. 68**, Pretto Dep. Vol. I Excerpts 42:1-14.

**Response:**  Undisputed.

261.    It did not concern the Panel that Smith had never complained about the alleged non-consensual sex until months, if not, years later. **Ex. 69**, Gordon Dep. Excerpts 109:23-110:9.

**Response:**  Undisputed.

262.    According to Pretto, the deterioration of the relationship between John and Smith and its possibility of influencing Smith's recitation of events did not "change" what the Panel discussed. **Ex. 68**, Pretto Dep. Vol. I Excerpts 63:17-65:10; **Ex. 134**, Ex. 51 Pretto Dep. Vol I.

>    **Response:**  Undisputed.

263.    The Panelists understood that they had a duty to produce a findings letter that reflects the complete rationale of the panel and how it made its decision. **Ex. 135**, Klass Dep. Excerpts 19:17-21; **Ex. 69**, Gordon Dep. Excerpts 35:20-23.

>    **Response:**  Undisputed.

264.    The new/revised letter, drafted by Sandstrom, included statements contrary to the actual findings made by the Panel as reflected in the original letter. See Statement Nos. 236, 241-243. **Ex. 136**, Ex. 74, Sandstrom Dep. and Ex. 58 Pretto Dep. Vol I. (Dkt. 33-7).

>    **Response:**  Disputed insofar as the "original letter" was a draft which was still under discussion and did not yet reflect the panel's findings.  Ex. 128.

265.    The finding that Smith had falsely reported John for violations of the honor code was changed to, "There is not...a preponderance of the evidence to suggest that Smith falsely accused you, as it is possible she believed she had written papers for you" and "The committee was not persuaded by your argument that Smith participated in the appeal portion of the honor case as retaliation..." Id.; **Ex. 129**, WMS07127 (Ex. 53 Pretto Dep. Vol. I and Ex. 72 Sandstrom Dep.).

>    **Response:**  Undisputed.

266.    The November 21, 2016 letter mentions John's claim that Smith filed a Title IX complaint in retaliation against his Title IX complaint against her but does not provide any information about the Panel's deliberation and why this was dismissed. **Ex. 136**.

>    **Response:**  Disputed insofar as the fact that the panel found Smith's Title IX complaint had merit necessarily meant that Smith's allegation was not retaliatory.

267.    The November 21, 2016 letter stated that the Panel found

it more likely than not that [John] did *not* have affirmative consent to have sexual intercourse with [Smith] during the incident in question. Smith indicated that the unusual sexual position and roughness were indicators that you did not have consent. In addition, several witnessed recalled that Smith had described this incident of nonconsensual sex to them. Taken together, the Hearing Panel found this evidence to be credible... Id**.**

**Response:**  Undisputed.

268.    On November 23, 2016, John initiated this lawsuit seeking injunctive relief after

providing notice under Rule 65 to Defendant. **Ex. 137**, WMS09348; Dkt. 1, 3, 4, and 6.

**Response:**  Undisputed.

269.    The Complaint alleges that the Panel fabricated "evidence that there was 'roughness' in the

sex, when Smith made absolutely no statement of such sort to the investigator or her friends." ¶ 181p.

**Response:**  Undisputed.

270.    On or around December 1, 2016, Sandstrom prepared a document "policies over time.doc"

that highlighted the differences in the policies. Sandstrom, College Counsel, Kurker, Kurker's

associate, and Cynthia Haley communicated about the document. **Ex. 114**, Privilege Log Nos. 9,

10, 11, 12, 13, 14, and 15; **Ex. 138**, WMS11133-WMS11134 (Ex. 78 Sandstrom Dep.).

**Response:**  Undisputed for these purposes as immaterial.

271.    On December 7, 2016, the Panel and Sandstrom sent a sanction letter to John stating,

"Considering the severity of your current violation along with your history of disciplinary

difficulties, the hearing panel has determined that an appropriate sanction is permanent

separation from Williams College." **Ex. 139**, WMS07142.

**Response:**  Undisputed.

272.    On December 11, 2016, John initiated a request for an appeal on the basis of a number

of significant procedural lapses by emailing VP Leticia Haynes. **Ex. 140**, (Ex. 76 Sandstrom

Dep.).

**Response:**  Disputed that in fact there were a number of significant procedural lapses, which is unsupported by the evidence cited.  Otherwise undisputed.

273.  At 1:31 p.m. on December 12, 2017, Sandstrom emailed Smith, informing her that John requested an appeal of the hearing panel's decision and that she would "keep [her] posted as [she] learn[s] more." **Ex. 141**, WMS08827.

**Response:**  Undisputed.

274.  At 2:07 p.m. on said date, Sandstrom emailed President Falk, informing him of John's appeal request and stating

> I believe that there may well have been a procedural error that could possibly serve as grounds for appeal. It has to do with the a (sic.) change in the way consent was defined right around the time of the incident in question. This change occurred in October 2014, a month after the alleged incident occurred in Sept 2014. Unfortunately, the panel was using the Oct 2014 definition of consent, rather than the September 2014 definition. **The difference in definitions is not trivial.** The change that occurred in October 2014 made mention of "affirmative" consent for the first time; the previous version from a month earlier did not include such language. (emphasis added.) **Ex. 142**, WMS11358 (Ex. 75 Sandstrom Dep.).

**Response:**  Undisputed.

275.  Said letter went on to state that Haynes "will ultimately make the decision about whether **this** is grounds for appeal." (emphasis added.) Id.

**Response:**  Undisputed.

276.  On December 19, 2016, John emailed a description of specific procedural lapses including, but not limited to, "the application of an incorrect burden of proof and incorrect college policy [and/or disregard for the correct policy]." **Ex. 143** at 1, WMS10428.

**Response:**  Disputed that in fact there were multiple procedural lapses, which is unsupported by the evidence cited.  Otherwise undisputed.

277.  Excerpts from the Complaint accompanied said email. **Ex. 144** (Dkt. 76-14).

**Response:**  Undisputed.

56

278.    President Falk left the College at the end of the year 2017 and an interim President was appointed in his place. **Ex. 7**, Rossi Affidavit ¶ 18.

**Response:**  Undisputed.

279.    During Falk's tenure, the College's Board of Trustees never discussed this case at any Board meeting. **Ex. 62**, Falk Dep. Excerpts 12:22-13:2.

**Response:**  Undisputed.

280.    College Counsel retired in 2017. **Ex. 7**, Rossi Affidavit ¶ 19.

**Response:**  Undisputed.

281.    On January 3, 2017, John emailed Haynes a summary of the procedural lapses that were in addition to the incorrect policy issue: 1) The Panel did not apply the correct standards in determining whether John engaged in non-consensual sexual intercourse; 2) The proceedings were not conducted with basic fairness; 3) The Panel's decision was arbitrary and capricious. **Ex. 145**, WMS10371; **Ex. 146**, WMS10372.

> **Response:**  Disputed that in fact there were any procedural lapses other than the policy issue.  Otherwise undisputed.

282.    Haynes forwarded all John's communications to College Counsel. **Ex. 147**, WMS09710; **Ex. 148**, WMS09713; **Ex. 149**, WMS09715, **Ex. 144**; **Ex. 150**, WMS10980, **Ex. 151**, WMS10994.

**Response:**  Undisputed.

283.    Haynes, Sandstrom, and College Counsel discussed the appeal request by John. Sandstrom prepared a memorandum "for College Counsel and Haynes concerning issue in appeal." **Ex. 152**, WMS10983; **Ex. 114**, Privilege Log Nos. 92, 93, and 94.

> **Response:**  Undisputed for these purposes as immaterial.

284.    On January 31, 2017, Haynes sent John a letter allowing an appeal hearing on the sole

basis "of the fact that the hearing panel applied a policy not in effect at the time of the alleged

misconduct." **Ex. 153**, WMS11123 (Dkt. 76-16).

     **Response:**  Undisputed.

285.    Said letter states, "The two policies are different, including with respect to the

requirement for affirmative consent." **Ex. 153** at 2, WMS11124 (Dkt. 76-16).

     **Response:**  Undisputed.

286.    On January 31, 2017, Sandstrom informed Smith that Haynes "has decided to grant a

limited rehearing of the case" and provided details about the appeal. **Ex. 154**, WMS11347.

     **Response:**  Undisputed.

287.    Sandstrom never had any written communications about this case with President Falk

or the interim College President. **Ex. 7**, Rossi Affidavit ¶ 16.

     **Response:**  Disputed.  Ex. 142.

288.    On February 10, 2017, John's counsel objected to the narrowness of the appeal and

argued that three other procedural lapses should be considered on appeal. **Ex. 155**, WMS09706;

See  Statement No. 281.

     **Response:**  Undisputed.

289.    Defendant's counsel replied, "We disagree. The Vice President was entirely within her

discretion to handle the appeal in the manner that she did." **Ex. 7**, Rossi Affidavit ¶ 17.

     **Response:**  Undisputed.

290.    On February 6, 2017, the same Panel that previously adjudicated the case held an appeal

hearing at which they were provided a handout containing the pre-October 2014 policy and the one

that was in the investigative report. The handout stated that the Panel had previously applied a

policy not in effect at the time of the alleged misconduct. **Ex. 124** at 4, WMS10308; **Ex. 156**, WMS11718.

      **Response:**  Undisputed.

291.   Unlike the "policies over time" document Sandstrom compiled, the differences between the policies were not highlighted by bold type. Id.; Statement No. 270.

      **Response:**  Undisputed.

292.   On February 8, 2017, the three panelists plus an additional person, Cynthia Haley, met again for an appeal hearing. **Ex. 124** at 5, WMS10309.

      **Response:**  Disputed that Ms. Haley was present for the appeal hearing, which the evidence does not support.  Ex. 63, Bossong Dep. Vol. I at 69: 22-23;  Ex. 69, Gordon Dep. at 148:4-8; Ex. 135, Klass Dep. at 19:3-12; Ex. 158, Pretto Dep. Vol. II at 21:18-21.

293.   Haley, who works at the Dean's Office, had assisted Sandstrom with the "policies over time" document. **Ex. 2**.; Statement No. 270.

      **Response:**  Undisputed.

294.   On February 13, 2017, Sandstrom and the Panel provided John a decision letter that affirmed the Panel's original finding of responsibility for non-consensual sex. **Ex. 157**, WMS10303.

      **Response:**  Undisputed.

295.   Said letter cited the same rationale that the Panel originally used in coming to their determination: "Smith credibly reported that both the sexual position and roughness **during the incident** in question were unusual, and clear indicators that you did not have consent, and witnesses recalled that Smith had described this incident to them as nonconsensual." (emphasis added.) Id.

      **Response:**  Undisputed.

296.    The Panel's letter does not provide any other factors than allegedly unusual sexual positioning and roughness "during the incident" as indicators of non-consent. Id.

**Response:**  Undisputed.

297.    Like the original letter, the appeal decision letter did not address John's any of arguments in his Responses relative to [in]credibility of Smith's claim there had been non-consensual sex. Id.

**Response:**  Undisputed.

298.    The appeal decision letter cited that witnesses recalled that Smith had described this incident to them as nonconsensual without addressing the statements' evolution, inconsistencies, or other evidence demonstrating lack of credibility. Id.

**Response:**  Undisputed.

299.    The letter did not provide any information explaining the Panel's alleged reconsideration of the evidence as it only stated that the Panel reconsidered it. Id.

**Response:**  Undisputed.

300.    The appeal decision letter claimed that the version of the policy in effect at the time of the alleged incident used different language to express the same concept in the newer version. Id.

**Response:**  Undisputed.

301.    The Panelists believed that the sexual misconduct policy regarding non-consensual sex was essentially the same in September 2014 as it was when the October 2014 Statement on Sexual Assault and Other Sexual Misconduct went into effect. **Ex. 135**, Klass Dep. Excerpts 15:16-23.

**Response:**  Undisputed.

302.    In her depositions, Pretto stated that affirmative consent was required for consent to be present and that the Panel believed that both (pre-October 2014 and post-October 2014) policies

were affirmative consent policies. **Ex. 68**, Pretto Dep. Vol. I Excerpts 90:5-9; **Ex. 158**, Pretto Dep. Vol. II Excerpts 20:5-11.

> **Response:**  Undisputed.

303.    In his deposition, Gordon stated that the Panel felt that the "language had been changed and added to and clarified but it didn't change the fundamentals of the policy itself" and **that's how they "felt [they] could be consistent between the two and have the same outcome**." (emphasis added.) **Ex. 69**, Gordon Dep. Excerpts 148:16-23.

> **Response:**  Undisputed.

304.    In Spring 2016, John walked with his class at graduation but did not receive a degree. **Ex. 159**, John Doe Dep. Vol. I Excerpts 197:11-13.

> **Response:**  Undisputed.

305.    John wanted to apply to law school but was/is derailed by the proceedings at the College. **Ex. 159**, John Doe Dep. Vol. I Excerpts 44:13-21; **Ex. 160,** John Doe Dep. Vol. II Excerpts 19:15-20:9; <u>See</u> Statement 60; **Ex. 161**, Ex. 97 John Doe Dep. Vol. I.

> **Response:**  Undisputed for these purposes as immaterial.

306.    Around the same time, John considered graduate study. <u>Id.</u>

> **Response:**  Undisputed for these purposes as immaterial.

307.    Sometime between the spring and fall of 2016, John also inquired into what his chances would be at transferring into another college or university undergraduate program to achieve a bachelor degree. **Ex. 162**, Ex. 98 John Doe Dep. Vol. I.

> **Response:**  Undisputed for these purposes as immaterial.

308.    Instead of continuing his education, which was not possible without his degree and this case still pending, John took a job in October 2016 in a position that did not require a degree at the time he was hired. **Ex. 159**, John Doe Dep. Vol. I Excerpts 42:4-7, 43:2-6.

**Response:**  Undisputed for these purposes as immaterial.

309.    John has incurred expenses during, and, as a result of, his expulsion - including lost tuition for his four years enrolled at Williams in the amount of $224,000; lost present earnings from fall 2011 when John first enrolled at the College to the conclusion of the proceedings estimated at $450,000; has diminished earning potential as a result of the denial of his degree estimated at $4,464,000; faces reputational injury estimated at $4,000,000. **Ex. 163-164.**

> **Response:**  Disputed, as the evidence cited merely constitutes Doe's assertion that he has incurred these damages. Moreover, Doe's analysis is flawed.  Doe received the education he paid for.

WILLIAMS COLLEGE,

/s/ Elizabeth H. Kelly
Daryl J. Lapp (BBO No. 554980)
  daryl.lapp@lockelord.com
Elizabeth H. Kelly (BBO No. 672277)
  liz.kelly@lockelord.com
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA 02199
October 29, 2018          617.230.0100

**Certificate of Service**

This document was served electronically upon all counsel of record by filing through the ECF system on October 29, 2018.

/s/ Elizabeth H. Kelly
Elizabeth H. Kelly