**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

JOHN DOE,                              )
                                       )
        Plaintiff,          )
                                       )       Civil Action
v.                                     )       No. 16-30184-MGM
WILLIAMS COLLEGE.                      )
                                       )
        Defendant.         )
_____)


**MEMORANDUM AND ORDER REGARDING PLAINTIFF'S**
**MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

March 29, 2021

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

      John Doe ("Doe" or Plaintiff)[1] was a student at Williams College (the "College" or Defendant) beginning in the fall of 2011. During his time as a student he was involved in four disciplinary proceedings. In his first year he was found responsible for sexual misconduct and punished with a one-year suspension. Later he was found responsible for academic dishonesty in violation of the College honor code. During his final year, he was again the subject of an academic dishonesty complaint. After a hearing he was found responsible for plagiarism, but that decision was reversed following his appeal. The academic dishonesty complaint had been made by Doe's former romantic partner, Susan Smith,[2] following an altercation during which she struck Doe. Both Doe and Smith were students when they began their romantic relationship, but Smith had graduated

---

[1] Plaintiff's Motion to Proceed Under Pseudonym (Dkt. No. 6) was previously granted by Judge Michael A. Ponsor (Dkt. No. 10).

[2] Like John Doe, Susan Smith is a pseudonym that has been used throughout this litigation.

1

before Doe's senior year and at the time of the altercation she was employed by the College. While

Doe was waiting to learn the result of his academic dishonesty appeal, he complained to the College

about Smith's assault and alleged that then-Dean of the College, Sarah Bolton, had discriminated

against him based on his gender. Smith subsequently filed her own complaint with the College,

alleging Doe had subjected her to relationship abuse while they were both students. Later, she also

alleged that on one occasion during their relationship, while both were students, Doe had

nonconsensual sexual intercourse with her. After a lengthy disciplinary process involving both

complaints, Doe was found responsible for sexual misconduct. He filed this action soon after,

invoking this court's federal question and diversity jurisdiction. The operative complaint includes six

substantive counts.[3] Plaintiff claims the College (1) violated Title IX of the Education Amendments

of 1972 ("Title IX") (Count I); (2) explicitly or implicitly breached its contract with Doe (Count II –

breach of contract and Count III – breach of the implied covenant of good faith and fair dealing);

(3) violated the Massachusetts Equal Rights Act, Mass. Gen. L. c. 93, § 102 (Count IV); (4)

negligently failed to properly hire, train, and supervise employees and maintain proper policies and

procedures for adjudicating sexual misconduct claims (Count V); and (5) violated a duty it owed to

provide Doe a fundamentally fair disciplinary process (Count VI). With respect to his claims, Doe

seeks injunctive relief and declaratory judgment, as well as monetary damages. While this case was

pending, the College heard Doe's appeal of the sexual misconduct finding. His appeal was

unsuccessful and, although he had completed all of the academic requirements for his degree, the

College expelled him rather than award the degree.

       This case was initially assigned to Judge Ponsor. He denied Plaintiff's motions for a

temporary restraining order and preliminary injunction and denied the bulk of Defendant's motion

---

[3] The operative complaint is Plaintiff's Third Amended Complaint. (Dkt. No. 76.) In addition to his six, numbered, substantive counts, Plaintiff has asserted a "Count X" for injunctive and declaratory relief from the wrongdoing attributed to the College in the preceding substantive counts.

to dismiss. (Dkt. Nos. 23, 65, and 71.) Shortly before the parties filed their motions for summary judgment, this case was reassigned to this court. (Dkt. No. 117.) Plaintiff moved for partial summary judgment as to his Title IX, breach of contract, breach of implied covenant, and fundamental fairness claims (Count I, II, III, and VI). (Dkt. No. 122.) Defendant moved for summary judgment as to all claims. (Docket No. 125.) For the reasons stated below, the court denies Plaintiff's motion for summary judgment and grants, in part, Defendant's motion for summary judgment.

## II.   SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law'" and disputes are genuine when a reasonable jury considering the evidence "'could resolve the point in the favor of the non-moving party.'" *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-4 (1st Cir. 2017) (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). This standard is the same where, as here, the parties have filed cross-motions for summary judgment. *Doe v. Trs. of Boston Coll. (Trs. of Boston Coll. 2018)*, 892 F.3d 67, 79 (1st Cir. 2018). When ruling on a motion for summary judgment, the court must construe "the record evidence in the light most favorable to the nonmoving party." *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). The court must draw all reasonable inferences in favor of the non-moving party, but must avoid making unreasonable inferences or crediting "bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Cherkaoui, 877 F.3d at 23* (internal quotations omitted). "[I]f there is a genuine dispute of a material fact, that dispute would 'need[] to be resolved by a trier of fact.'" *Trs. of Bos. Coll. 2018*, 892 F.3d at 79 (quoting *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002)).

### III.   BACKGROUND

Each party has filed a statement laying out the facts, supported by citations to record evidence, in order to meet the initial burden of establishing an absence of genuine issues of material fact relevant to the counts for which summary judgment is sought. *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995). Defendant's statement of fact encompassed 180 paragraphs and Plaintiff's statement included 309-paragraphs. Each party also filed a fact-by-fact response to the other party's statement. Many of the objections included citations to evidence in the record that either directly contradicted the evidence cited by the other party or provided a specific basis for arguing that evidence was not credible, thereby establishing a genuine dispute regarding the fact. There were also objections asserting a party's summary of a document in the record or selected quotation from a document, such as an email, was misleading. In those instances, the court has reviewed the cited document to determine whether the meaning of the document could be reasonably interpreted in more than one way, thus establishing a genuine dispute. Plaintiff also objected to some facts on the grounds that though technically accurate, the fact as stated by Defendant was misleading or incomplete without other information. Plaintiff then provided that additional context or referred the court to portions of Plaintiff's own statement of material facts. Finally, in a few instances, Plaintiff objected to a fact on the grounds that it was only supported by the deposition testimony of a single witness, but without citing any record evidence that contradicts the fact or provides a basis for impeaching the witness with respect to that fact. The court has generally disregarded this last type of objection as it is not supported by record citations. Fed. R. Civ. P. 56(c).

As evidenced by the statements of fact and oppositions, both parties have tried to provide the court with as much context as possible to support their overarching narrative and undermine the narrative offered by the other party. The parties have cast their arguments through the lenses of

their competing narratives, which can be briefly summarized as follows. Doe describes himself as being subjected to malicious allegations from his former romantic partner, Smith. He also asserts the College's sexual misconduct policies and administrators are biased against male students causing him to be denied a fair disciplinary process. He has supported his narrative by raising doubts about Smith's credibility and pointing to evidence that he and Smith were not treated identically or that a policy was not followed in the exact manner he believed necessary as evidence of gender bias. In the College's narrative, the College's written policies were fair, Doe's disciplinary process followed the written policies, and any deviations did not prevent a fair outcome.

Before proceeding with a summary of the undisputed facts, the court observes that though Doe has devoted significant effort to attacking Smith's credibility, questions regarding her credibility or the truth of her accusations cannot be decided by this court at summary judgment. Moreover, whether a different factfinder would assess Smith's credibility differently is not a relevant line of inquiry. At issue is whether the College met its obligations to provide Doe with a fair disciplinary process consistent with the requirements of the law and its contractual obligations. The following summary therefore focuses on the facts material to the College's alleged shortcomings.

### A. Relevant Events Prior to the 2015-2016 Academic Year

Doe matriculated as a student at the College in the fall of 2011. (Dkt. No. 133, Def. 56.1 State. & Pl. Resp. ("DF") ¶ 19.)[4] While Doe was a student, the College had a code of conduct that provided a set of rules broadly applicable to students, staff, and faculty. (DF ¶ 9.) The code of conduct was published in hardcopy for the last time during the 2012-2013 academic year. (Dkt. No. 137, Pl. 56.1 State. & Def. Resp. ("PF") ¶ 3.) Instead, the College published the code on its website. (*Id.*)

---

[4] Each party filed a response to the other party's 56.1 statement that included the full text of the original 56.1 statement. For simplicity of citations, the court cites to the responses for both the facts contained in the original 56.1 statement and the other party's responses.

During the spring of 2012, the College conducted a disciplinary proceeding involving Doe, which culminated in a finding that Doe was responsible for engaging in penetrative sexual intercourse with another student without first obtaining her consent in violation of the Code of Conduct.[5] (DF ¶ 19.) The College suspended Doe for two semesters. (DF ¶ 21.) When he returned to campus in the fall of 2013, Doe commenced a romantic relationship with Smith. (PF ¶ 32.)

In the spring of 2014, the College received media coverage critical of its handling of sexual assault complaints after a former student and her parents accused leaders at the College of mishandling its response to her sexual assault in the fall 2012. (DF ¶ 21, Pl. Resp.) Members of the College administration, including Dean of the College, Sarah Bolton ("Bolton") and Director of Sexual Assault Prevention and Response, Meagan Bossong ("Bossong"), were the targets of an online petition signed by several thousand individuals. (DF ¶ 7, ¶ 21, Pl. Resp.) At the time of this media coverage, the College was not under federal investigation for mishandling sexual misconduct complaints, though many other schools were. (*Id.*) There is no evidence connecting Doe or Smith to the complaint or to any student movement involved in advocating for changes to the College's response to alleged sexual misconduct.

In October of 2014, Smith sent an email to Bolton, in which she expressed concerns about whether her relationship with her boyfriend was healthy. (Dkt. No. 127-57, Email exchange between Smith and Bolton, dated Oct. 5, 2014 ("10/5/2014 Emails").) In her email, Smith gave examples of recurring situations in which her boyfriend would get angry and say things like she deserved a bad outcome when something went wrong, he hated her, he wished she didn't exist, she was selfish, and

---

[5] Plaintiff's complaint and statement of material facts do not raise this earlier disciplinary action, but Defendant mentions it briefly in its statement of material facts and has argued this history is relevant to Plaintiff's understanding of College rules regarding consent. The previous disciplinary process is also relevant to assessing whether Plaintiff and Smith were similarly situated during the spring of 2016. Plaintiff objected to Defendant's brief statement and provided additional facts that suggest he contests the outcome of that earlier disciplinary proceeding. (DF ¶ 20, Pl. Resp.) The additional facts he provides do not establish a genuine dispute as to the fact relevant here – that he was, in fact, found responsible of sexual misconduct in violation of the Code of Conduct in 2012.

he couldn't even look at her. (*Id.*) Smith stated that her boyfriend would later apologize, but that the interactions affected her greatly and she felt trapped. (*Id.*) She also wrote that she had no one to turn to "because people brush[ed] it off" and she and Doe had the same group of friends. (*Id.*) Bolton responded to Smith's email quickly. (*Id.*) Although Smith's email did not name her boyfriend, Bolton knew or soon after learned that Smith's boyfriend was Doe. (*Id.*; Dkt. No. 127-63, Bolton Aff., ¶ 2.) In her response, Bolton expressed sympathy, asked questions about the kind of help Smith was seeking, informed her that there were resources available to help her, and encouraged her to provide a phone number so the Dean on Call, Rosanna Reyes, could contact her. (Dkt. No. 127-57, 10/5/2014 Emails.) Reyes later referred Smith to Bossong for additional support. (DF ¶ 28.) At her deposition Bossong stated that she had provided Smith with additional support during the 2014-2015 school year and that Smith told her Doe had verbally and physically assaulted her. (DF ¶¶ 29-31.) Pointing to an absence of corroborating records, Plaintiff challenges Bossong's credibility on this point and identifies an issue of genuine dispute regarding the scope and timing of help received by Smith. (DF ¶ 29, Pl. Resp.) There is, however, no dispute that in responding to Smith's request for assistance, College administrators focused on helping Smith. At that time, no complaint was made against Doe, nor was an investigation initiated.

Doe was, however, involved in an unrelated disciplinary proceeding and in November of 2014, the College Honor Code Committee found him responsible for an academic honor code violation. (DF ¶ 22.) Although the parties do not dispute that College rules permitted the expulsion of Doe at that time based on the prior finding and suspension for sexual assault, Bolton accepted the Honor Code Committee's recommended sanction of failure in the course and disciplinary probation for one year. (DF ¶¶ 23, 24.) In the letter informing him of the College's decision, Bolton warned Doe, "[i]t is crucial that you understand that any future violation of the college's code of

conduct, whether academic or nonacademic, and even if of relatively 'minor' significance, will certainly lead to your separation from the College." (DF ¶ 25.)

Smith graduated from the College in the spring of 2015. (DF ¶ 3.) In June, she began working for the College in its alumni office. (*Id.*) She held that position until June 30, 2016. (*Id.*)

**B.  Relevant Events During December of 2015**

At 2:27 a.m. on December 6, 2015, Smith emailed Bolton. (PF ¶ 41.) The subject line of the email was "Help" and Smith opened her email by acknowledging that she had reached out for help the previous year "while . . . still a student . . . and chose not to receive it." (Dkt. No. 76-4, Email exchange between Smith and Bolton, dated Dec. 6, 2015.) Smith's email went on to say that Doe had driven Smith "to a point of desperation" that night and that Smith had been struggling emotionally all semester. (*Id.*) She then alleged that she had been helping Doe write essays for his Spanish classes, including, just days earlier, writing a portion of an essay, a copy of which she attached to the email. (*Id.*) Smith acknowledged her actions violated the honor code and she asked for Bolton's forgiveness. (*Id.*) Notably absent from Smith's email were any specific details about her interactions with Doe that night, including the undisputed fact that she struck him in the face during an argument and was worried that her actions could have negative repercussions for her. (PF ¶¶ 37-39.) Despite the seriousness of Smith's conduct, there is no evidence that Bolton, or any other College employee, learned of it until significantly later.

Bolton responded to Smith's email the following morning, writing that she was "so sorry to hear that [Doe] is continuing to cause [Smith] so much suffering." (PF ¶ 42.). She encouraged Smith to separate from Doe and asked her if she had "help in staying safe." (*Id.*) After responding to Smith's communication, Bolton emailed Bossong regarding Smith's email, writing "'[s]he says [she] and [Doe] are still together, so I don't know that this is going to really go anywhere. . . [.]I've encouraged her to start by getting support for herself, and we will work from there.'" (PF ¶ 43

(quoting Dkt. No. 124-25, First Email exchange between Bolton and Bossong, dated Dec. 6, 2015) (alterations added).) Later that same day, Smith emailed Bolton, retracting her previous statement that she had written portions of Doe's essays for him. (PF ¶ 45.) Bolton forwarded the email to Bossong, saying: "This gives me grave concern for Smith's safety [. . . .] I believe that this last message was not written by Smith." (PF ¶ 46 (quoting Dkt. No. 124-24, Second Email exchange between Bolton and Bossong, dated Dec. 6, 2015) (alteration added).) Despite Smith's second email retracting her accusations, an honor code violation proceeding was initiated against Doe. (DF ¶ 33.) Bolton and Bossong also followed up with Smith and met with her on February 2, 2016. (PF ¶ 49.) That same day, Bossong emailed Smith her cell phone number, a "safety plan," and instructions for "Circle of 6," a safety app that would alert Smith's contacts to call the police in certain situations. (PF ¶ 50.)

### C. The Honor Code Proceeding

Bolton initiated an honor code violation proceeding against Doe with respect to three papers submitted in classes taught be three different professors, Fox, French, and Martinez-Raguso. (PF ¶ 51; Dkt. No. 124-32, Email exchange between Bolton and Smith, dated Feb. 4, 2016 ("2/4/2016 Emails")).) Doe has asserted that Bolton's actions initiating the honor code proceeding violated the applicable Honor Hearing Procedures, but the evidence cited by Doe is insufficient to support this finding.[6] Bolton was in touch with Smith regarding the honor code proceeding and on February 10,

---

[6] The description of the "Honor Hearing Procedures" cited by Plaintiff provides that "[a] case begins when a member of the community comes forward with evidence that a violation . . . might have occurred" and that "[t]his person normally brings the suspected violation to the attention of the Student Chair (SC) or Faculty Chair (FC)," after which the Chairs would decide whether there was sufficient evidence to proceed. (Dkt. No. 124-27, Honor Hearing Procedures.) While the first part of this language is stated in absolute terms, the use of the word "normally" in the second part clearly anticipates variations. This is consistent with language at the beginning of the Honor Hearing Procedures describing the document as "a guide to what [participants] may expect as normal procedure," and noting that while the "procedures constitute a guide to expected behavior, . . . the committee and its officers are free to act flexibly in ways consistent with fairness, and minor variations should not be considered violations of procedure." (*Id.*) Elsewhere in the Honor Code Procedures, the Dean's Office is made available to assist witnesses. (*Id.*; DF ¶ 34.) Despite the flexibility of the procedures and role assigned to the Dean's Office, Doe has not detailed how Bolton violated the Honor Hearing Procedures, or cited evidence in the record that provides that information. Doe's citation to an email exchange between

2016, Smith sent Doe an update on the proceedings she had received in a text message from Bolton. (PF ¶ 52.) The hearing was scheduled for February 23, 2016. (PF ¶ 54.) On February 22, 2016, Bolton exchanged email with Fox, confirming that Fox, who was in Spain at the time, would participate in the hearing via telephone. (*Id.*) Later that day, Bolton emailed the Student Chair of the Honor Code Committee and stated that Fox would be unable to participate. (PF ¶55.) The record indicates that Bolton and Fox exchanged additional emails on February 22, 2016, but neither party has identified an explanation for the change of plans reflected in Bolton's email to the Student Chair. (Dkt. No. 124-38, Email from Bolton to Fox, dated Feb. 22, 2016 at 1:56 PM.) On February 22, 2016, Bolton also sent an email to the Student and Faculty Chairs of the Honor Code Committee regarding faculty witnesses. (Dk. 124-33, Email from Bolton to Honor Code Committee Chairs, dated Feb. 22, 2016.) In that email, Bolton wrote:

> It's worth your knowing, as you think about this, that the faculty have had very different responses to the case being brought to them. One had some reason for concern about [Doe's] work before this case came forward. The other two, though, seem at base to believe that the allegations aren't likely true. One even feels that it is his/her role to advocate for [Doe] against the other student—which I confess concerns me.

(*Id.* (alterations added)) Bolton did not elaborate on the nature of her concerns. (*Id.*)

The Honor Code Committee held a hearing on February 23, 2016 and afterwards the Committee found Doe responsible for plagiarism with respect to the paper he submitted in Fox's class, which was also the paper Smith attached to the first email she sent Bolton on December 6, 2015. (DF ¶ 35; PF ¶ 58; Dkt. No.  127-26, Letter from Bolton to Doe, dated March 2, 2016 ("March 2, 2016 Letter".) The Honor Hearing Procedures provide that that the accuser is informed of the outcome of the proceedings, and Bolton telephoned Smith on February 23rd, notifying her that Doe had been found responsible for plagiarism and the Honor Code Committee had voted to

---

Smith and Bolton establishes only that Bolton was involved in the process of gathering relevant evidence from Smith, a task that appears to fall within the role of assisting witnesses. (Dkt. No. 124-32, 2/4/2016 Emails .)

expel him. (DF ¶ 34, PF ¶ 59.) Bolton accepted the sanction recommended by the Committee; the

President of the College approved it; and Bolton, acting as the recording secretary to the Honor

Code Committee, wrote Doe a letter, dated March 2, 2016, informing him of the Committee's

decision and his right to appeal the decision. (DF ¶¶ 35-36.) The letter also informed Doe that if he

appealed the decision, he could remain at the College until the appeal was decided. (Dkt. No. 127-

26, March 2, 2016 Letter.)

On March 16, 2016, Doe appealed the finding of the Honor Code Committee. (DF ¶ 49.)

The Honor Code Committee reconvened April 26, 2016 to hear Doe's appeal. Fox participated in

the appeal hearing and the finding against Doe was vacated. (DF ¶ 50, PF ¶ 72.) The following day,

Bolton sent Smith an email in which she informed Smith of the outcome of the appeal and told her

that "'the most important things are to continue to get support, and to ensure that you are safe.'"

(PF ¶ 75 (quoting Dkt. No. 124-50, Email from Bolton to Smith, dated Apr. 27, 2016).)

### D.  The Misconduct Complaints

Doe and Smith were in contact with each other for the last time on March 4, 2016. (DF ¶ 51,

Pl. Resp.; PF ¶ 61.) Despite Doe communicating to Smith that he did not want to talk to her, she

continued to try to contact him between the 4th and 12th of March, sending texts and repeatedly

calling him, including calling his phone forty-one times in a four-hour period on March 10th. (PF ¶¶

62-63.) On March 13, 2016, Doe's attorney emailed a letter to Smith and blind copied Bolton. (DF ¶

37.) A heading at the top of the letter identified it as a "CEASE AND DESIST DEMAND." (Dkt.

No. 127-27, Letter from Atty. Rossi to Smith, dated Mar. 13, 2016 ("Cease and Desist Letter").) The

letter detailed Smith's recent efforts to contact Doe, explained that Doe considered her behavior

harassment, warned Smith not to make further attempts to contact Doe, and warned her that Doe

was considering legal action "in connection with your battery upon him on the night of December 5,

2016 [sic]." (*Id.*) The letter identified the location and approximate time of the December 5, 2015

altercation during which Smith struck Doe in the face, but did not specify Smith's conduct. (*Id.*) This is the first evidence cited by either party of the College receiving information about the December altercation.

Doe and his attorney met with Bolton and College Counsel, Jeffrey Jones, the following day, March 14, 2016. (DF ¶ 40.) Although Doe, through his attorney, expressed concern that the College was protecting an employee who allegedly had assaulted and harassed him, he did not ask Bolton or Jones to take any specific steps or initiate any type of process against Smith. (DF ¶¶ 41, 42 and Pl. Resp.; PF ¶ 79.) Neither party has provided the court with any additional information about what was discussed during the meeting. Also on March 14, 2016, Bossong provided Smith with a referral to a local organization that supports survivors of domestic and sexual violence. (PF ¶ 65.) Bossong also encouraged Smith to travel to her family's home, and Smith temporarily left the area on March 15, 2016. (PF ¶ 66.)

On or around April 5, 2016, the Honor Code committee agreed to hear Doe's appeal. (DF ¶ 44 Pl. Resp.) Around this same time, Smith, having returned to campus, complained to her supervisor that Doe would be attending an upcoming event organized by the alumni office in order to perform with a student dance group. (PF ¶ 68.) Smith was scheduled to work at the event and her supervisor contacted Bolton to see if it was possible to prevent Doe from attending the event. (PF ¶ 68-69.) On April 7, 2016, Bolton helped facilitate a mutual no-contact order between Doe and Smith. (DF ¶ 45; PF ¶ 70.) Bolton then asked that Doe not attend the event, and he did not do so. (DF ¶ 47; PF ¶ 71.)

The following week, on April 13, 2016, Doe's attorney sent a letter to Toya Camacho, Title IX Coordinator at the College, attaching the Cease and Desist Letter, and stating that Doe wanted to bring a complaint against Smith. (DF ¶ 48.) In the letter, Doe's attorney contended the implementation of a no-contact order a month after Doe's last communication to Smith was

discriminatory. (PF ¶ 83.) On April 28, 2016, Doe requested Bolton recuse herself from the case, and she agreed to do so. (PF ¶ 84.) Bolton later accepted a position at another school, and her employment with the College ended on June 30, 2016. (DF ¶ 5.)

At the beginning of May, Doe met with Camacho to discuss his complaint against Smith. (PF ¶ 85.) Camacho thereafter scheduled a meeting with Smith to discuss Doe's allegations. (PF ¶ 86.) On May 5, 2016, the day before the scheduled meeting, Smith emailed Camacho informing her that she wished to file a complaint against Doe regarding relationship abuse and retaliation. (PF ¶ 87.) Before sending the email to Camacho, Smith sent a draft to Bossong, who suggested a minor change to Smith's email. (PF ¶ 88; Dkt. No. 124-56, Draft, with revision history, of email from Smith to Camacho.) On May 9, 2016, Camacho met with Smith to discuss Doe's complaint against her and her complaint against Doe. (DF ¶ 55.) The following day, Camacho met with Doe to discuss Smith's complaint and the investigation process. (DF ¶ 57; PF ¶ 90.) During that meeting Doe asked why the College was not treating Smith's complaint as retaliation against him for filing his complaint; he has not described the response he received except to say that it did not contain a clear answer. (PF ¶ 91.)

Camacho also sent Doe a letter informing him that Smith had filed a complaint in which she alleged that he had behaved abusively towards her during the previous two years. (DF ¶ 56; PF ¶ 90.) The letter also explained the investigation process and provided approximate timelines, guidelines for advisors, a copy of the Code of Conduct, and the procedures for the investigation and adjudication process, including a Sexual Misconduct, Dating/Domestic Violence, and Stalking Discipline Process Outline (the "Process Outline"). (DF ¶ 56.) Although Doe was already represented by counsel, Camacho's letter informed him that Dean Johnson was his "assigned dean

for this process."[7] (Dkt. No. 127-30, Letter from Camacho to Doe, dated May 10, 2016.) The attached Process Outline divided the disciplinary process into six stages and provided an "Approximate time" for each stage. (Dkt. No. 124-13, Process Outline.) Added together, the estimated time from the commencement of an investigation through the beginning of the selection of disciplinary panel members shown on the Process Outline is approximately eleven weeks. (*Id.*; PF ¶ 17.) However, language in the Process Outline makes clear that the stages in which the investigator meets with the complainant, respondent, and witnesses and produces their report may take longer "depend[ing] on the number of witnesses to be interviewed or other evidence to be compiled." (Dkt. No. 124-13, Process Outline.)

**E.  The Investigation**

In May 2016, the College retained outside attorney Allyson Kurker to conduct a formal investigation into Doe's and Smith's complaints. (DF ¶ 59.) Kurker had been practicing law for more than 10 years and had been conducting Title IX investigations for approximately 4 years. She had attended numerous trainings related to Title IX and had conducted more than 25 investigations at different colleges. (DF ¶¶ 60-61.)

i.    Interviews with Doe and Smith

During her investigation, Kurker conducted three interviews with Doe and three interviews of Smith. (PF ¶ 144.) Doe was accompanied and assisted by his attorney at all three interviews. (DF ¶¶ 68, 71, 75.) Doe asserts Kurker improperly interfered with his answers by interrupting him and

---

[7] Doe has asserted that the support provided by his assigned Dean was inferior to support Smith received, and that the disparate types of support provided are an example of gender-biased treatment, but has not supported this contention with sufficient facts. His assertions that Bossong provided Smith with information regarding the Victim Rights Law Center, which provides pro bono representation and that Johnson did not provide him with similar information is undisputed. (PF ¶¶ 94-95.) However, no relevant inferences can be drawn from these isolated facts and Doe has not supplied the context necessary to infer any inequitable treatment.  He has not identified Bossong as Smith's "assigned Dean," and indeed, it seems unlikely Bossong would have filled this role for Smith as she was the Director of Sexual Assault Prevention and Response, not a dean. Doe also has not explained why he should have received information about possible pro bono representation, when he was already represented by counsel.

completing his sentences. (PF ¶ 150.) Doe has not asserted that he or his attorney made any contemporaneous complaints about Kurker's behavior either to Kurker or a College administrator.

Kurker conducted her first interview with Doe on May 20, 2016. (DF ¶ 68.) During the interview he had the opportunity to tell Kurker about his relationship with Smith, the night of the alleged battery, and Smith's plagiarism allegations. (DF ¶ 69.) Following the interview, he sent Kurker documents and identified three witnesses. (DF ¶ 70.) Kurker also conducted her first interview with Smith in May. (DF ¶ 62; PF ¶ 144.) In the final five minutes of the two-and-a-half-hour interview, Smith mentioned, for the first time, an incident of sex with Doe that she believed was not consensual. (PF ¶ 145.) Kurker had another interview scheduled immediately after and did not get details about the incident before the interview concluded. (DF ¶ 64.)

On June 1, 2016, Kurker conducted her second interview with Doe. (DF ¶ 71.) She provided Doe with some of the information she had received during her first interview with Smith, but she did not mention the alleged incident of non-consensual sex. (DF ¶ 71 and Pl. Resp.) Doe provided additional documents to Kurker on June 1, June 3, and June 13, 2016. (DF ¶ 74.) On June 8, 2016, Doe also requested transcripts of all the interviews conducted during the investigation. (PF ¶ 167.) Camacho told Doe that he could ask Bolton for the records under the Family Educational Rights and Privacy Act ("FERPA"). (PF ¶ 168.) On June 15, 2016, Bolton promised she would get the records from Kurker. (PF ¶ 169.) Doe had not received any transcripts when Bolton left the college for other employment at the end of June.

Kurker interviewed Smith for a second time on June 15, 2016. (DF ¶ 65.) During this interview Smith provided details about her sexual relationship with Doe and the specific incidence of non-consensual sex. (DF ¶ 65; PF ¶ 146.) She informed Doe about Smith's allegation of non-

consensual sex at his third and final interview on July 13, 2016.[8] (DF ¶¶ 75-76.) The facts provided

by the parties do not indicate that Doe was provided with a written notice of Smith's allegation of

non-consensual sex. During the interview Doe denied the allegation and offered details in support

of his denial. (DF ¶ 78; PF ¶ 151.) He also asked whether he would be interviewed again if Smith

said anything in her third interview that would warrant a response from Doe. (PF ¶ 153.) Kurker

responded "'[i]t depends if there's a material discrepancy or not.'" (*Id.* (citing Dkt. 124-26, 116).) She

acknowledged that there could be a lengthy back and forth of interviews, but that she would write

her report when she felt like she had "'captured both [Doe's and Smith's] perspectives.'" (*Id.*)

Kurker also explained that Doe would have an opportunity to read her report and identify any

outstanding issues to the College before the hearing panel decided the case. (PF ¶ 153) At the end of

the interview, Doe stated that he had no further information to provide. (DF ¶ 79.) The following

day, Doe's attorney sent Kurker copies of the College's Code of Conduct obtained from the College

website, first raising the issue of the importance of evaluating past incidents using the correct

version of the Code of Conduct. (DF ¶¶ 80-81 and Pl. Resps.) On July 26th, Kurker notified Doe

that Smith had identified Labor Day of 2014 as the date of the alleged non-consensual sex and

invited him to schedule a time to provide any new information he wished to share now that he had

the exact date. (DF ¶ 83.) Doe declined to do so. (*Id.*)

On August 22, 2016, Doe followed up with Camacho regarding his transcript request. (PF ¶

171.) Sandstrom informed Doe in early September that he could request transcripts of his own

interviews, but it was the College's practice not to provide a student with transcripts of interviews

conducted with other witnesses during an adjudicative process. (DF ¶ 158, PF ¶ 172.) On September

16, 2016, Jones told Doe's attorney that Doe could make a formal request pursuant to FERPA and

---

[8] Defendant's Statement of Facts lists June 13, 2016 as the date, but this is a typographical error. Plaintiff's response states the date was July 13, 2016 and this is consistent with the date in the document cited by Defendant. (DF ¶ 75 and Pl. Resp.; Dkt. 127-5.)

the College would respond appropriately, but that the disciplinary proceeding would not be delayed while a FERPA request was outstanding. (PF ¶ 173.) The College sent Doe transcripts of his own interviews with Kurker. (DF ¶ 159.) On December 4, 2016, Counsel for Doe sent the College a letter citing FERPA and seeking copies of Doe's disciplinary records including transcripts of all interviews conducted during the investigation. (DF ¶ 160.) The College made Doe's disciplinary records, including the interview transcripts, available for inspection by Doe and his counsel on January 16, 2017. (DF ¶ 161.) One month later, Doe's counsel followed up to review the documents. (DF ¶ 162.)

ii.     Communications Regarding the Scope of the Investigation

On July 1, 2016, Marlene Sandstrom became the new Dean of the College. (DF ¶ 6.) As part of her transition into her new position, Sandstrom received guidance about the Doe/Smith complaints and investigation from Bossong. (PF ¶ 103.) On July 19, 2016, Kurker sought guidance from Camacho regarding the scope of her investigation, specifically how many witness interviews she should conduct. (PF ¶¶ 154-56.) Sandstrom opined in an email to Bossong that she was inclined to allow the investigation to include an interview with a newly identified witness, even though it was unlikely to provide particularly useful information, because the additional witness interview "apparently feels important to Smith." (PF ¶ 156.) At that time, Smith had identified ten of twelve non-party witnesses. (PF ¶ 154.) In her response to Kurker, Camacho said Kurker should interview the witness recently identified by Smith, but not witnesses identified later because both parties had ample time to submit lists of witnesses. (PF ¶ 157.) On July 23rd and 24th, Doe notified Camacho and Kurker that he wished to add three people to his witness list. (DF ¶ 82.) Despite the earlier restriction on witnesses, the record indicates that Kurker took steps to interview these witnesses. (PF ¶ 158; Dkt. No. 127-37, Email from Doe to Kurker, dated July 24, 2016, 3.) She emailed Camacho and Sandstrom on August 1, 2016 to inform them that she was waiting on interviews with

two final witnesses, one identified by Doe on July 24th and one identified by Smith. (*Id.*) Despite indicating that he was willing to speak to Kurker, Doe's final witness stopped replying to Kurker's email before his interview was scheduled. (PF ¶¶ 161-164.)

> iii.     The Report and Responses

By mid-August, Kurker had completed a draft of her report. (PF ¶ 175.) She sent her draft to Camacho and Sandstrom. (PF ¶ 190.) Kurker noted that although she had made several attempts to contact Doe's final witness, the witness had not scheduled a time to speak with her. (PF ¶ 190.) In her draft, she highlighted a space where language from the sexual misconduct policy in effect in September of 2014 was to be inserted. (*Id.*) Throughout August and September, Kurker and College administrators attempted to locate the misconduct policy in effect prior to October 2014. (PF ¶ 178, 179, 181, 182, 185, 186, 190, 196, 198, 199.) They eventually determined that the Code of Conduct was the only applicable policy in effect because the College did not have a stand-alone policy on sexual misconduct prior to October of 2014. (PF ¶ 200.) Camacho informed Kurker of this on September 12, 2016. (DF ¶ 89; PF ¶ 199.) The following day, Kurker emailed a revised draft of the report to Camacho. (PF ¶¶ 202-03.)

Sandstrom sent Kurker's report to Doe along with an email in which she noted that the allegations spanned both the period during which Doe and Smith were students and the period after Smith graduated when she was employed by the College while Doe continued to be a student. (DF ¶ 107.) Sandstrom proposed to Doe that all issues be considered together and adjudicated by a single panel that would act under the student misconduct procedures and be overseen by Sandstrom. (*Id.*) After consulting with counsel, Doe agreed to Sandstrom's proposal. (DF ¶ 108.)

The version of Kurker's report Doe received on September 13, 2016, contained the following statement regarding the applicable policy on sexual misconduct: "'The College's 2013-

2014 Student Code of Conduct applies to the allegations that precede the College's adoption of its Statement of Sexual Assault and Other Sexual Misconduct, which went into effect in October 2014.'" (PF ¶ 203.) The report did not copy the text of the section on sexual misconduct from the Code of Conduct, but it did contain the language from the Statement of Sexual Assault and Other Sexual Misconduct which became effective in October 2014, including the requirement of affirmative consent. (DF ¶ 90; PF ¶ 205.) Doe was informed that he had the right to provide a written response to the investigation report and that he could identify additional witnesses to be interviewed or additional questions that should be asked of those who had been interviewed already. (DF ¶ 94.)

Doe, assisted by his attorney, submitted a 24-page written response to the investigation report along with over 100 pages of exhibits. (DF ¶ 95.) Doe included an excerpt from the Code of Conduct in effect in September 2014 defining sexual misconduct. (PF ¶ 211.) Smith, who does not appear to have been represented by counsel at any point, also submitted a response and emailed Sandstrom separately with additional information she wished to bring forward. (DF ¶ 97; PF ¶ 217; Dkt. No. 124-115, Email from Smith to Sandstrom, with history, dated Oct. 11, 2016.) Sandstrom agreed to amend Smith's response to the report with the additional information. (Dkt. No. 124-115, Email from Smith to Sandstrom, with history, dated Oct. 11, 2016.) After receiving each other's responses, Doe and Smith were given an opportunity to submit further responses. (PF ¶ 220.) With the assistance of his attorney, Doe responded to Smith's response. (DF ¶ 98.)

### F. The Adjudication

Once Kurker's report was complete, the College began the process of assembling a hearing panel to consider the evidence and make findings regarding the allegations in the two complaints. Doe was informed who the eligible hearing panelists were and was given an opportunity to identify anyone he thought, based on specific interactions, was biased or unfit. He made no objection to any

of the three panelists selected to his case. (DF ¶ 109.) The hearing panel consisted of Aaron

Gordon, the Administrative Director of Divisional Affairs; Stephen Klass, Vice President for

Campus Life, and Ninah Pretto, the Assistant Dean of International Student Services. (DF ¶ 110.)

Gordon had previously served on seven or eight other panels involving sexual misconduct

complaints and Klass had previously served on one or two other panels involving sexual misconduct

complaints. (DF ¶ 118.) All three panel members had attended training on cases involving sexual

misconduct conducted by Bossong. (DF ¶¶ 111-112.) The trainings included a review of policies, the

definitions in the policies, the adjudication process, a review of case studies and scenarios, and

breakout group discussions. (DF ¶ 113.) Bossong's training materials included a ninety-slide

presentation in which the phrase "hostile masculinity" appeared on two slides and was used to

describe a specific set of traits that could contribute to sexual aggression. (Dkt. No. 124-66,

Presentation: Adjudicating Misconduct Cases at Williams: Sexual Assault, Dating Violence, Stalking,

and Retaliation ("Presentation Slides"), slides 38, 40.) Other materials used to train the hearing panel

members cited the Code of Conduct's definition of consent as "'words _and_ conduct indicat[ing]

freely given approval or agreement, without coercion, by all participants in the sexual act.'" (PF ¶

120, (quoting Dkt. No. 124-66, Presentation Slides) (emphasis in original.) In September of 2014, at

the time of the alleged incident, the Code of Conduct used a disjunctive to define consent as

"'words or conduct indicat[ing] freely given approval.'" (Dkt. No. 124-1, Excerpt of Code of

Conduct in effect Sept. 2014; PF ¶ 1.)

On October 21, 2016, the panel met for a refresher training with Sandstrom. (PF ¶ 231.) The

panel then began to review the case materials, including Kurker's report and the students' responses

and accompanying exhibits. (DF ¶¶ 119-20.) After the panel's first meeting, Gordon emailed the

other panel members, writing, in part, that

> Upon review the way [sic] the [retaliation] policy reads in order for there to be retaliation it has to be in response to the victim's participation in a disciplinary investigation or process. It can't just be to get back at them because you're angry/upset with them. This changes my thinking on aspects of the retaliation charge.

(PF ¶ 235 (quoting Dkt. No. 124-127, Email from Gordon to Pretto and Klass, dated Nov. 4, 2016).)

> The relevant retaliation policy states:

> Retaliation is harmful action taken against someone who has filed a complaint, provided testimony, or in some way participated in a disciplinary investigation or process... [sic] If the actions directed at that individual would deter a reasonable person in the same circumstances from reporting misconduct, participating in a disciplinary process, or opposing behavior in violation of our Code of Conduct, it is deemed retaliatory.

(PF ¶ 26.)

> The panel continued to review the materials and met for a second time on November 2, 2016 for ninety minutes. (DF ¶¶ 121-22.) The panel used a spreadsheet to organize information about their deliberations. (DF ¶ 124.) The spreadsheet included a Y/N guilty determination from each panel member on each issue considered as well as a notes column. (PF ¶ 242; Dkt. No. 124-130, Hearing Panel Spreadsheet.) Pretto and Klass's notes reflect that they analyzed Smith's claims for consistency and credibility. (PF ¶¶ 244-45.)

> On or around November 7, 2016, the Panel drafted a findings letter which found Smith guilty of (1) relationship abuse for slapping Doe and (2) falsely reporting Doe for violations of the honor code. (PF ¶ 236.) It found Doe guilty of (1) nonconsensual sex and (2) relationship abuse based on the nonconsensual sex.

> On November 17, 2016, Sandstrom emailed the Panel a revised version of the findings letter, writing that

> I found that I needed more information about the panel's reasoning in order to include more depth in the letter. Both parties would want to understand more about how the decisions were made. I met with Aaron, who summarized the group's thoughts. I tried to incorporate that thinking into this new version of the letter.

(Dkt. No. 124-131, Email from Sandstrom to Gordon, Klass, and Pretto, dated November 17, 2016.) The revised findings letter no longer found Smith guilty of falsely reporting Doe for violations of the honor code. Sandstrom explained that the evidence did not appear to support a finding that Smith was lying about the Honor Code violations by a preponderance of the evidence. (*Id.*) The panel's notes on the spreadsheet detailing each issue reflect the panel's understanding that Smith did edit Doe's work, but Gordon and Pretto both also indicated that they believed Smith was guilty of falsely reporting Doe for academic honor code violations. (Dkt. No. 124-130, Hearing Panel Spreadsheet.) The revised findings letter also no longer found Doe guilty of relationship abuse. (PF ¶ 240; Dkt. No. 124-131, Email from Sandstrom to Gordon, Klass, and Pretto, dated November 17, 2016.) Sandstrom explained that the finding of nonconsensual sex could not alone render Doe responsible for the additional finding of relationship abuse. (*Id.*)

Pretto responded to Sandstrom's email, writing: "The honor code section does not reflect what I thought the panel had decided, however if Aaron and Steve are in agreement then I suppose it stands." (PF ¶ 241; Dkt. No. 124-132, Email from Pretto to Sandstrom, Gordon, and Klass, Dated Nov. 17, 2016.) Gordon also responded to the email, writing that he believed that Smith falsely reported Doe to the Honor Code Committee, but he was willing to move on. (PF ¶ 243.)

On November 22, 2016, Sandstrom emailed Doe the hearing panel's final decision letter. (DF ¶ 136.) The findings were that Smith was responsible for violating the Code of Conduct by slapping Doe, and Doe was responsible for violating the Code of Conduct by engaging in nonconsensual sex. (Dkt. No. 127-44, Hearing Panel Letter dated Nov. 21, 2016.)

Regarding Doe's allegation that Smith falsely reported him for violations of the honor code, the letter stated: "There is not . . . a preponderance of the evidence to suggest that Smith *falsely* accused you, as it is possible she believed she had written papers for you." (Dkt. No. 127-44, Hearing Panel Letter dated Nov. 21, 2016.) Regarding Doe's allegation that Smith retaliated against

him by reporting the Honor Code violation and by filing a Title IX complaint, the letter stated that

Smith's "motivation for reporting your alleged honor code violation may have been driven, in part,

by frustration with aspects of your relationship." (*Id.*) The letter continued:

> The committee was not persuaded by your argument that Susan participated in the appeal portion of the honor case as retaliation against your Title IX claim. We note that the honor process started well before you made your Title IX claim in March of 2016, and that it was you yourself who initiated the appeal process. Susan's participation in the appeal process was merely a continuation of the process that had been started in February 2016.

(*Id.*) However, the letter found that Smith slapping Doe was a violation of the Code of Conduct.

(*Id.*)

Regarding Smith's claims against Doe, the letter stated that Smith's claims did not amount to

relationship abuse, because "the investigative report and responses did not provide a preponderance

of the evidence to suggest that your pattern of behaviors rose to the threshold of 'creating fear,

isolation, or restriction of access to resources, education or work.'" (*Id.*) However, the letter

continued,

> Based on the preponderance of the evidence we find it more likely than not that you did *not* have affirmative consent to have sexual intercourse with [Smith] during the incident in question. [Smith] indicated that the unusual sexual position and roughness were indicators that you did not have consent. In addition, several witnesses recalled that [Smith] had described this incident of nonconsensual sex to them. Taken together, the Hearing Panel found this evidence to be credible . . . .

(*Id.*)

Doe filed this action on November 23, 2016. On December 7, 2016, Sandstrom and the

panel sent a sanction letter to Doe containing the determination that Doe's appropriate sanction was

permanent separation from the College. (PF ¶ 271.)

### G.  The Appeal

On December 11, 2016, Doe appealed the panel's findings. (PF ¶ 272.) Sandstrom informed

Smith of Doe's appeal. (PF ¶ 273.) She also informed the President of the College that the panel had

used the October 2014 definition of consent instead of the definition contained in the Code of

Conduct applicable in September 2014 and this procedural error could provide grounds for an

appeal. (PF ¶ 274.) Sandstrom wrote that "[t]he difference in definitions is not trivial." (*Id.*)

Doe's appeal request was granted on January 31, 2017, based on the discrepancy between the

hearing panel's reference to its finding that Doe did not have Smith's "affirmative consent" at the

time of the allegedly nonconsensual sex and the absence of the phrase "affirmative consent" from

the Code of Conduct in effect in September of 2014. (PF ¶¶ 284, 285.) A week later, the same panel

that previously adjudicated the case held an appeal hearing at which they were provided a handout

containing the Code of Conduct in effect in September of 2014 and the Sexual Misconduct policy

adopted in October 2014 and contained in Kurker's report. (PF ¶ 290.)

> In September 2014, the Code of Conduct defined non-consensual sexual intercourse as:
>
> Any sexual intercourse (anal, oral or vaginal); however slight; with any object; by a man
> or a woman upon a man or a woman; without effective consent . . . . Consent is a
> crucial part of both the Williams Code of Conduct and Massachusetts law. Consent
> means that at the time of the sexual contact, words or conduct indicate freely given
> approval or agreement, without coercion, by both participants in the sexual contact.
> Both parties have the obligation to communicate consent or the lack of consent. A
> verbal "no" (no matter how indecisive) or resistance (no matter how passive)
> constitutes the lack of consent. In addition, consent once given may be withdrawn at
> any time. If consent is withdrawn, the other party must immediately stop whatever
> sexual contact is occurring.

(PF ¶ 1; Dkt. No. 124-1, Excerpt of Code of Conduct in effect Sept. 2014, 18.)

In the summer of 2014, Bossong, Bolton and others worked on revising the sexual

misconduct and gender-based violence policies. (PF ¶ 124.) In her deposition, Bossong explained

that the term "affirmative consent" was added to the policy "because there was a need for

clarification: That we had an affirmative consent policy . . . . [W]hat we wanted was to provide

clarification and certainty to the [College's] community that we had an affirmative consent policy."

(Dkt. No. 124-6, Bossong Dep., 15:2-9.)

24

As of October 2014, The College's Statement on Sexual Assault and Other Sexual Misconduct defined non-consensual sexual intercourse as "any sexual penetration (anal, oral or vaginal), however slight, with any body part or object, by any person upon any other person, without effective consent." (Dkt. No. 124-4, Statement on Sexual Assault and Other Sexual Misconduct, 3.) Consent was defined as follows:

> Consent is a crucial part of both the Williams Code of Conduct and Massachusetts law. The Williams College Code of Conduct requires affirmative consent for all sexual activity. Consent means that at the time of the sexual contact, words or conduct clearly indicate freely given approval or agreement, without coercion, by both participants in the sexual contact. Both parties have the obligation to communicate consent or the lack of consent. In addition, a verbal "no" (no matter how indecisive) or resistance (no matter how passive) constitutes the lack of consent. In addition, consent once given may be withdrawn at any time. If consent is withdrawn, the other party must immediately stop whatever sexual contact is occurring.

(*Id.*)

On February 8, 2017, two days after receiving the handout containing the two consent policies, the panel met for an appeal hearing. (PF ¶¶ 290, 292.) Sandstrom and the panel provided Doe a decision letter on February 13, 2017. (PF ¶ 294.) That letter affirmed the panel's original finding of responsibility for nonconsensual sex. (*Id.*) The appeal decision letter stated that the version of the policy in effect at the time of the alleged incident used different language to express the same concept in the newer version. (PF ¶ 300.) The letter explained that

> Although the version of the policy in effect at the time of the incident did not use the term "affirmative" consent, it used other language, still present in the newer version, to express the same concept. The version in effect at the time stated, "Any intercourse (anal, oral or vaginal), however slight, with any object, by a man or a woman upon a man or a woman, without *effective* consent [is non-consensual sexual intercourse]." . . . When the panel reconsidered the evidence again, focusing specifically on the version of the Code of Conduct in effect at the time, they concluded it was more likely that not that [Smith] did not provide effective consent – i.e., 'words or conduct [that] indicate freely given approval or agreement.'"

(Dkt. No. 124-157, Hearing Panel Appeal Letter.) In their depositions, Pretto and Gordon stated that the Panel believed that the substance of the consent requirements were the same under both the

Code of Conduct in effect in September of 2014 and the Statement on Sexual Assault and Other
Sexual Misconduct in effect beginning in October of 2014. (PF ¶¶ 302, 303.)

IV.   DISCUSSION

Doe's Third Amended Complaint alleges the College violated Title IX (Count I); breached
its contract with him (Count II); breached the implied covenant of good faith and fair dealing
(Count III); violated the Massachusetts Equal Rights Act (Count IV); was negligent (Count V); and
breached a separate obligation to provide basic fairness (Count VI). (Dkt. No. 76.) The College has
moved for summary judgment on all counts, while Doe has moved for summary judgment as to
only Counts I, II, III, and VI. The viability of Doe's Title IX and Massachusetts Equal Rights Act
claims turn on whether Plaintiff has identified sufficient record evidence of gender bias, while his
remaining claims focus on whether the disciplinary process provided by the College met the
College's obligations to Doe, especially its obligation of basic fairness. The court begins with Doe's
claims of gender bias, then turns to the questions of basic fairness.

### A.   Title IX (Count I)

Subject to certain limitations not relevant here, Title IX prohibits "any education program or
activity receiving Federal financial assistance" from discriminating against students on the basis of
sex. 20 U.S.C. § 1681. Within the context of Title IX, prohibited discrimination occurs when an
individual is "subjected to differential treatment . . . on the basis of sex." *Jackson v. Birmingham Bd. of
Educ.*, 544 U.S. 167, 174 (2005). Both parties assert the undisputed facts support entry of judgment
in their favor on Doe's Title IX claim. Unsurprisingly, the parties disagree about which facts are
material and both parties have contested facts deemed undisputed by the opposing party. Doe
argues the record evidence supports a finding that the College violated Title IX by subjecting him to
selective enforcement, treating him with deliberate indifference, and reaching an erroneous outcome

26

in his disciplinary proceeding.[9] The College counters that there is insufficient record evidence that gender-bias played any role in its treatment of Doe and it is entitled to summary judgment on Doe's Title IX claim. For the reasons explained below, the court will grant the College's motion for summary judgment on Doe's Title IX claim.

    1.   Selective Enforcement

"To succeed on [a selective enforcement] claim, [a plaintiff] must show that 'the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.'" *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). Plaintiff bases his selective enforcement claim on two sets of actions by the College. First, he alleges the College treated him differently than it would have treated a similarly situated female student when it received a copy of the March 13, 2016 Cease and Desist Letter. Second, he alleges that throughout the disciplinary process the College treated him less favorably than it treated Smith and asserts his gender was the reason for the disparate treatment. However, given the lengthy and complicated context of this case, Doe's examples of disparate treatment are insufficient to support a finding that "'gender bias was a motivating factor' in the disciplinary process." *Haidak*, 933 F.3d at 74 (quoting *Trs. of Bos. Coll. 2018*, 892 F.3d at 90.

Doe describes the Cease and Desist Letter blind copied to Bolton, as a complaint to the College regarding Smith's behavior that was ignored because of his gender. Contrasting Bolton's response to the Cease and Desist Letter to her responses to Smith's earlier emails seeking help with her relationship, Doe asserts that, had he been female, the College would have encouraged him to report the incident to law enforcement and taken other steps within a short time of receiving the

---

[9] In addition to arguing that the College violated Title IX via selective enforcement, deliberate indifference, and reaching an erroneous outcome, Doe asserts the College violated Title IX in a fourth way, by misapplying its own policies to such an extent that it failed to provide Doe with a prompt and equitable procedure as required by Title IX. However, as Doe has cited no authority recognizing this fourth basis for a Title IX claim, the court finds the College is entitled to summary judgment as to this theory.

letter. Both of these arguments founder on the obviously different circumstances of Doe's letter and
Smith's emails.

The Cease and Desist Letter cannot reasonably be read as initiating a complaint with the
College. The letter is addressed only to Smith and the allegations do not implicate Smith in her
capacity as a College employee. Though the letter warns of legal action, both civil and criminal,
should Smith continue to try to contact Doe, there is no mention of College disciplinary action. The
only reference to the College is as the location of the student party Smith attended on the night of
December 5, 2015. Doe has not identified any evidence that a similar letter written on behalf of a
female student would have been treated any differently by the College. Indeed, Smith's emails
seeking help from Bolton also did not trigger an investigation or any other formal process. Doe's
own experience with the response to the letter his attorney sent to Camacho in April is also evidence
that the College promptly responds if it receives a complaint from a male student.

Significant differences between the Cease and Desist Letter and Smith's emails warranted
different responses from Bolton and, without more, are not evidence of gender bias. The Cease and
Desist Letter was drafted by a lawyer, warned of further legal action, was not addressed to Bolton,
and did not request help from Bolton or the College. Smith's emails, on the other hand, were written
by Smith, addressed to Bolton, requested her help, and indicated that Smith lacked other avenues of
support. *See Haidak*, 933 F.3d at 74 (contrasting affirmative contact seeking relief with accusations
not tied to a request to make a claim). Not only were the communications substantially different
from one another, Doe and Smith also were not similarly situated when the communications were
sent. Only Doe had a disciplinary history; meanwhile, by the time Smith sent her second email in
December of 2015, she already had a history of seeking help in her relationship with Doe. *See Id.*
(denying summary judgment on selective enforcement claim on the basis that the plaintiff, a male
student, was not similarly situated to a female where the female student filed the first complaint and

the male student made his accusations defensively then declined to initiate a charge). Doe suggests that Smith's status as an employee at the time of her second email to Bolton should have resulted in a different, and less helpful, response from Bolton, but Smith was a very recent graduate and had begun her relationship with Doe when both were students. Bolton clearly still viewed Smith as closer to a student than a colleague or contemporary, and there is no evidence that Bolton was required to take a different approach. Bolton's later implementation of a no-contact order also falls short of establishing gender bias. The order was neutral on its face, and Bolton's decision to request, not order, Doe to forego the alumni event was responsive to a request from the alumni office seeking to ensure Smith could work at the event. Finally, Doe's decision to comply was made voluntarily after he had an opportunity to consult with counsel.

  2.  Deliberate Indifference

  Title IX also provides a remedy for students, regardless of their sex or gender, who establish their school has responded with deliberate indifference to their allegations of sexual harassment. *See Davis v. Monroe Cty Bd. of Educ.,* 526 U.S. 629, 653-54 (1999); *see also Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 65-66 (1st Cir. 2002). "To succeed on a Title IX deliberate indifference claim, a plaintiff must show that an official with authority to implement corrective measures was aware of and deliberately indifferent to an act of discrimination on the basis of sex." *Trs. of Bos. Coll. 2018,* 892 F.3d at 93. The First Circuit has laid out a five-part test for assessing whether a plaintiff experienced gender-based discrimination due to deliberate indifference. *Doe v. Brown Univ.,* 896 F.3d 127, 130 (1st Cir. 2018). Under that test, "a plaintiff must show that (1) 'he or she was subject to severe, pervasive, and objectively offensive sexual harassment'; (2) 'the harassment caused the plaintiff to be deprived of educational opportunities or benefits'; (3) the funding recipient was aware of such harassment; (4) the harassment occurred 'in [the funding recipient's] programs or activities'; and (5) the funding recipient's response, or lack thereof, to the harassment was 'clearly unreasonable.'" *Id.* (quoting *Porto v. Town of*

*Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007)). Doe's claim fails to satisfy most, if not all, of these elements.

The incidents of harassment identified by Doe are Smith striking him in December of 2015 and making numerous attempts to contact him in early March of 2016. Based on the record, the earliest the College had reason to know of either incident was March 13, 2016 when Bolton received a copy of the Cease and Desist Letter. The only further incident of harassment alleged by Doe was Smith's filing of her complaint. While there may be situations where the filing of a single complaint could constitute "severe, pervasive, and objectively offensive" harassment, the facts do not support such a finding here. Nor does the record evidence support a finding that the College's response to Smith's filing of her complaint was "clearly unreasonable." Smith's complaint was based on concerns documented as early as the fall of 2014. Though filed after Doe's complaint, that alone did not mark Smith's complaint as retaliatory. The College had not prevented Doe from filing his complaint, even though he filed it after he was found responsible for an honor code violation following Smith's complaint.

3. Erroneous Outcome

Finally, Doe alleges gender bias on the part of the College infected the investigation and adjudication process, ultimately causing the hearing panel to reach an erroneous outcome with respect to the claims against him. "To succeed on [his] erroneous outcome claim, [Doe] must offer evidence (1) that would 'cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) show 'gender bias was a motivating factor.'" *Trs. of Bos. Coll. 2018*, 892 F.3d at 91 (quoting *Yusuf*, 35 F.3d at 715). While Doe has identified some facts that cast doubt on the accuracy of the hearing panel's decision finding him responsible for non-consensual sex with Smith, those facts fall short of suggesting that gender bias was a motivating factor for the outcome.

As is often the case when a dispute arises about whether both parties consented to a sexual encounter, the hearing panel's decision about what happened between Doe and Smith was determined by which version of the encounter it credited. In its decision, the hearing panel credited Smith's description of an unusual sexual position and pain and concluded that these indicated Doe had not obtained Smith's consent before engaging in sexual intercourse with her on the date in question. Doe has identified reasons why another factfinder might choose not to credit Smith's version of events, including her tumultuous history with Doe, the timing of her disclosures about the incident to several friends after the disciplinary process had been initiated, and another friend's insistence that Smith had denied ever being subjected to non-consensual sex by Doe. However, while each of these might provide a basis for an effective cross-examination of Smith, they provide no basis for finding that Smith was motivated to fabricate her allegation because of Doe's gender. Doe was the subject of Smith's complaint not because of his gender, but because she was complaining about contact that occurred within the context of their established relationship. There also is no record evidence suggesting that Smith was, for example, involved with efforts to influence the way the College responded to sexual misconduct complaints against students and that those activities influenced her decision to fabricate a sexual misconduct claim against Doe.

The record, even construed in the light most favorable to Doe, also does not support his conclusory contention that gender bias is the only credible explanation for the hearing panel's decision. Contrary to Doe's assertion, the operative Code of Conduct and Smith's statements provided a gender-neutral basis for the hearing board's decision. *Trs. of Bos. Coll. 2018*, 892 F.3d at 91-92. The Code of Conduct in effect in September of 2014 defined consent as contemporaneous "words or conduct indicat[ing] freely given approval or agreement, without coercion, by both participants in the sexual contact." (Dkt. No. 124-1, Excerpt of Code of Conduct in effect Sept. 2014, 18-19.) This language gave the hearing panel a gender-neutral reason to conclude that the

Code of Conduct required Doe to obtain Smith's consent before sexual intercourse, regardless of whether Smith notified him that she did not consent. The hearing panel's factual finding that Doe did not obtain Smith's consent by words or conduct was amply supported by the record. Smith stated that she and Doe never previously started in the sexual position used by Doe and that Doe's conduct caused her pain. Though other factfinders could have reached a different decision, these statements provided sufficient support for the Hearing Panel's finding that "sexual position and roughness" during the incident were unusual and indicated that Doe had proceeded without first obtaining Smith's consent.

Doe has also argued that gender-bias in training materials was a motivating factor behind the hearing panel's decision ruling against him. He points to two specific aspects of the training materials Bossong used when training panel members. First, he asserts Bossong "provided trauma-informed training that presumes the complainant is not lying," thereby training panelists to overlook inconsistent statements by accusers and to focus on accuser's feelings rather than their behavior. (Dkt. No. 123, Pl. Memo., 10.) However, even as described by Doe, the trauma-informed training materials used gender-neutral language and provided a framework for considering the testimony of complainants regardless of their gender. Such gender-neutral training materials do not support Doe's gender bias claims. *See Trs. of Bos. Coll. 2018,* 892 F.3d at 92 (observing that the use of gender-neutral language indicates a belief "that men and women can both be victims and perpetrators"). Second, Doe relies on the use of the phrase "hostile masculinity" on two slides of a ninety-slide presentation, as evidence that the training materials were inherently biased towards the belief that men are sexual offenders. The extremely minimal use of the phrase "hostile masculinity" to describe a set of attributes that comprise one of two parts in a particular behavioral model, without more, is insufficient evidence that the training materials are tainted by anti-male gender bias. Finally, not only has Doe identified no more than minimal, gendered language in the training materials, he has failed

to demonstrate any causal connection between these specific aspects of the training materials and the decision reached by the two men and one woman on the hearing panel. *Id.*

As Doe's evidence, even construed in his favor, is too paltry to support a finding of selective enforcement, deliberate indifference, or erroneous outcome, the court will enter judgment for the College on Count I.

### B. <u>Massachusetts Equal Rights Act (Count IV)</u>

Doe's Massachusetts Equal Rights Act claim, like his Title IX claim, requires him to establish that the College discriminated against him due to his sex. MASS. GEN. L. c. 93, §102(a). For purposes of the Massachusetts Equal Right Act, Doe must also demonstrate that the discrimination impaired his rights or opportunities under his contract with the College. *See Harrington v. City of Attleboro*, 172 F.Supp.3d 337, 354 (D. Mass. 2016). For the reasons discussed above, the court finds that the evidence identified by Doe is insufficient to demonstrate that gender bias caused any of the College's actions with respect to Doe. The court, therefore, will enter judgment for the College on Count IV.

### C. <u>Breach of Contract (Count II), Breach of Implied Covenant of Good Faith and Fair Dealing (Count III), and Basic Fairness (Count VI)</u>

Both parties have moved for summary judgment on Doe's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. With respect to Doe's breach of contract claim, the parties agree that a contract existed between Doe and the College, the terms of which were set forth in the Code of Conduct and other written materials drafted by the College. Additionally, "the implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law, applied in the context of school disciplinary proceedings, creates an independent duty to provide basic fairness." *Trs. of Bos. Coll. 2018*, 892 F.3d at 87; *see also Driscoll v. Bd. of Trustees of Milton Acad.*, 873 N.E.2d 1177, 1185-1187 (Mass. App. Ct. 2007). When a school promises to

33

provide basic fairness, the implied duty of basic fairness becomes superfluous and the breach of contract analysis expands to include basic fairness. *Doe v. Trs. of Bos. Coll.* (*Trs. of Bos. Coll. 2019*), 942 F.3d 527, 534 n.6 (1st Cir. 2019).

Two tests, reasonable expectation and basic fairness, are relevant to Doe's contract claims. *Trs. of Bos. Coll. 2019.*, 942 F.3d at 533. Under the reasonable expectations test, the court "looks at the terms of the contract established between the college and the student and asks whether the reasonable expectations of the parties have been met." *Id.* (citing *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 378 (Mass. 2000); *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 724 (1st Cir. 1983)). The basic fairness test, on the other hand, does not turn on the specifics of the parties' contracts, but instead requires that disciplinary processes be "conducted with basic fairness." *Trs. of Bos. Coll. 2019*, 942 F.3d at 533 (internal quotation omitted). When applying each of these tests, the court must also follow the well-established principle that Massachusetts "'courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities.'" *Id.* at 535 (quoting *Schaer*, 735 N.E.2d at 381).

The parties' cross-motions for summary judgment suggest they agree that there are no disputed facts material to the question of whether the College breached its contract with Doe either by failing to meet his reasonable expectations or by conducting a disciplinary process that failed to provide basic fairness. Summary judgment is appropriate to the extent their dispute turns on a reading of the parties' contract or the scope of basic fairness as applied to an agreed set of facts. However, neither party is entitled to summary judgment if the facts need to be interpreted before the court can determine whether they satisfy the reasonable expectation or basic fairness tests.

Doe has alleged numerous breaches based on both the failure of the College to follow its policies and flaws in the policies that denied Doe basic fairness and argues he is entitled to summary judgment with respect to each. The College counters that it substantially followed its policies and

procedures and, by doing so, provided Defendant with basic fairness. The court has divided the alleged breaches into two groups, those primarily based on the College's failure to meet Doe's reasonable expectations and those primarily asserting a lack of basic fairness. For the reasons explained below, the court will grant Defendant's motion for summary judgment as to all breach of contract, breach of implied covenant, and fair dealing claims, except those claims related to Plaintiff's allegations that Sandstrom's involvement undermined the fairness of the disciplinary proceeding.

      1.      Reasonable Expectations

            a.   Allegedly Confusing Policy

Doe argues the College could not reasonably have expected a student to understand that the conduct found by the hearing panel violated the sexual misconduct policies in effect in September of 2014. Specifically, he asserts that the College "could not reasonably expect a student who read the 2013-2014 sexual misconduct policy in September 2014 to intuit that the College intended it to mean the later, post-October 2014 more finely tuned definition of sexual misconduct that required affirmative consent for all sexual activity." (Dkt. No. 123, Pl. Memo., 24.) Defendant counters that the policy clearly required Doe to obtain consent before initiating sexual intercourse and that "[n]o student reasonably could expect [the policy] language to prohibit sexual intercourse only if the other person communicates a *lack* of consent." (Dkt. No. 136, Def. Opp., 12 (emphasis in original).)

In the course of the disciplinary proceeding, the hearing panel found "it more likely than not that [Doe] did *not* have affirmative consent to have sexual intercourse with [Smith] during the incident in question." (Dkt. No. 127-44, Hearing Panel Letter dated Nov. 21, 2016, 9.) The phrase "affirmative consent" did not appear in the sexual misconduct sections of the Code of Conduct applicable in September of 2014, but did appear in the definition of consent within the separate Sexual Misconduct Policy adopted in October of 2014. When considering Doe's appeal, the hearing

panel found the concept embodied in the phrase "affirmative consent"—that a person must obtain consent before initiating sexual intercourse, rather than continue until the other person communicates a lack of consent—was already a part of the relevant policy in September of 2014. (Decision Letter, 2/13/2017, Dkt. No. 127-49 at 3 (emphasis in original).) The court agrees and finds the language applicable in September of 2014 was sufficiently clear that the College could reasonably expect all students to understand that a failure to obtain consent before initiating sexual intercourse violated the Code of Conduct.  Additionally, this meaning of the Code of Conduct had been explicitly communicated to Doe in the context of his 2012 disciplinary proceeding, undercutting any argument that he did not understand that the Code of Conduct already required affirmative consent in September of 2014, though the label had not yet been applied.

In the version of the Code of Conduct applicable in September of 2014, "[c]onsent means that at the time of the sexual contact, words or conduct indicate freely given approval or agreement, without coercion, by both participants in the sexual contact." (Dkt. No. 124-1, Excerpt of Code of Conduct in effect Sept. 2014, 18-19.) Identical language appears in the later policy, along with additional language explicitly stating that the Code of Conduct requires affirmative consent. (Dkt. No. 124-4, Statement on Sexual Assault and Other Sexual Misconduct, 3.) The earlier policy defined non-consensual sexual intercourse as "[a]ny sexual intercourse (anal, oral or vaginal); however slight; with any object; by any person upon any other person; without effective consent." (Dkt. No. 124-1, Excerpt of Code of Conduct in effect Sept. 2014, 18.)

"Effective consent" was not separately defined, but a list of situations in which "[a]n individual is unable to give consent" followed the definition of consent, providing strong evidence that effective consent requires the person initiating intercourse do so only after receiving consent

supplied by a person capable of giving consent.[10] (*Id.*) Even if there are other reasonable interpretations of the phrase "effective consent," there is no reasonable reading that would allow a person to initiate intercourse before obtaining their partner's consent. The College, therefore, did not breach its contract with Doe when the panel found he had initiated intercourse with Smith without first obtaining her consent in violation of the applicable Code of Conduct.

  b. Investigation of Smith's Complaint

  The court turns next to Doe's contention that the College's investigation of Smith's complaint constituted a breach of its contract with Doe because (1) Smith was an employee at the time and (2) her complaint was retaliatory. Doe's assertion that the College acted in contravention to its policies by investigating Smith's complaint is undercut by the very document he cites to support his position, the College's Sexual Misconduct Investigation and Adjudication Process. (Dkt. No. 124-18). The first numbered paragraph of the document explains that the investigation and adjudication process applicable to student sexual misconduct cases will apply in cases when faculty or staff report a student for conduct violating the College's Sexual Misconduct Policies—exactly what occurred in this case. (*Id.*)

  Doe's second argument, that the College breached its contractual obligations to Doe by failing to immediately label Smith's complaint retaliatory is also without merit. None of the language cited by Doe obligated the College to reach a certain decision about whether Smith's complaint was retaliatory or legitimate before proceeding with an investigation. Further, if the College did have such a policy, it is likely that it would have applied equally to Doe's own complaint, filed as it was after Smith had reported Doe's alleged honor code violation.

---

[10] Similarly, the phrase "affirmative consent" appears within the definition of consent in Sexual Misconduct Policy adopted in October of 2014, but is not separately defined. (Dkt. No. 124-4, Statement on Sexual Assault and Other Sexual Misconduct, 3-4.)

c.   Estimated Timeline

Doe asserts that the College specified an eleven-week timeline from when a complaint is made until the College begins selecting the members for the hearing panel and that timeline was part of his contract with the College. Measuring from March 13, 2016, Doe claims the disciplinary process took three times as long as promised, constituting a breach by the College. First, as addressed above, Doe did not make his complaint until April of 2016, shortening the length of the disciplinary process by about a month. Second, the three-page Process Outline cited by Doe clearly explains that the timelines are estimates and actual proceedings may take longer. (Dkt. No. 124-13, Process Outline.) All provided date ranges appear in a column below the heading "Approximate time." (*Id.*) Additionally, two sections in the timeline, those headed "Meeting with the investigator" and "Receiving and reviewing the investigator's report" explicitly state that the number of witnesses could cause that portion of the process to take additional time, thereby extending the overall timeline beyond eleven weeks. (*Id.*) The College is, therefore, entitled to summary judgment as to Doe's claim that the length of the disciplinary process breached his contract with the College.

d.   Interview Transcript Requests

More than six months and several related email exchanges occurred between the time Doe initially requested transcripts of some of the interviews Kurker conducted with witnesses other than himself and the date the College informed his attorney that the transcripts were available for review. Doe alleges the College breached its contract with him by delaying his access to his student records.[11] In order to establish a breach, Doe must first establish that the College had a contractual obligation to Doe. Though Doe asserts that the College's actions violated College policy, he has not identified the text of such a policy and, therefore, has not sufficiently demonstrated that the

---

[11] Doe also asserts the College's behavior violated FERPA; however, as FERPA does not provide a private right of action, the alleged FERPA violation is relevant only within the context of the breach of contract claim. *Frazier*, 276 F.3d at 69 (concluding "that Congress did not intend FERPA to encompass a private right of action").

College's behavior regarding transcripts failed to meet the reasonable expectations of its students. Summary judgment in favor of the College is, therefore, appropriate with respect to Doe's claims related to interview transcript requests.

2.    Basic Fairness

The College had an obligation to provide Doe with a fundamentally fair disciplinary proceeding. *Trs. of Bos. Coll. 2018*, 892 F.3d at 87-88. The obligation arose both from language in the College's Code of Conduct which stated that "[t]he College' procedures seek to ensure a prompt, fair, and impartial investigation and resolution," Dkt. No. 124-11, Code of Conduct (undated), 9, and "the implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law," *Trs. of Bos. Coll. 2018*, 892 F.3d at 87. The court summarizes Doe's arguments as follows. First, Doe asserts the College's use of adjudication procedures that did not provide the hearing panel "any opportunity for an 'in person' credibility assessment during the . . . adjudication" breached its duty to provide basic fairness. (Dkt. (Dkt. No. 123, Pl. Memo., 22.)  Next, he claims the College failed to provide him with a fair appeal because the College returned his case to the same hearing panel, even after identifying an appeal-error related to the version of the College policies the hearing panel applied. Finally, Doe argues the College breached its duty by interfering with the creation of Kurker's report and the hearing panel's deliberations.

a.    Absence of Live Testimony

Under Massachusetts law, a private college, like Defendant, breaches its obligations to its students if it fails to conduct disciplinary proceedings with basic fairness. *Trs. of Bos. Coll. 2019*, 942 F.3d at 533. To meet the required standard, Colleges must follow the rules they establish for themselves, but have a great deal of "flexibility to adopt diverse approaches to student discipline matters that do not meet federal due process requirements." *Id.* at 535. Basic fairness does not require a live hearing, quasi-cross-examination, access to evidence, or even the opportunity for a

student accused of misconduct to seek advice or counsel. *Id.* at 534-35. Had the College promised Doe a disciplinary proceeding that included a hearing at which the panel could hear live testimony, basic fairness would have obligated the College to provide such a hearing. *Trs. of Bos. Coll. 2018*, 892 F.3d at 87-88. Since the disciplinary process set out in the College's written policies did not include an opportunity for the hearing panel to hear live testimony, basic fairness did not require such a proceeding. *Trs. of Bos. Coll. 2019*, 942 F.3d at 533-34. Instead, the College promised a process like the one that occurred in this case. "The Dean of the College [assigned] a person trained in sexual assault investigations to determine the facts of the case as completely as possible;" that investigator wrote a report that was "shared with the complainant and respondent," both of whom were able to write a response. (Dkt. No. 124-11, Code of Conduct (undated), 10-11.) The Dean of the College then appointed a panel which reviewed the report, responses, and other material, deliberated, and reached a decision applying a preponderance of the evidence standard. (*Id.* at 11.)

   b.  Adequacy of Appeal Procedures

   The College's disciplinary policies only permitted appeals of the hearing panel decisions in a limited number of circumstances. Doe argues basic fairness required the College to provide him with an opportunity to appeal the hearing panel's decision simply on the basis that it was erroneous and unsupported by the evidence. No Massachusetts court has previously ruled that basic fairness requires any right to an appeal, let alone the type of broad appeal championed by Doe. He has cited *Doe v. Brandeis University*, in support of his position, but the disciplinary process at issue in that case was materially different. 177 F. Supp. 3d 561, 606-07 (D. Mass. 2016). Under the disciplinary process used by Brandeis University "a single individual was essentially vested with the powers of an investigator, prosecutor, judge, and jury." *Id.* at 606. The court's concern about the necessity for a broad appeal was a direct response to the fact that the entire disciplinary process was otherwise the purview of a single individual. Even if the requirements of basic fairness expanded to require a

broad right to appeal because of the circumstances of *Brandeis*, no similar right to appeal is required here. *See Trs. of Bos. Coll. 2019,* 942 F.3d at 535 (reversing decision of district court that extended the scope of basic fairness in the absence of supporting case law from a Massachusetts court). A broad appeal right is not necessary to prevent a single individual from unilaterally reaching an erroneous decision because the investigation was conducted by an independent investigator, Doe and Smith were able to respond to the report, and findings were made by a three-person panel, consistent with the procedures set forth in the College's Code of Conduct.

c.      Interference with Report and Hearing Panel Deliberations

The College's disciplinary process provided for an investigation, which would generate a written report, and an adjudication by a three-member hearing panel that would reach a decision regarding each charge after reviewing the written report, written responses, and other evidence. Once the College adopted those procedures, basic fairness required they be conducted fairly. *Cf Trs. of Bos. Coll. 2018*, 892 F.3d at 87-88. Doe asserts that the College allowed interference with the investigation and adjudication that prevented either from being conducted fairly. He identifies the following specific issues. First, he claims Sandstrom interfered with the panel during deliberations, as evidenced by her guidance on the issue of retaliation by Smith and her removal of the hearing panel's conclusion that Smith had falsely accused Doe of violating the honor code from the hearing panel's finding letter. Second, he asserts College administrators interfered with the drafting of Kurker's report, noting the removal of a footnote regarding changes to the policies in effect in the fall of 2014 and language about potentially problematic power dynamics in relationships between students and staff. Third, he asserts Kurker failed to abide by College policy by allowing College administrators to be involved in her decision to interview Smith's last witness.

When placed within the full context of the factual record, most, but not all, of the conduct identified by Doe fails to raise questions about the integrity of the investigation or adjudication.

Turning first to the investigation, Kurker's communications with College administrators about reconciling the timing of her submission of the draft report and her interview with Smith's last witness is not evidence that she abdicated her independence regarding which interviews to conduct. Nor is Kurker's decision to make certain changes to the draft report evidence that Kurker sought to improperly influence the hearing panel. Doe has not identified a reason, other than an accident of timing, why Kurker's authorial decisions related to the two passages identified by Doe should be considered suspect.  Similarly, part of Sandstrom's role as Dean of the College was to answer questions raised by the hearing panel and to review the hearing panel's findings letter to ensure it was clearly written and consistent with College policy. In the case of the retaliation policy, Doe has not identified anything improper about her answer taking issue only with the fact it caused a member of the hearing panel to revise his thinking regarding retaliation. Without some evidence that the answer she provided was misleading or erroneous, the fact that it impacted the thinking of a member of the hearing panel is not evidence of an unfair process.

The same cannot be said of Sandstrom's involvement with drafting of the portion of the findings letter addressing the claim that Smith falsely accused Doe of an honor code violation. The undisputed facts demonstrate that both Gordon and Pretto found Smith responsible for false reporting of the honor code violation. Early drafts of the findings letter reflected a decision by the hearing panel that Smith had falsely reported. That finding was removed from a later draft Sandstrom sent to the hearing panel. After that draft was circulated, Pretto complained that the finding did not reflect the decision of the hearing panel, but acknowledged that if both other panelists agreed with the decision, it would stand. Gordon then sent an email affirming that he also believed Smith had falsely reported Doe to the Honor Code Committee, but that he was "willing to move on." (PF ¶ 243, Dkt. No. 124-133.) This evidence  provides a sufficient basis for inferring that Sandstrom influenced the hearing panel's decision. The College's Code of Conduct provides that

decisions will be made by the hearing panel and Sandstrom's apparent influence over the outcome is, therefore, at odds with the Code of Conduct. Additionally, Smith's status as an employee and her close relationship with Bolton and Bossong, who gave Sandstrom guidance about the case, suggest Sandstrom's interference may have been influenced by favoritism. While the affected finding is not the one disputed by Doe, evidence that Sandstrom improperly influenced the hearing panel's decision raises questions about whether the College conducted a fair adjudication and forestall this court from entering summary judgment as to this portion of Doe's breach of contract claim, though the College is entitled to summary judgment on all other aspects of Doe's breach of contract claim.

### D. Negligence (Count V)

The College has moved for summary judgment on Doe's negligence claim, asserting that the only duties it owed Doe were those arising from the parties' contractual relationship. Doe has alleged the College was negligent in the training and supervising of Bolton and Sandstrom. "Under Massachusetts law, '[w]hether or not a duty of care existed is a question of law for the court.'" *Trs. of Bos. Coll. 2018*, 892 F.3d at 93 (quoting *Gorfinkle v. U.S. Airways, Inc.*, 431 F.3d 19, 23 (1st Cir. 2005)). The First Circuit has recognized that when a school's disciplinary procedures are part of a contract between the school and its students, the school does not owe the student an independent duty of care with respect to disciplinary proceedings. *Id.* Without such an independent duty, tort remedies are not available to students asserting their school has failed to conduct disciplinary proceedings with due care. *Id.* Doe attempts to distinguish his negligence claim, describing it as a claim for negligent training and supervision. However, as Doe's claim is that the College's negligent training and supervision of Bolton and Sandstrom denied him a fair disciplinary process, the court finds this to be a distinction without a difference. The court will, therefore, grant the College's Motion for Summary Judgment as to Doe's negligence claim.

### V.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 122) is denied and Defendant's Motion for Summary Judgment is granted at to Counts I, IV, and V is granted in part as to Counts II, III, and VI. (Dkt. No. 125). Counts II, III, and VI survive only as to Plaintiff's claim that Sandstrom undermined the fairness of the adjudication while helping to draft the hearing panel's finding letter. The court sets an initial pretrial conference in this matter on April 27, 2021 at 10:00 am.

It is So Ordered.

 /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge